No. 25-6138

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THE BABYLON BEE, LLC, *et al.*,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, *et al.*,
*Defendants-Appellants*.

**On Appeal from the United States District Court
for the Eastern District of California**
No. 2:24-cv-02527-JAM-CKD
The Honorable John A. Mendez

## DEFENDANTS' OPENING BRIEF ON THE MERITS

ROB BONTA
  *Attorney General of California*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
ANYA M. BINSACCA
  *Supervising Deputy Attorney General*
KRISTIN A. LISKA
  *Deputy Attorney General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3916
Fax: (415) 703-5480
Kristin.Liska@doj.ca.gov
*Attorneys for Defendants-Appellants*

January 12, 2026

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Statement of Jurisdiction................................................................................3

Statement of Issues........................................................................................3

Statement Regarding Addendum ...................................................................3

Statement of the Case.....................................................................................4

      A.     Publisher and Distributor Liability Under the Common Law ..............4

      B.     Section 230 of the Communications Decency Act ..............................7

      C.     Assembly Bill 2655 ...........................................................................10

      D.     Procedural History.............................................................................15

Standard of Review ......................................................................................18

Argument......................................................................................................18

I.     AB 2655 Is Not Preempted by Section 230(c)(1) of the
Communications Decency Act .....................................................................19

II.    AB 2655 Is Not Preempted by Section 230(c)(2)(B) of the
Communications Decency Act .....................................................................38

Conclusion ...................................................................................................41

Statement of Related Cases...........................................................................42

Certificate of Compliance ............................................................................43

# TABLE OF AUTHORITIES

**Page**

**CASES**

*A.B. v. Salesforce, Inc.*
123 F.4th 788 (5th Cir. 2024) ...............................................................27

*Barnes v. Yahoo! Inc.*
570 F.3d 1096 (9th Cir. 2009) .........................................................*passim*

*Batzel v. Smith*
333 F.3d 1018 (9th Cir. 2003) ..............................................................28

*Bowerman v. Detroit Free Press*
283 N.W. 642 (Mich. 1939)....................................................................4

*Calise v. Meta Platforms, Inc.*
103 F.4th 732 (9th Cir. 2024) .........................................................*passim*

*Capital Broad. Co. v. Mitchell*
333 F. Supp. 582 (D.D.C. 1971)..............................................................6

*Doe 1 v. Internet Brands*
824 F.3d 846 (9th Cir. 2016) ..........................................................20, 33

*Doe 1 v. Twitter*
148 F.4th 635 (9th Cir. 2025) ........................................24, 25, 26, 28

*Doe v. Kamehameha Schools/Bernice Pauahi Bishop Est.*
470 F.3d 827 (9th Cir. 2006) ...............................................................36

*Enigma Software Grp., USA, LLC v. Malwarebytes, Inc.*
946 F.3d 1040 (9th Cir. 2019) ..............................................................39

*Estate of Bride by & through Bride v. Yolo Techs., Inc.*
112 F.4th 1168 (9th Cir. 2024) .......................................................*passim*

*FCC v. Pacifica Foundation*
438 U.S. 726 (1978)..............................................................................6

# TABLE OF AUTHORITIES
## (continued)

Page

*Flores-Miramontes v. INS*
212 F.3d 1133 (9th Cir. 2000) ...............................................................30

*Ginsburg v. New York*
390 U.S. 629 (1968)....................................................................6, 30, 36

*Head v. New Mexico Bd. of Examiners in Optometry*
374 U.S. 424 (1963)..............................................................................6

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC.*
141 S. Ct. 13 (2020)..............................................................................5

*Moody v. NetChoice*
603 U.S. 707 (2025)............................................................................38

*Osmond v. EWAP*
153 Cal. App. 3d 842 (1984) ...............................................................4

*Oswalt v. Resolute Indus., Inc.*
642 F.3d 856 (9th Cir. 2011) ...............................................................18

*Street v. Johnson*
50 N.W. 395 (Wis. 1891)......................................................................4

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .................................7

*United States v. Hunter*
459 F.2d 205 (4th Cir. 1972) ................................................................6

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
455 U.S. 489 (1985)......................................................................30, 36

*Zango, Inc. v. Kaspersky Lab, Inc.*
568 F.3d 1169 (9th Cir. 2009) .......................................................38, 39

## TABLE OF AUTHORITIES
### (continued)

Page

**CONSTITUTIONAL PROVISIONS**

United States Constitution
   First Amendment ................................................................*passim*

**STATUTES**

United States Code, Title 28
   § 1291....................................................................................3
   § 1331....................................................................................3

United States Code, Title 47
   § 223...................................................................................35
   § 223a.............................................................................34, 35
   § 223a(a)(1)(A) ...................................................................35
   § 223a(a)(3).........................................................................35
   § 223a(b) .............................................................................35
   § 230..............................................................................*passim*
   § 230(b)(3) .......................................................................8, 31
   § 230(b)(4) ............................................................................8
   § 230(b)(5) .......................................................................8, 31
   § 230(c) ..........................................................................*passim*
   § 230(c)(1) ......................................................................*passim*
   § 230(c)(2).........................................................................38
   § 230(c)(2)(A).......................................................................9
   § 230(c)(2)(B) ..................................................................*passim*
   § 230(e) ...........................................................................31, 35
   § 230(e)(1) ........................................................................9, 35
   § 230(e)(2) ..........................................................................10
   § 230(e)(3) ........................................................................9, 19
   § 230(e)(4) ..........................................................................10
   § 230(e)(5) ............................................................................9

California Business and Professions Code
   § 22943.2(b)(1) ...................................................................36
   § 22944.2(a)(1) ...................................................................36

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

California Civil Code
  § 3273.66(a) ..........................................................................................36
  § 3273.66(d)(1) ....................................................................................36

California Elections Code
  § 20012..................................................................................................10
  § 20511(a) .............................................................................................10
  § 20511(b) .............................................................................................10
  § 20511(c) .............................................................................................10
  § 20511(e) .............................................................................................10
  § 20512(h) .......................................................................................11, 27
  § 20512(i)(1) .........................................................................................11
  § 20513(a) .............................................................................................25
  § 20513(a)(1) .........................................................................................12
  § 20513(a)(2) .........................................................................................12
  § 20513(a)(3) .........................................................................................12
  § 20513(a)(4) .........................................................................................13
  § 20513(c) .......................................................................................13, 25
  § 20513(e) .............................................................................................12
  § 20514(a) .............................................................................................25
  § 20514(a)(1) .........................................................................................13
  § 20514(a)(2) .........................................................................................14
  § 20514(a)(3) .........................................................................................14
  § 20514(c) .............................................................................................14
  § 20514(d) .............................................................................................14
  § 20514(e) .............................................................................................14
  § 20515(a) .......................................................................................11, 25
  § 20515(b) .............................................................................................15
  § 20516..................................................................................................15

TAKE IT DOWN Act, 139 Stat. 55 (2025)
  § 2(a)(2) ................................................................................................36
  § 4(3)......................................................................................................34

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**COURT RULES**

Federal Rules of Appellate Procedure
Rule 4(a)(1)(A) ......................................................................................3

**OTHER AUTHORITIES**

141 Cong. Rec. 22045 (1995) ....................................................................8

141 Cong. Rec. 22047 (1995) ....................................................................8

H.R. Conf. Rep. 104-457 (1996)................................................................8

Restatement (First) of Torts
§ 558.....................................................................................................4
§ 577.....................................................................................................4
§ 578.....................................................................................................4
§ 581.....................................................................................................4

Restatement (Second) of Torts
§ 558.....................................................................................................4
§ 577.....................................................................................................4
§ 578.....................................................................................................4
§ 581.....................................................................................................4

Robert W. Hamilton, *Liability for Third-Party Content on the
Internet*, 8 Seton Hall Con. L.J. 733 (1998) .......................................5

vi

## INTRODUCTION

The California Legislature enacted Assembly Bill 2655 (AB 2655) out of concern for the impact of political deepfakes on voters and electoral integrity. AB 2655 imposes three substantive regulations on large online platforms. First, such platforms must create a process for users to report specified political deepfakes that are posted on the platform. Second, the platform must remove specified political deepfakes once reported. Third, the platform must label other specified political deepfakes once reported. AB 2655 imposes no obligations on platforms to proactively monitor third-party content for political deepfakes subject to AB 2655; rather, a platform must only act once it receives a report that a covered political deepfake is on its platform. Plaintiffs, a group of platforms and content creators, brought suit against Attorney General Rob Bonta and Secretary of State Shirley N. Weber challenging AB 2655 on a variety of grounds. The lower court granted judgment to plaintiffs, holding that AB 2655 is preempted under section 230(c)(1) and section 230(c)(2)(B) of the Communications Decency Act. That was error.

Congress enacted section 230 of the Communications Decency Act in 1996 to remove disincentives for online platforms to engage in content moderation—disincentives created by concerns that doing so would expose those platforms to insurmountable tort liability for their choices about whether and how to moderate content. Section 230 was enacted against the backdrop of then-existing law,

1

including the longstanding common law distinction between publishers and distributors with respect to tort liability and the similarly longstanding authority of States to regulate the content of distributors and publishers alike.

AB 2655 is not preempted by section 230(c). As to section 230(c)(1), AB 2655 is not preempted because it does not treat platforms as publishers. AB 2655 is an evenhanded regulation of all large platforms, regardless of whether or how a platform chooses to engage in content moderation. It imposes no obligations on platforms to actively monitor third-party content for specified political deepfakes, but rather only the duty to create a reporting process for users and to respond to users' reports. Nor does AB 2655 impose liability on a platform's editorial choices about what content to host and whether to modify that content—after all, AB 2655 removes a platform's discretion to make such choices altogether when it comes to the content the law regulates. In sum, AB 2655 creates a statutory obligation on all platforms, common-law distributors and publishers alike, to follow the law. Imposing liability on a platform that chooses not to follow the law is not imposing liability on a platform's own publishing decisions. AB 2655 is simply not within the scope of section 230(c)(1).

Nor does section 230(c)(2)(B) preempt AB 2655. This provision grants immunity to platforms for their decisions to provide users with the technical means to screen or block content they find undesirable. AB 2655, including its reporting

2

requirement, does not constitute a technical means for users to censor content. Instead, the law regulates the content on platforms. It is thus not a regulation that falls within the scope of section 230(c)(2)(B). The decision below to the contrary was erroneous and should be reversed.

## STATEMENT OF JURISDICTION

The district court entered judgment on August 20, 2025. ER-16. Defendants filed a timely notice of appeal on September 19, 2025. ER-109; *see* Fed. R. App. P. 4(a)(1)(A). The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Does section 230(c)(1) of the Communications Decency Act preempt a state statute that requires all internet platforms to create a mechanism for users to report certain content and to remove or label certain content once reported?

2. Does section 230(c)(2)(b) of the Communications Decency Act preempt a state statute that requires an internet platform to create a mechanism for users to report certain content for the platform to remove or label?

## STATEMENT REGARDING ADDENDUM

Pursuant to Circuit Rule 28-2.7, pertinent statutes, regulations, and rules are contained in the separate addendum.

3

## STATEMENT OF THE CASE

### A.    Publisher and Distributor Liability Under the Common Law

The common law has long treated publishers and distributors differently with respect to liability for defamation.  Under the common law, a publisher of defamatory material is subject to liability for defamation arising from the material it publishes.  *See, e.g.*, Restatement (First) of Torts, §§ 558, 577, 578; Restatement (Second) of Torts, § 558, 577, 578.  However, a distributor of defamatory material—that is, "[o]ne who disseminates matter . . . which was originally published by a third person"—has a defense from liability when "he has no reason to know of [the matter's] defamatory character."  Restatement (First) of Torts § 581; *see also* Restatement (Second) of Torts § 581.[1]  In other words, "'[p]ublishers' are treated differently under common law than 'distributors,' such as bookstores or newspapers, who usually cannot be held liable for repeating

---

[1] *See also, e.g.*, *Osmond v. EWAP*, 153 Cal. App. 3d 842, 852 (1984) ("It is, therefore, a good defense for a mere vendor or distributor of a newspaper or other periodical to show that he had no knowledge of the libelous matter and that there were no extraneous facts which should have put him on guard."); *Bowerman v. Detroit Free Press*, 283 N.W. 642, 645 (Mich. 1939) (newspaper distributor could be held liable for defamation if he "had an active part in the publication of a libel with knowledge of its nature"); *Street v. Johnson*, 50 N.W. 395, 395-396 (Wis. 1891) ("[t]he mere seller of newspapers is not liable for selling and delivering a newspaper containing a libel upon the plaintiff if he can prove upon the trial to the satisfaction of the jury that he did not know that the paper contained a libel . . . and had no grounds for supposing, that the paper was likely to contain libelous matter").

unlawful content, such as advertisements, unless they knew or had reason to know that the content was unlawful." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024); *see also Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC.*, 141 S. Ct. 13, 14 (2020) (Thomas, J., respecting the denial of certiorari).

This differential treatment stems from the different roles played by distributors and publishers. "Publishers or speakers were subjected to a higher standard because they exercised editorial control." *Malwarebytes*, 141 S. Ct. at 14 (Thomas, J., respecting the denial of certiorari). Distributors, however, "acted as a mere conduit without exercising editorial control, and they often transmitted far more content than they could be expected to review." *Id.*; *see also* Robert W. Hamilton, *Liability for Third-Party Content on the Internet*, 8 Seton Hall Con. L.J. 733, 735 (1998) ("The true distinction between a creator of content and a distributor of content is that a creator of content inherently has knowledge of what that content says. A distributor of content, on the other hand, does not inherently know what the content he or she is disseminating says."). Given distributors' limited knowledge, they were "liable only when they knew (or constructively knew) that content was illegal." *Malwarebytes*, 141 S. Ct. at 13 (Thomas, J., respecting the denial of certiorari); *see also* Hamilton, *supra*, at 734 ("A distributor can give you something and he or she may already know what it says, and under the law of libel in that circumstance the distributor is subject to liability.").

Notwithstanding the common law distinctions between distributors and publishers with respect to defamation liability, the State has long had authority to regulate the content of *both* publishers and distributors. The Supreme Court has held that "[b]ookstores . . . , for example, may be prohibited from making indecent material available to children." *FCC v. Pacifica Foundation*, 438 U.S. 726, 749 (1978); *see also Ginsburg v. New York*, 390 U.S. 629, 643-645 (1968) (upholding validity of law that prohibited booksellers from knowingly selling explicit material to minors). So, too, may the State regulate the content of advertisements related to the practice of licensed professions. *See, e.g.*, *Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 429 (1963) (upholding validity of New Mexico law regulating advertisements for eyeglasses applied to newspaper). The State may also prohibit advertisements that discriminate in violation of civil rights laws. *See, e.g.*, *United States v. Hunter*, 459 F.2d 205, 213 (4th Cir. 1972) (upholding application of civil rights law to newspaper that printed ad for discriminatory housing). And the State may restrict advertisements for certain goods altogether. *See, e.g.*, *Capital Broad. Co. v. Mitchell*, 333 F. Supp. 582, 584 (D.D.C. 1971) (upholding validity of federal law prohibiting advertisements for cigarettes on radio and television broadcasts), *aff'd*, 405 U.S. 1000 (1972). These restrictions can and have applied to both distributors and publishers, as the cases cited above illustrate.

6

**B.    Section 230 of the Communications Decency Act**

The distinction between publishers and distributors for defamation liability developed in the brick-and-mortar world.  With the advent of the Internet, courts began to apply the doctrine to online platforms.  In 1995, a New York state court addressed whether an online platform was a publisher or distributor for purposes of defamation liability.  *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).  The platform defendant in the case "held itself out to the public and its members as controlling the content of its computer bulletin boards" and "implemented this control through its automatic software screening program" that would remove content "on the basis of offensiveness and 'bad taste.'"  *Id.* at *4.  The New York court held that because the platform had "uniquely arrogated to itself the role of determining what is proper for its members to post and read" on its platform, the defendant "is a publisher rather than a distributor."  *Id.*  In other words, because the defendant platform engaged in content moderation, it was no longer a distributor for purposes of defamation liability, but rather a publisher.  *Id.*

This decision "created a perverse incentive" for online platforms "not to moderate any offensive content, and Congress was concerned."  *Calise*, 103 F.4th at 739.  In response, Congress enacted section 230 of the Communications Decency Act in 1996 "to bring traditional 'distributor' immunity online."  *Id.*  The

7

provision was intended "to protect computer Good Samaritans, online service providers, anyone who provides a front end to the Internet . . . who takes steps to screen indecency and offensive material for their customers." 141 Cong. Rec. 22045 (1995); *see also* H.R. Conf. Rep. 104-457, at 194 (1996). By "remov[ing] liability of providers . . . who currently make a good faith effort to edit the smut from their systems," the law would lift "the disincentive for online services to creat[e] family friendly services by detecting and removing objectionable content." 141 Cong. Rec. 22047 (1995); *see also Calise*, 103 F.4th at 739.

In enacting section 230, Congress declared that "[i]t is the policy of the United States to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services" and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(3), (4). And Congress declared that it is also "the policy of the United States to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." *Id.* § 230(b)(5).

To effectuate these policies, section 230(c) of the Communications Decency Act provides that "[n]o provider or user of an interactive computer service shall be

8

treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It also provides two additional immunities from civil liability for interactive computer services. First, no such service "shall be held liable on account of any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Id.* § 230(c)(2)(A). Second, no such service "shall be held liable on account of any action taken to enable or make available to information content providers or others the technical means to restrict access to material" that is objectionable. *Id.* § 230(c)(2)(B).

Section 230 also explicitly addresses its effect on other laws. First, section 230 specifies that it "shall not be construed" to impair the enforcement of federal criminal statutes related to obscenity and the sexual exploitation of children or the enforcement of suits brought under specified federal statutes and similar state laws related to sex trafficking and prostitution. 47 U.S.C. § 230(e)(1), (5). Second, section 230 specifies that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." *Id.* § 230(e)(3). However, "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent" with section 230. *Id.* Finally, section 230 specifies that it "shall not be construed" to limit the

9

enforcement of intellectual property laws or the Electronic Communications Privacy Act of 1986. *Id.* § 230(e)(2), (4).

## C.   Assembly Bill 2655

The California Legislature passed Assembly Bill 2655 (AB 2655) "to ensure California elections are free and fair." Cal. Elec. Code § 20511(e).[2] With the rise of digitally manipulated media facilitated by modern technology, "bad actors now have the power to create a false image of a candidate accepting a bribe, or a fake video of an elections official 'caught on tape' saying that voting machines are not secure, or to generate the Governor's voice telling millions of Californians their voting site has changed." *Id.* § 20511(b). "Voters will not know what images, audio, or video they can trust." *Id.* § 20511(a). The dissemination of such media "to millions of Californians in seconds" can "skew election results" and "undermine trust in the ballot counting process." *Id.* § 20511(c). The legislative history referenced examples of such political deepfakes already in existence, including doctored photos purporting to show President Donald Trump hugging Anthony Fauci and a digitally-created robocall allegedly from former President Joe Biden urging New Hampshire voters not to vote in the 2024 primary election. ER-

---

[2] AB 2655 was enacted alongside a companion statute, Assembly Bill 2839 (AB 2839), which directly prohibited distributing certain political deepfakes. *See* Cal. Elec. Code § 20012.

48, ER-62; *see also* ER-81 (deepfake of former President Biden), ER-87 (same); ER-96 (deepfake of President Trump); ER-100 (same).

To combat this growing societal problem, AB 2655 imposes three regulations on a "large online platform," defined as "a public-facing website, web application, or digital application, including a social media platform . . ., video sharing platform, advertising network, or search engine" with at least 1,000,000 California users in the preceding year. Cal. Elec. Code § 20512(h). The law applies to "materially deceptive content," defined as "audio or visual media that is digitally created or modified" and that "would falsely appear to a reasonable person to be an authentic record of the content depicted in the media." *Id.* § 20512(i)(1).

*The Reporting Requirement*: First, large online platforms must "provide an easily accessible way for California residents to report to that platform content that should be removed . . . or labeled" under AB 2655. Cal. Elec. Code § 20515(a). The platform "shall respond to the person who made the report within 36 hours of the report, describing any action taken or not taken by the large online platform" as to the reported content. *Id.*

*The Removal Requirement*: Second, a large online platform "shall develop and implement procedures for the use of state-of-the-art techniques to identify and remove materially deceptive content" that meets all of the following requirements:

11

(1)  The materially deceptive content is reported to the platform via the means created to comply with the Reporting Requirement, Cal. Elec. Code § 20513(a)(1); and,

(2) The materially deceptive content depicts:

(a) A candidate for office doing or saying something they did not do or say that is reasonably likely to harm the candidate's reputation or electoral prospects, or

(b) An elections official doing or saying something they did not do or say in connection with their elections-related duties that is reasonably likely to falsely undermine confidence in an election's outcome, or

(c) An elected official saying or doing something they did not say or do that influences an election in California and that is reasonably likely to falsely undermine confidence in an election's outcome, *id.* § 20513(a)(2); and,

(3) The material is posted during the period of time 120 days before an election through the day of the election, and, for material showing an elections official, the period of time 60 days after an election *id.* § 20513(a)(3), (e); and,

(4) The platform knows or acts with reckless disregard for the fact the materially deceptive content meets the requirements of this section, *id.* § 20513(a)(4).

This main part of the Removal Requirement only applies once a platform has received a report regarding materially deceptive content; it imposes no affirmative obligation on the platform to search or watch for deceptive content on its platform. The same holds true for the other part of the Removal Requirement, which requires a platform to "identify, using state-of-the-art techniques, and remove, upon discovering or being alerted to the posting or reposting of, any identical or substantially similar materially deceptive content that the platform had previously removed" under AB 2655. Cal. Elec. Code § 20513(c).

*The Labeling Requirement*: Finally, AB 2655 requires a large online platform to "develop and implement procedures for the use of state-of-the-art techniques to identify materially deceptive content and for labeling such content" if all of the following requirements are met:

(1) The materially deceptive content is reported to the platform via the means created to comply with the Reporting Requirement, Cal. Elec. Code § 20514(a)(1); and,

(2) The materially deceptive content is either content within the scope of the Removal Requirement but posted outside that requirement's temporal

13

window or content within the scope of AB 2655 but not subject to the Removal Requirement, *id.* § 20514(a)(2); and,

(3) The platform knows or acts with reckless disregard for the fact that the materially deceptive content meets the requirements of this section, *id.* § 20514(a)(3); and,

(4) The material is posted in the period of time six months before an election and, for material that depicts or pertains to elections officials, the electoral college process, a voting machine, ballot, voting site, other election equipment, or the canvass of the vote, the period of time 60 days after the election, *id.* § 20514(e).

For materially deceptive content that meets all the requirements above, the online platform must add a label stating that the audio, image, or video has been manipulated and is not authentic. Cal. Elec. Code § 20514(c). The label must allow users to click on it for an additional explanation and shall be in an easy-to-understand format. *Id.* § 20514(d). As with the Removal Requirement, the Labeling Requirement imposes no obligation on a platform to search or watch for content that should be labeled, but rather only to act in response to receiving a report.

*Enforcement Provisions*: AB 2655 allows enforcement in two circumstances. First, a candidate, elected official, or elections official who has reported content to

14

the platform may bring suit. Cal. Elec. Code § 20515(b). The suit may only seek injunctive or other equitable relief to compel removal, labeling, or compliance with the Reporting Requirement, and the plaintiff bears the burden of establishing the violation through clear and convincing evidence. *Id.* Second, the Attorney General or a district or city attorney may seek enforcement. *Id.* § 20516. Such a suit is also limited to injunctive or other equitable relief to compel removal, labeling, or compliance with the Reporting Requirement, and the plaintiff here also bears the burden of establishing the violation through clear and convincing evidence. *Id.*

### D. Procedural History

Plaintiffs in this appeal are a combination of online platforms and media creators. Three plaintiffs—Rumble Inc., Rumble Canada Inc., and X Corp.—run platforms where users can upload content, view other users' content, and interact with content. *See* ER-33. The remaining three plaintiffs—Christopher Kohls, The Babylon Bee, and Kelly Chang Rickert—create and post content on various online platforms and websites. *See* ER-32, ER-33. All plaintiffs filed suit against Attorney General Rob Bonta and Secretary of State Shirley N. Weber, in their official capacities, challenging AB 2655 on several grounds. *See* ER-34.[3]

---

[3] This matter was originally four separate actions consolidated into a single case below. *See* ECF Nos. 20, 32, & 37 (consolidation orders). Plaintiffs additionally

(continued…)

The parties filed cross-motions for summary judgment and the lower court held a hearing on the motions on August 5, 2025.  At the hearing, the lower court ruled from the bench and granted judgment to plaintiffs, holding that AB 2655 is preempted by section 230(c)(1) and section (c)(2)(B) of the Communications Decency Act.  ER-20, ER-27.  The court first held that AB 2655 was preempted under section 230(c)(1) "because the removal, labeling, and reporting provisions of the law impermissibly treat the covered platforms as publishers of third-party content."  ER-19-20.  This is so, the court said, because "the conduct that the removal, labeling, and reporting requirements regulate can be understood as traditional publishing activity that Section 230 immunizes."  ER-24.  In other words, the lower court held that because AB 2655 "mandates that covered platforms develop and implement procedures to identify and label" or remove certain reported content, the statute regulates "publishing activity" and is thus preempted by section 230(c)(1).  ER-25.

The lower court further held that AB 2655 was preempted by section 230(c)(2)(B) of the Communications Decency Act.  ER-27.  It stated that "[t]he reporting system mandated by AB 2655 would count as an action taken to make

---

challenged AB 2655's companion statute, AB 2839, and the lower court held that AB 2839 violates the First Amendment.  *See* ECF No. 101 (ruling on AB 2839). AB 2839 and its validity are not at issue on this appeal.

16

available the technical means to restrict access to objectionable material." ER-26-27. "Because platforms will face enforcement if the reporting mechanism they implement does not . . . satisfy [AB 2655's] reporting requirement," the lower court held that AB 2655 also "directly contravenes section 230(c)(2)(B)." ER-27. The parties were directed to meet and confer and submit a proposed order and judgment on AB 2655 for the lower court to enter. *See* ECF No. 97 (proposed order and judgment).

On August 20, 2025, the lower court entered judgment consistent with and for the reasons given at the August 5, 2025 hearing. ER-14. The court entered a permanent injunction of AB 2655's enforcement against the platform plaintiffs in this matter, X Corp. and Rumble Inc. ER-16. In its order, the lower court stated that "in light of this Order and Final Judgment and Permanent Injunction," it would not "at this time reach" the other arguments for AB 2655's invalidity brought by X Corp. and Rumble Inc., including that AB 2655 violates the First Amendment. ER-15; see also ER-19.

Following the entry of judgment, defendants and the remaining plaintiffs entered into a joint stipulation wherein defendants agreed not to enforce AB 2655 against other "interactive computer services" within the scope of section 230(c). ER-11. The parties stated that "[i]n light of this agreement," the lower court "need not address the Parties' Cross-Motions for Summary Judgment as to the

17

constitutionality of AB 2655" under the First Amendment.  ER-11.  The lower

court entered an order enforcing this joint stipulation on August 28, 2025, which

similarly recognized that it "need not address" the validity of AB 2655 under the

First Amendment "at this time."  ER-8.  Defendants thereafter filed a timely

appeal.  ER-109.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo.

*E.g.*, *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011).  In

reviewing a grant of summary judgment, this Court "'determine[s], viewing the

evidence in the light most favorable to the nonmoving party, whether there are any

genuine issues of material fact and whether the district court correctly applied the

relevant substantive law.'"  *Id.* (citation omitted).

## ARGUMENT

The lower court erred in holding that AB 2655 is preempted by either section

230(c)(1) or section 230(c)(2)(B) of the Communications Decency Act.  With

respect to section 230(c)(1), AB 2655 is not preempted because it does not treat the

platforms it regulates "as a publisher."  AB 2655 regulates evenhandedly, and its

regulations apply to both common-law publishers and distributors.  Its obligations

do not derive from a platform's choices as a publisher—indeed, AB 2655 *prohibits*

platforms from making a choice about whether to host or label content within the

scope of the statute. Just as a State may regulate the knowing distribution of materials at bookstores or the content in advertisements, a State may require platforms to review reported material and remove specified content without running afoul of section 230(c)(1).

Nor is AB 2655 preempted by section 230(c)(2)(B). That provision immunizes an interactive computer service that makes available to users the technical means to block access to objectionable content. But AB 2655's requirement that a platform allow users to report certain content is not akin to a platform's choice about whether to employ anti-malware protections or software that blocks nudity. AB 2655 does not constitute a technical means that allows a user to block content that the user does not want to see, and thus does not fall within the scope of section 230(c)(2)(B) preemption.

## I. AB 2655 IS NOT PREEMPTED BY SECTION 230(C)(1) OF THE COMMUNICATIONS DECENCY ACT

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The section also provides that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section," but that "[n]o cause of action may be brought and no liability imposed under any State or local law that is inconsistent with" section 230(c)(1). *Id.* § 230(e)(3). This Court

19

has stated that section 230 immunity "is extraordinarily powerful, granting complete immunity where it applies and, in the process, preempting even the will of the people as expressed in their state legislatures." *Estate of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176-1177 (9th Cir. 2024). But while immunity under section 230(c)(1) may be broad, it "is not limitless." *Calise*, 103 F.4th at 739. As this Court has repeatedly recognized, section 230 does not provide "general immunity from liability deriving from third-party content." *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009). And "it is not enough that a claim, including its underlying facts, stems from third-party content for § 230 immunity to apply." *Calise*, 103 F.4th at 742.

Instead, to determine whether section 230's immunity applies, this Court undertakes an "exacting analysis" to "avoid 'exceed[ing] the scope of the immunity provided by Congress.'" *Bride*, 112 F.4th at 1176 (quoting *Doe 1 v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016)) (alteration in original). This analysis is guided by a three-part test: section 230(c)(1) preempts claims against "(1) a provider or user of an interactive computer service, (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider." *Calise*, 103 F.4th at 738 (quoting *Barnes*, 570 F.3d at 1100-1101). At issue in this appeal is solely the second prong of this test: whether AB 2655 treats the platforms it regulates "as a publisher."

20

This Court recently addressed what it means to treat a platform "as a publisher" in its decision in *Calise*. As *Calise* explained, "[s]ubsection 230(c)(1)'s key word—publisher—has a well-defined meaning at common law." 103 F.4th at 738. "A 'publisher' can bear tort liability for anything that it communicates, even negligently to a third party." *Id.* at 739 And publishers "are treated differently under common law than 'distributors,' such as bookstores or newspapers, who usually cannot be held liable for repeating unlawful content, such as advertisements, unless they knew or had reason to know that the content was unlawful." *Id.* A platform acts as a publisher when it "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." *Barnes*, 570 F.3d at 1103.

To determine whether a claim treats a platform as a publisher, this Court determines "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher.'" *Calise*, 103 F.4th at 740 (quoting *Barnes*, 570 F.3d at 1102.); *see also, e.g.*, *Bride*, 112 F.4th at 1168 ("The proper analysis requires a close examination of the duty underlying each cause of action."). This Court "examine[s] two things in looking at duty" to determine whether a claim treats a platform as a publisher. *Calise*, 103 F.4th at 742; *see also Bride*, 112 F.4th at 1177. First, this Court considers "the 'right' from which the duty springs." *Calise*, 103 F.4th at 742. "If it springs from something

21

separate from the defendant's status as a publisher," such as "from an agreement" or "from obligations the defendant has in a different capacity," "then § 230(c)(1) does not apply." *Id.* Second, this Court asks what the duty "requir[es] [a platform] to do." *Id.* "If it obliges the [platform] to 'monitor third-party content'—or else face liability—then that too is barred by § 230(c)(1)." *Id.*

In laying out its two-part test, *Calise* discussed this Court's prior decision in *Barnes*. *See Calise*, 103 F.4th at 740. In *Barnes*, the "plaintiff's ex-boyfriend, posing as Barnes, created profiles on Yahoo, where he posted nude photographs of Barnes without her consent." *Id.* The plaintiff sued Yahoo "alleging two state law causes of action: negligent undertaking and promissory estoppel." *Id.* As *Calise* explained, this Court held that section 230(c)(1) barred the former, but not the latter. *Id.* With respect to the negligent undertaking claim, this Court "held that the 'undertaking that Barnes alleg[d] Yahoo failed to perform with due care' was the 'removal of the indecent profiles.'" *Id.* (quoting *Barnes*, 570 F.3d at 1103) (alteration in original). In other words, "Barnes's negligent undertaking claim faulted Yahoo for failure to remove content, and 'such conduct is publishing conduct . . . that can be boiled down to' editorial behavior." *Bride*, 112 F.4th at 1177 (quoting *Barnes*, 570 F.3d at 1103) (alteration in original). Thus, "impos[ing] liability on the basis of such conduct necessarily involves treating the

22

liable party as a publisher of the content it failed to remove." *Calise*, 103 F.4th at 740 (quoting *Barnes*, 570 F.3d at 1103) (alteration in original).

Cases applying the test from *Calise* have similarly held claims preempted by section 230(c)(1) where the underlying duty a plaintiff alleged had been breached arose from the defendant's own publishing choices. In *Bride*, for instance, the plaintiffs brought product liability claims against the operator of an app that allowed users "to post public questions and polls" and to "respond to the questions or polls anonymously." 112 F.4th at 1173. Plaintiffs alleged several product liability claims related to harms suffered from the use of the app, including the receipt of "harassing, obscene, and bullying messages" from other users. *Id.* They contended that the app was "inherently dangerous because of its anonymous nature, and that previous high-profile suicides and the history of cyberbullying should have put [the designer] on notice that its product was unduly dangerous to teenagers." *Id.* at 1179. This Court held all such claims were preempted because "[a]t root, all Plaintiffs' product liability theories attempt to hold [the designer] responsible for users' speech or [the designer's] decision to publish it." *Id.* In essence, plaintiffs "fault[ed] [the designer] for not mitigating, in some way, the harmful effects of the harassing and bullying content" and "for not moderating content in some way, whether through deletion, change, or suppression." *Id.* Such

"product liability claims that fault [the designer] for not moderating content are foreclosed." *Id.* at 1182.

So, too, in this Court's decision in *Doe 1 v. Twitter*, 148 F.4th 635 (9th Cir. 2025). The plaintiffs there "filed a complaint through Twitter's content-reporting interface" flagging posts that contained pornographic images of them as minors. *Id.* at 641. While Twitter initially declined to remove the posts, it later took the content down. *Id.* Plaintiffs then brought several claims against Twitter, including design defect claims related to Twitter's reporting mechanism for child sex abuse materials and its failure to remove reported content pending review. *Id.* at 644-645. This Court held that the claim related to Twitter's failure to remove reported content pending review was barred by section 230(c)(1) because "decisions about what third-party content is disseminated are quintessentially the province of a publisher." *Id.* at 645. However, it held that the claim related to the reporting mechanism's failures was not barred because "Twitter's improvement of its reporting mechanism . . . would not necessarily require Twitter to monitor third-party content." *Id.* It also held that claims related to Twitter's failure to report the content to the National Center for Missing and Exploited Children (NCMEC) as required by federal law were not barred by section 230(c)(1). *Id.* at 648. Such claims did not require Twitter to "scour its platform for content triggering its NCMEC-reporting duty" or to "review reported child pornography." *Id.* at 647-

24

648. Since the claim did not impose liability because of Twitter's publishing conduct, it was not within the scope of section 230(c)(1). *Id.* at 648.

Under the two-part test laid out in *Calise*, AB 2655 does not treat platforms as publishers. Starting with the second part—whether the duty alleged would require platforms to monitor third-party content—AB 2655 does not obligate platforms to monitor third-party content to avoid liability in the way that a publisher under the common law must. AB 2655 contains three substantive requirements. First, AB 2655 requires a platform to "provide an easily accessible way for California residents to report to that platform content that should be removed . . . or labeled" under AB 2655. Cal. Elec. Code § 20515(a). Second, AB 2655 requires a platform to "develop and implement procedures for the use of state-of-the-art techniques to identify and remove" specified materially deceptive content that is reported to it. *Id.* § 20513(a). A platform must also remove content "upon discovering or being alerted to the posting or reposting of, any identical or substantially similar materially deceptive content that the platform had previously removed" under AB 2655. *Id.* § 20513(c). Third, AB 2655 requires a platform to "develop and implement procedures for the use of state-of-the-art techniques to identify" specified materially deceptive content "and for labeling such content" when such content is reported to the platform. *Id.* § 20514(a).

25

In sum, AB 2655 imposes on platforms the obligation to: (1) allow users to report certain content to the platform and (2) remove or label reported content as required by AB 2655. Neither of these obligations requires a platform to monitor third-party content as a publisher does. Under the common law, a publisher faces liability for defamation even if it is unaware of the defamatory nature of the content it publishes—in contrast to a distributor, who must know the content is defamatory to face liability. *See supra* at 4-5. To avoid liability, then, a publisher must "*actively* vet and evaluate" third-party content, *Calise*, 103 F.4th at 744 (emphasis added), to ensure it has not published something that is defamatory. A claim that would require a platform to do precisely that thus falls within the scope of section 230(c)(1). But AB 2655 does not require a regulated platform to "scour its platform for content triggering" the removal or labeling requirements. *Twitter*, 148 F.4th at 647. The law does not require platforms to continuously watch for, proactively review for, or affirmatively search for particular third-party content when it is posted, nor does it impose liability because a platform has failed to do so. Instead, AB 2655 solely requires a platform to act once a user has reported content to that platform. That is not an obligation to monitor third-party content in the way a publisher does.

Nor does AB 2655 impose a duty that "springs from" a platform's status as a publisher, *Calise*, 103 F.4th at 742. First and foremost, AB 2655 does not apply

26

solely to platforms that constitute a "publisher" under the common law, but rather also regulates platforms that would be a "distributor." AB 2655 applies to *all* "large online platforms," regulating any "public-facing website, web application, or digital application, including a social media platform . . ., video sharing platform, advertising network, or search engine" with at least 1,000,000 California users in the preceding year. Cal. Elec. Code § 20512(h). That includes platforms that do *not* engage in content moderation that would qualify them as a publisher under the common law. The law is indifferent as to whether a platform is a common-law publisher or distributor, is an interactive computer service or information content provider, or engages in content moderation or not. And while AB 2655 might require a platform to review, remove, or label certain reported content, any obligation to do so arises "not because of the publisher's unique functions." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 798 (5th Cir. 2024). Rather, such an obligation exists because AB 2655 creates a "statutory duty" that "a publisher—like . . . every other [platform] subject to [California] law" owes "to the public." *Id.*

The fact that AB 2655 requires the removal or alteration of content does not necessarily mean that it imposes a duty that stems from a platform's role as a publisher. After all, distributors—such as bookstores and libraries—disseminate a third party's speech too. A platform that hosts third-party content can be a

27

common-law publisher or it can be a common-law distributor. The distinction between the two turns not on whether third-party content is being disseminated, but rather on whether the platform is engaging in "the usual prerogative of publishers to choose among proffered material and to edit the material published." *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003), *overruled on other grounds by Gopher Media LLC v. Melone*, 154 F.4th 696 (9th Cir. 2025).

This Court has been clear that what section 230 prohibits is liability that stems from "*publication decisions*, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Barnes*, 570 F.3d at 1105 (emphasis added); *see also Twitter*, 148 F.4th at 645 (section 230(c)(1) protects "decisions about what third-party content is disseminated"). That is precisely why this Court held that section 230(c)(1) barred the claims raised in *Barnes*, *Bride*, and *Twitter*; in each case, the claims that were barred alleged harms stemming from the *editorial choices* made by the defendants regarding whether to allow or remove certain content on their platforms. *E.g.*, *Barnes*, 570 F.3d at 1103 ("[T]he duty that Barnes claims Yahoo violated derives from Yahoo's conduct as a publisher—the steps it allegedly took, but later supposedly abandoned, to de-publish the offensive profiles."). Making such editorial choices is what it means to be a publisher. Holding a platform liable for such choices is treating that platform as a publisher. *See, e.g.*, *id.*

28

AB 2655 does not hold a platform liable for making editorial choices. On the contrary, under AB 2655, platforms have *no editorial discretion* about whether to remove or label material within the statute's scope. If a political deepfake is reported to the platform and falls within the requirements of AB 2655, it *must* be removed or labeled, regardless of the platform's own thoughts or preferences about doing so. The only choice a publisher—or any platform—is presented with under AB 2655 is to follow the law or not. That is not a publishing choice. Similarly, any sanction a platform faces under AB 2655 does not stem from the kind of discretionary publishing decisions that are immunized under section 230(c)(1), but rather from its failure to comply with its statutory obligations. Sanctioning a bookstore for selling obscene materials to a child in contravention of the law is not holding that classic common-law distributor liable for its "publishing decisions." So, too, with AB 2655.

Instead, rather than seeking to treat a platform as a publisher, AB 2655 is part of the State's longstanding authority to regulate the content of distributors and publishers alike. Though the common law treated distributors and publishers differently when it came to liability for defamation, the State has long had authority to regulate the content of both publishers and distributors. *See supra* at 6. Brick-and-mortar distributors have never had a special immunity from such regulations. The State may prohibit a bookstore such as Barnes and Noble from

29

knowingly selling child sex abuse materials, whether it is a publisher or distributor. *Cf. Ginsburg v. New York*, 390 U.S. 629, 643-645 (1968) (upholding validity of law that prohibited booksellers from knowingly selling explicit material to minors). And the State may prohibit ads proposing illegal transactions. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496 (1985) (State may "regulate or ban entirely" speech "proposing an illegal transaction"). The State has always been able to regulate the knowing dissemination of certain third-party content when within the bounds of the First Amendment.  AB 2655 is an exercise of this longstanding authority.

Section 230(c)(1) did not suddenly remove this traditional power from the States.  Congress enacts laws against the backdrop of the common law and existing law. *See, e.g.*, *Flores-Miramontes v. INS*, 212 F.3d 1133, 1139 (9th Cir. 2000) ("We presume that Congress knows the law.").  It would have understood when enacting section 230(c)(1) that the State can prohibit knowingly disseminating certain content whether done by a common-law publisher or a distributor.  Nothing in the language or legislative history of section 230(c)(1) suggests that Congress intended to grant online platforms a special exemption from such general regulations, one that not even their brick-and-mortar common-law distributor counterparts enjoy.  Indeed, to the contrary, Congress specified that section 230 "shall not be construed" to limit certain laws directed at the knowing distribution

30

of harmful or illegal materials such as child sex abuse materials. *See* 47 U.S.C. § 230(e). That Congress stated that section 230 should not "be construed" to limit such laws indicates that Congress did not intend such laws to be within the scope of section 230 to begin with.

Moreover, removing such authority from the States would undermine, rather than further, Congress's purpose in enacting section 230(c)(1). In enacting section 230, Congress declared that "[i]t is the policy of the United States to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material" and "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." 47 U.S.C. § 230(b)(3), (5). It would be anomalous if as part of an enactment meant "to encourage internet companies to monitor and remove" harmful content, *Calise*, 103 F.4th at 739, Congress retracted a State's traditional authority to prohibit such harmful content from being knowingly distributed altogether.

At the end of the day, there is a difference between tort claims that arise from a platform's exercise of editorial discretion regarding content moderation and a statute that imposes a statutory obligation on all platforms—irrespective of their common-law status as a publisher or distributor—to remove or alter specific

31

content when reported to it. Whether or not the former is preempted by section 230(c)(1), the latter is not. Claims that relate to the voluntary publishing choices a company makes are fundamentally different from what AB 2655 does. Any liability under AB 2655 does not arise from a platform's exercise of a publisher's editorial decisionmaking about the kind of content it wants to host, but rather from the platform's failure to comply with a law that makes those decisions for the platform. And AB 2655 does not obligate platforms to monitor third-party content in the way that a common-law publisher does or impose liability because a platform failed to do so; it solely requires a platform to review and remove or label only content that has been reported to it. AB 2655 does not impose a duty that stems from a platform's status as a publisher. It therefore does not treat a platform as a publisher and is not within the scope of section 230(c)(1)'s preemption.

The lower court erred in ruling to the contrary. In the lower court's view, AB 2655 is preempted by section 230(c)(1) because it requires companies to engage in "traditional publishing activities," specifically removing or labeling the content within the scope of AB 2655. ER-24. In the lower court's view, *any law* that requires a company to remove or alter content on its platform is necessarily preempted by section 230(c)(1). But such reasoning is contrary to this Court's existing precedent on section 230(c)(1) and would carry with it grave

32

consequences for a State's ability to regulate dangerous, illegal, and concerning content online.

First and foremost, the lower court's logic creates the precise "but-for" test that this Court has consistently rejected as part of section 230(c)(1). This Court has been clear: "It is imperative to consider that 'neither [subsection 230(c)] nor any other declares a general immunity from liability deriving from third party content.'" *Bride*, 112 F.4th at 1176 (quoting *Barnes*, 570 F.3d at 1100). Such a rule of but-for causation "could not be." *Id.* After all, "[p]ublishing activity is a but-for cause of just about everything" modern internet platforms are involved in. *Id.* (quoting *Internet Brands*, 824 F.3d at 853) (alteration in original). It is therefore "not enough that a claim, including its underlying facts, stems from third-party content for § 230 immunity to apply." *Calise*, 103 F.4th at 742.

The lower court's ruling functionally creates the precise "but-for" test that this Court has consistently rejected. Because AB 2655 regulates content that has been posted by third parties, the lower court held that it necessarily treats the platforms as publishers. In doing so, however, the lower court failed to engage in the required "close examination of the duty underlying each cause of action to decide if it 'derives from the defendant's status or conduct as a publisher.'" *Bride*, 112 F.4th at 1176 (quoting *Barnes*, 570 F.3d at 1107). The simple fact that AB 2655 might impact what content is on a platform does not by itself establish that

33

the duty it creates is one that "derives from [a platform's] status or conduct as a publisher," *id.* As explained above, AB 2655 does not impose a duty that derives from a platform's status as a publisher; instead, it creates a statutory duty shared equally by common-law publishers and distributors. The creation of such a statutory duty is merely a continuation of the State's long-recognized authority to regulate the content of common-law publishers and distributors alike within the bounds of the First Amendment.

Furthermore, the "but-for" test created by the lower court critically hampers a State's ability to prevent the spread of dangerous and harmful content online, such as child sex abuse materials, criminal content, or advertisements for illegal goods. For instance, consider the recently passed federal TAKE IT DOWN Act, which imposes reporting and removal requirements. *See* 47 U.S.C. § 223a. The federal Act applies to any "website, online service, online application, or mobile application" that (1) "serves the public" and (2) "primarily provides a forum for user-generated content, including messages, videos, images, games, and audio files," TAKE IT DOWN Act, § 4(3), 139 Stat. 61 (2025)—a definition plainly encompassing platforms such as plaintiffs Rumble Inc. and X Corp. that constitute "interactive computer services" under section 230(c)(1). Such platforms must "establish a process" for individuals to "notify the platform" of nonconsensual intimate visual depictions on the platform and "submit a request for the platform to

34

remove such intimate visual depiction," 47 U.S.C. § 223a(a)(1)(A)—a requirement akin to AB 2655's Reporting Requirement. Covered platforms must then, "as soon as possible, but not later than 48 hours after receiving such request," "remove the intimate visual depiction" and "make reasonable efforts to identify and remove any known identical copies of such depiction," *id.* § 223a(a)(3)—a requirement akin to AB 2655's Removal Requirement. The Federal Communications Commission is authorized to enforce these reporting and removal requirements. *See id.* § 223a(b).

Under the lower court's ruling, the federal TAKE IT DOWN Act would be invalid under section 230(c) as a law that treats platforms as publishers—just like AB 2655, the law imposes "removal . . . and reporting requirements [that] regulate . . . traditional publishing activities that Section 230 immunizes," ER-24. But in enacting the TAKE IT DOWN Act, Congress clearly thought otherwise. While parts of the TAKE IT DOWN Act were codified at 47 U.S.C. § 223—which section 230(c) is not construed to impact, *see id.* § 230(e)(1)—the reporting and removal requirements were separately codified at 47 U.S.C. § 223a. Nor does the TAKE IT DOWN Act fall within the other categories of laws detailed in section 230(e). *See* 47 U.S.C. § 230(e). It would have been anomalous for Congress to enact a law that on its face imposed a reporting and removal requirement on interactive computer services if it thought that doing so would be treating those platforms "as a publisher" contrary to section 230(c), thus rendering the law

35

invalid in a large swath of its applications. *See, e.g.*, *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Est.*, 470 F.3d 827, 847 (9th Cir. 2006) (en banc) ("[W]e presume that Congress acts consistently with the extant body of law."). This is particularly so when Congress was clearly aware of section 230 while passing the Act. *See* TAKE IT DOWN Act, § 2(a)(2), 139 Stat. 55 (2025) (incorporating definition from 47 U.S.C. § 230).

Nor would the lower court's logic be limited to the federal TAKE IT DOWN Act. It would apply equally to California's requirement that social media platforms create a mechanism for users to report illegal child sex abuse materials involving an identifiable minor and to remove such content when reported. *See* Cal. Civ. Code § 3273.66(a), (d)(1); *cf. Ginsburg*, 390 U.S. at 643-645 (upholding law prohibiting bookstores from knowingly selling obscene materials to children). It would apply equally to California's requirement that online marketplaces for cannabis and hemp create a mechanism for users in California to report advertisements thereon from sellers that do not have a California license for such products and to remove such advertisements when reported. *See* Cal. Bus. & Prof. Code §§ 22943.2(b)(1), 22944.2(a)(1); *cf. Village of Hoffman Estates*, 455 U.S. at 496 (State may ban and regulate speech proposing illegal transactions). Just as with AB 2655 and the Federal TAKE IT DOWN Act, these laws also regulate "traditional publishing activities" under the lower court's interpretation of section

36

230(c)(1), ER-24, by requiring a platform to facilitate the reporting and undertake the removal of specified reported content.

But Congress never intended section 230(c)(1) to reach statutes such as these—statutes which are analogous to the laws that have long regulated the content of brick-and-mortar distributors and publishers alike, *see supra* at 6. The entire purpose of section 230(c) was to *enable* the moderation of questionable, concerning, illegal, or explicit content online. *See supra* at 7-8. That purpose is entirely unserved if section 230(c)(1) prohibits States wholesale from regulating such content online. Allowing objectionable or obscene content to proliferate online because the State cannot prohibit such content in no way serves the purposes that animated section 230(c)'s passage.

Ultimately, section 230(c)(1) was intended to allow platforms the freedom to engage in content moderation without raising concerns about incurring liability flowing from *their own choices* about content moderation. AB 2655, in contrast, *removes choice*: platforms must allow users to report and then must remove or label content within the scope of AB 2655. The law requires this of all platforms, regardless of whether the platform qualifies as an interactive computer service or common-law publisher or otherwise. Just as the State can require a bookstore not knowingly sell child sex abuse materials or a newspaper not knowingly advertise

37

illegal goods, it can require platforms to create a reporting mechanism and remove or label specified reported materials without running afoul of section 230(c)(1).[4]

## II. AB 2655 IS NOT PREEMPTED BY SECTION 230(C)(2)(B) OF THE COMMUNICATIONS DECENCY ACT

Section 230(c)(2) provides that "[n]o provider or user of an interactive computer service shall be held liable on account of" either (1) "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" or (2) "any action taken to enable or make available to information content providers or others the technical means to restrict access to [such] material." 47 U.S.C. § 230(c)(2). These provisions were meant to "remov[e] disincentives for the development of software that filters out objectionable or inappropriate material." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1174 (9th Cir. 2009).

Section 230(c)(2)(B) "immunizes from suit a provider of interactive computer software that makes available software that filters or screens material that the user

---

[4] Of course, to the extent that a law like AB 2655 is a regulation of a platform's own expressive activities, it would need to comply with the First Amendment to be permissible. *See generally Moody v. NetChoice*, 603 U.S. 707 (2025) (discussing applicability of First Amendment to platform moderation choices). The lower court held it need not address AB 2655's validity under the First Amendment in light of its ruling regarding section 230 preemption, a conclusion the parties concurred in. *See* ER-8, ER-11, ER-15, ER-19.

or the provider deems objectionable." *Zango,* 568 F.3d at 1173 (emphasis removed). It "covers actions taken to enable or make available to others the technical means to restrict access to objectionable material." *Id.* at 1174-75 (emphasis removed). AB 2655 does not impose liability on such actions. The statute has nothing to do with providing users the technical means to block or restrict access to certain material. Nor does it have anything to do with facilitating "user control over what information they receive." *Enigma Software Grp., USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1051 (9th Cir. 2019). On the contrary, AB 2655 *removes* a user or provider's ability to determine whether to remove or label content within its scope. Section 230(c)(2)(B)'s immunity simply does not reach a statute that is directed at what content a platform may host rather than what technological means it provides customers.

The lower court erred in holding otherwise. It held that AB 2655 is preempted because the "reporting system mandated by AB 2655 would count as an action taken to make available the technical means to restrict access to objectionable material." ER-26-27. But requiring that a platform have a means for a person to report to the platform that certain content must be removed or labeled *by that platform* is not at all akin to allowing users to employ anti-spam email filters, obscenity-blocking software, or anti-script extensions on a browser to remove content that a *user* objects to. After all, AB 2655 is completely *indifferent*

to a user's preferences about what content to see. It requires a platform to remove reported content—whether or not a user wants that content removed. For while the reporting user may wish such content removed, other users may want to be able to see that content.

The purpose of section 230(c)(2)(B) is to immunize platforms with respect to their decisions to make technical features available so that *a user* can block material that user does not wish to see. The purpose of AB 2655 is to require a platform create a way for users to report content within the scope of AB 2655— which itself requires content be removed from or labeled on the platform for all users. Such a reporting requirement is not a technical means for users to block unwanted content. Thus, the statute does not fall within the scope of section 230(c)(2)(B)'s immunity.

///

///

40

## CONCLUSION

For the foregoing reasons, the lower court's ruling should be reversed.[5]

Dated:  January 12, 2026                    Respectfully submitted,

_s/ Kristin Liska_

Rob Bonta
  _Attorney General of California_
Thomas S. Patterson
  _Senior Assistant Attorney General_
Anya M. Binsacca
  _Supervising Deputy Attorney General_
KRISTIN A. LISKA
  _Deputy Attorney General_

---

[5] The Attorney General would like to acknowledge the contribution of law student Carolyn Daly (Harvard '26) to this brief.

41

## STATEMENT OF RELATED CASES

The State is not aware of any related cases, as defined by Ninth Circuit Rule 28-2.6, that are currently pending in this Court and are not already consolidated here.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-6138

I am the attorney or self-represented party.

**This brief contains** | 9,446 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [　　　　].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Kristin Liska | **Date** | January 12, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

43