No. 25-6138

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THE BABYLON BEE, LLC, et al.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of California
Case No. 2:24-cv-02527-JAM-CKD / Hon. John A. Mendez

## ANSWERING BRIEF OF APPELLEES RUMBLE INC., RUMBLE CANADA INC., THE BABYLON BEE, LLC, KELLY CHANG RICKERT AND CHRISTOPHER KOHLS

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jonathan A. Scruggs
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org

James A. Campbell
Johannes Widmalm-Delphonse
Mathew W. Hoffmann
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
mhoffmann@ADFlegal.org

*Counsel for Appellees Rumble Inc., Rumble Canada, Inc., The Babylon Bee, LLC, and Kelly Chang Rickert*
*additional counsel listed on signature page*

# TABLE OF CONTENTS

Table of Authorities.................................................................................iv

Statement of Jurisdiction......................................................................1

Statement of Issues ...............................................................................2

Circuit Rule 28-2.7 Addendum .............................................................3

Introduction ...........................................................................................4

Statement of the Case ...........................................................................7

I.     Rumble promotes a free and open internet. ...................................7

II.    The Bee, Rickert, and Kohls want to talk freely about politics
online. ...................................................................................................9

III.   AB 2655 requires Rumble and other large online platforms
to remove and label political content, like that posted by The
Bee, Rickert, and Kohls.....................................................................11

     A.    The reporting requirement: platforms must create a
way for Californians to report political speech they
don't like. ....................................................................................12

     B.    The removal requirement: platforms must remove
reported political speech. ...........................................................12

     C.    The labeling requirement: platforms must put a
disclaimer on political content. .................................................14

     D.    Politically motivated actors enforce AB 2655.........................15

     E.    AB 2655 has a multitude of exemptions.................................15

IV.   The California legislature recognizes AB 2655's statutory
and constitutional problems but passes it anyway. ......................16

V.    AB 2655 places near impossible burdens on Rumble and
incentivizes it to over-censor...........................................................20

i

VI.   AB 2655 mandates a counterproductive solution for a speculative problem..................................................................23

VII.  The district court permanently enjoins AB 2655. ..........................25

Standard of Review ..............................................................................28

Summary of the Argument ...................................................................29

Argument..............................................................................................31

I.    Section 230 preempts AB 2655. ...................................................31

      A.    Section 230(c)(1) preempts the removal, labeling, and reporting requirements. .....................................................31

            1.    AB 2655 targets platforms' publishing activity. .........32

            2.    Platforms must remove, label, and monitor third-party content. ...........................................................36

      B.    Section 230(c)(2)(B) preempts the reporting requirement..................................................................40

      C.    AB 2655 incentivizes platforms to aggressively censor political speech, undermining the marketplace of ideas Section 230 aims to protect...............................................41

II.   AB 2655 violates the First Amendment and California Constitution...............................................................................44

      A.    AB 2655 triggers at least strict scrutiny. ...........................46

            1.    AB 2655 interferes with Rumble's content moderation decisions..................................................46

            2.    AB 2655 discriminates based on political content. .....47

            3.    AB 2655 discriminates based on viewpoint.................48

            4.    AB 2655 compels speech. ............................................49

            5.    AB 2655 facilitates prior restraints............................51

ii

B. AB 2655 fails strict scrutiny. ...............................................51

    1. California can't meet its narrow tailoring burden. .....52

        a. California has many less restrictive alternatives. ......................................................52

        b. AB 2655 is fatally over and underinclusive. .......56

    2. AB 2655 doesn't advance any compelling government interest. ..................................................58

III. AB 2655 is overbroad and vague. .................................................60

A. AB 2655 overwhelmingly targets protected speech. ............61

B. AB 2655 uses unconstitutionally vague terms. ....................61

Conclusion .............................................................................................65

Statement of Related Cases .................................................................67

Certificate of Service ...........................................................................68

iii

# TABLE OF AUTHORITIES

## Cases

*281 Care Committee v. Arneson,*
766 F.3d 774 (8th Cir. 2014) .............................................. 48, 53, 59

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ................................................................... 50

*44 Liquormart, Inc. v. Rhode Island,*
517 U.S. 484 (1996) .................................................................. 54

*A.B. v. Salesforce, Inc.,*
123 F.4th 788 (5th Cir. 2024) ................................................... 34

*Animal Legal Defense Fund v. Wasden,*
878 F.3d 1184 (9th Cir. 2018) .................................................. 48

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) .............................. 26, 29, 31–35, 38

*Beilenson v. Superior Court,*
44 Cal. App. 4th 944 (1996) ..................................................... 18

*Berger v. City of Seattle,*
569 F.3d 1029 (9th Cir. 2009) .................................................. 64

*Boyer v. City of Simi Valley,*
978 F.3d 618 (9th Cir. 2020) .................................................... 49

*Brown v. Entertainment Merchants Association,*
564 U.S. 786 (2011) ............................................................. 57–60

*Buckley v. Valeo,*
424 U.S. 1 (1976) ..................................................................... 17

*Bullfrog Films, Inc. v. Wick,*
847 F.2d 502 (9th Cir. 1988) .................................................... 62

*Butcher v. Knudsen,*
38 F.4th 1163 (9th Cir. 2022) ................................................... 62

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) ........................... 26, 31–34, 36, 38–39

*Carfano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ......................................................17

*Children's Health Defense v. Meta Platforms, Inc.*,
112 F.4th 742 (9th Cir. 2024) ......................................................46

*Citizens United v. FEC*,
558 U.S. 310 (2010) ...................................................... 4–5, 48, 51

*Cohen v. California*,
403 U.S. 15 (1971) .......................................................................4

*Commonwealth v. Lucas*,
34 N.E.3d 1242 (Mass. 2015) ................................................ 48, 64

*Consolidated Edison Company of New York v. Public Service Commission of New York*,
447 U.S. 530 (1980) ...................................................................59

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) ................................................ 37, 39

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ......................................................36

*Edge v. City of Everett*,
929 F.3d 657 (9th Cir. 2019) ................................................ 60, 62

*Estate of Bride v. Yolo Technologies, Inc.*,
112 F.4th 1168 (9th Cir. 2024) ...................................................38

*Eu v. San Francisco County Democratic Central Committee*,
489 U.S. 214 (1989) ............................................................. 58–59

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ............................................... 36, 39

v

*Fashion Valley Mall, LLC v. NLRB*,
   172 P.3d 742 (Cal. 2007) .............................................................. 45

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ............................................................... 60–62

*FEC v. Ted Cruz for Senate*,
   596 U.S. 289 (2022) ..................................................................... 59

*Free Speech Coalition, Inc. v. Paxton*,
   606 U.S. 461 (2025) ..................................................................... 52

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ...................................................... 51

*Gentile v. State Bar of Nevada*,
   501 U.S. 1030 (1991) ................................................................... 63

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................... 60–61

*Grimmett v. Freeman*,
   59 F.4th 689 (4th Cir. 2023)........................................................ 57

*HomeAway.com, Inc. v. City of Santa Monica*,
   918 F.3d 676 (9th Cir. 2019) ...................................................... 32

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
   515 U.S. 557 (1995) ..................................................................... 50

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) ..................................................................... 49

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) .................................... 28, 52, 56, 58

*In re Dan Farr Productions*,
   874 F.3d 590 (9th Cir. 2017) ...................................................... 51

*Junior Sports Magazines Inc. v. Bonta*,
   80 F.4th 1109 (9th Cir. 2023)...................................................... 49

vi

*Kaahumanu v. Hawaii,*
    682 F.3d 789 (9th Cir. 2012) ......................................................63

*Kohls v. Bonta,*
    752 F. Supp. 3d 1187 (E.D. Cal. 2024)..........................................61

*Kohls v. Bonta,*
    797 F. Supp. 3d 1177 (E.D. Cal. 2025)....... 45, 47–49, 53, 55, 63–64

*Lemmon v. Snap, Inc.,*
    995 F.3d 1085 (9th Cir. 2021) ......................................................33

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................53, 56

*McIntyre v. Ohio Elections Commission,*
    514 U.S. 334 (1995) .....................................................................47

*Minnesota Voters Alliance v. Mansky,*
    585 U.S. 1 (2018) ...................................................................49, 63

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) .....................................................................46

*Morse v. Frederick,*
    551 U.S. 393 (2007) .....................................................................47

*National Institute of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018) .................................................................54–56

*National Rifle Association of America v. Vullo,*
    602 U.S. 175 (2024) .....................................................................49

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (9th Cir. 2024)....................................................45

*New York Times Company v. Sullivan,*
    376 U.S. 254 (1964) .......................................................................6

*Packingham v. North Carolina,*
    582 U.S. 98 (2017) .........................................................................4

*Pierce v. Jacobsen,*
    44 F.4th 853 (9th Cir. 2022) ........................................................ 51

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) .................................................................... 51

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................. 47, 51

*Sackett v. EPA,*
    598 U.S. 651 (2023) .................................................................... 63

*The Babylon Bee, LLC v. Lopez,*
    2026 WL 555552 (D. Haw. Jan. 30, 2026) ............................. 45, 53

*United States v. Alvarez,*
    567 U.S. 709 (2012) ..................................................... 18, 47, 53, 60

*United States v. Stevens,*
    559 U.S. 460 (2010) .................................................................... 48

*United States v. Williams,*
    553 U.S. 285 (2008) .................................................................... 60

*X Corp. v. Bonta,*
    116 F.4th 888 (9th Cir. 2024) ..................................................... 50

*Zango, Inc. v. Kaspersky Lab, Inc.,*
    568 F.3d 1169 (9th Cir. 2009) ..................................................... 40

**Statutes**

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1331 ............................................................................. 1

28 U.S.C. § 1343 ............................................................................. 1

28 U.S.C. § 1367(a) ........................................................................ 1

42 U.S.C. § 1983 ............................................................................. 1

47 U.S.C. § 230 ........................................................... 1–2, 5, 34, 40–42

Cal. Elec. Code § 18502 ...................................................................56

Cal. Elec. Code § 18573 ...................................................................56

Cal. Elec. Code § 20500 ...................................................................56

Cal. Elec. Code § 20511 .....................................................................4

Cal. Elec. Code § 20512 ................................................ 11–12, 16, 62–63

Cal. Elec. Code § 20513 ................................... 13–14, 16, 37, 49, 57, 62

Cal. Elec. Code § 20514 ....................................................... 12, 14–15, 50

Cal. Elec. Code § 20515 ................................... 12, 15, 22, 32, 40, 43, 50

Cal. Elec. Code § 20516 ............................................................ 15, 32, 40

Cal. Elec. Code § 20517 ...................................................................15

Cal. Elec. Code § 20519 ...........................................................15–16, 57

## Other Authorities

AB 2655, Cal. Leg. 2023–24 Sess. (Feb. 14, 2024)..................................16

AB 2655, Cal. Leg. 2023–24 Sess. (Mar. 21, 2024)..................................16

## Constitutional Provisions

U.S. Const. amend. I .........................................................................1

U.S. Const. amend. XIV .....................................................................1

U.S. Const. art. VI.............................................................................1

## STATEMENT OF JURISDICTION

Plaintiffs Rumble Inc. and Rumble Canada, Inc. (collectively, "Rumble") filed a lawsuit against California AB 2655 based on Section 230 of the Communications Decency Act, 47 U.S.C. § 230; the United States Constitution Article VI's Supremacy Clause, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. Plaintiffs The Babylon Bee, LLC ("The Bee") and Kelly Chang Rickert filed suit under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. Plaintiff Christopher Kohls filed suit under the First and Fourteenth Amendments, 42 U.S.C. § 1983, and the California Constitution.

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a). On August 20, 2025, the district court entered judgment and a permanent injunction on Rumble's Section 230 claim. ER-16. Based on that decision, it declined to reach Rumble's other claims. ER-16. On August 28, 2025, the district court declined to reach all of The Bee, Rickert, and Kohls's challenges to AB 2655 based on Defendants' agreement not to enforce AB 2655 "against any 'provider' of 'an interactive computer service,' as those terms are defined in 47 U.S.C. § 230(c) and § 230(f)(2)." ER-8–9.

On September 19, 2025, Defendants timely appealed. ER-109. This appeal is from a final order or judgment that disposes of all parties' claims. This Court has jurisdiction under 28 U.S.C. § 1291.

1

## STATEMENT OF ISSUES

1. Section 230 prohibits treating an interactive computer service like Rumble as "the publisher or speaker of any information provided by another" and prevents liability for making available the technical means to block certain content. 47 U.S.C. §§ 230(c)(1), 230(c)(2). Yet AB 2655 authorizes lawsuits and injunctive relief against online platforms for failing to remove or label certain political content posted by others. Did the district court properly rule that Section 230 preempts AB 2655 because AB 2655 treats Rumble as a publisher for failing to remove and label political content and failing to provide the means to report that content for removal?

2. The First Amendment requires laws to satisfy at least strict scrutiny when they discriminate based on content and viewpoint; compel speech; or implement a prior restraint. AB 2655 mandates that platforms like Rumble identify and then remove election-related content or place burdensome labels on that content whenever it is "reasonably likely to harm" a candidate's "reputation or electoral prospects" or "undermine" electoral "confidence." Does AB 2655 violate the First Amendment?

3. The First and Fourteenth Amendments prohibit overbroad and vague laws that regulate speech. AB 2655 demands that platforms use "state-of-the-art" techniques to remove or label content about federal, state, and local candidates, elections officials, and elected officials

2

nationwide that falsely appears to be "authentic" and "reasonably likely to harm" a candidate's "reputation or electoral prospects" or to "falsely undermine confidence in" an election. Is AB 2655 unconstitutionally overbroad and vague?

## CIRCUIT RULE 28-2.7 ADDENDUM

All pertinent statutes are contained in the Addendum of Appellants.

## INTRODUCTION

In the crucial period before and after an election, AB 2655 requires online platforms to completely remove or add burdensome labels to their users' political speech, including speech likely to harm a politician's "electoral prospects." Its stated aim? Preserving "free and fair" elections. Cal. Elec. Code § 20511(e). Its means? Censorship.

But free speech "is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). Speech unfettered by government interference "is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Id.* "[N]o other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen v. California*, 403 U.S. 15, 24 (1971).

Today, the "vast democratic forums of the Internet" serve as "the most important places … for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Plaintiff Rumble operates one of those forums—a website and app where users can upload and comment on videos. In line with its mission to promote free speech online, Rumble doesn't police its users' political speech. It only removes content that violates its content moderation policy, like posts that promote racism or violence. Plaintiff content creators The Babylon Bee, Christopher Kohls, and Kelly Chang Rickert want to participate in political discussions online without being censored.

4

To preserve an online "forum for a true diversity of political discourse," Congress enacted Section 230. 47 U.S.C. § 230(a)(3). It preempts state law that treats online platforms like Rumble as the publisher or speaker of its users' content. And—of course—the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339 (citation modified). "Laws that burden political speech" must meet "strict scrutiny." *Id.* at 340. So Rumble and the content creators filed suit challenging AB 2655.

AB 2655 flunks both Section 230 and constitutional scrutiny. California's law has no application *except* to Rumble's publishing activity. It forces Rumble to create a snitch line so people can report posts by its users that contain certain political content—including content critical of politicians—and then either censor the posts or slap unnecessary labels on them. As the district court held, this "regime is antithetical" to Section 230's protection of private forums for political speech. ER-28.

Similarly, the First and Fourteenth Amendments prohibit California from forcing platforms to police their users' political speech and to serve as arbiters of truth for local political races. California may not conscript online platforms as censorship surrogates to shield politicians from hard-hitting criticism during election season.

5

California has many more democratic and effective means to address any legitimate concern about political speech. Counterspeech creates "the clearer perception and livelier impression of truth, produced by its collision with error." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 n.19 (1964). Counterspeech operates effectively on online platforms while censorship backfires by undermining trust in public institutions and alienating those censored. Plaintiffs' and California's experts agreed that increased media and political literacy help people identify false content. And other causes of action—like defamation and invasion of privacy—already address California's concerns. What's more, California didn't offer any evidence that the content it seeks to ban has deceived any voter anywhere.

AB 2655 proves both unnecessary and unconstitutional. The district court got it right: AB 2655 "harm[s] the public's access to an uninhibited marketplace of ideas" for political speech. ER-30. That's anathema to Section 230 and the Constitution. This Court should affirm.

6

## STATEMENT OF THE CASE

### I.    Rumble promotes a free and open internet.

In 2013, Chris Pavlovski founded Rumble after he noticed that YouTube had deprioritized small content creators in favor of influencers, corporations, and large brands. 2-SER-189; 1-SER-004. Rumble seeks to empower small and large content creators and give them an online video-sharing platform to express themselves. 2-SER-189; 1-SER-004. Its mission is to promote a free and open internet. 2-SER-189; 1-SER-004. It curates and publishes a variety of content from third-party creators and allows users to comment on posted videos. 2-SER-189, 194; 1-SER-004.

During the pandemic, Rumble noticed that other online platforms began aggressively removing and banning content and users based on viewpoint. 2-SER-189; 1-SER-004. But Rumble understands that society *needs* platforms that support diverse opinions, authentic expression, and open dialogue. 2-SER-189; 1-SER-004.

That's why Rumble doesn't tolerate government censorship. 2-SER-189; 1-SER-004. So Rumble doesn't operate in China, North Korea, or Russia. 2-SER-189; 1-SER-004. Similarly, Rumble stopped operating in Brazil and France after those governments demanded Rumble censor content that didn't violate the platform's terms and conditions. 2-SER-189; 1-SER-004.

For the same reason, Rumble doesn't restrict political content—no matter the topic or viewpoint—unless it violates a specific provision of its user agreement. 2-SER-194; 1-SER-004. Rumble also does not restrict digitally generated or modified content unless that content violates a specific provision of that agreement. 2-SER-194; 1-SER-004. And Rumble doesn't label its users' posts because it doesn't want to express a viewpoint about the content it hosts on its platform. 2-SER-194; 1-SER-004.

Rumble's terms and conditions create guardrails to encourage civil discussion and express Rumble's free-speech message. 2-SER-195; 1-SER-004. The terms and conditions contain Rumble's content moderation policy, which gives Rumble "the absolute right (but not the obligation) to prohibit, refuse, delete, move and edit Content and material for any reason, in any manner, at any time, without notice" to the content creator. 2-SER-193; 1-SER-004. That policy prohibits pornography, "grossly offensive" content like racist or antisemitic material, and content that incites or promotes violence. 2-SER-193–94; 1-SER-004. Rumble removes content that violates its content moderation policy. 2-SER-193; 1-SER-004.

8

## II.    The Bee, Rickert, and Kohls want to talk freely about politics online.

The Bee, Rickert, and Kohls create political content that they post on online platforms. The Bee publishes articles on its website that expose absurdity, mock foolishness, and highlight hypocrisy in faith, politics, and culture through satire, humor, and parody. 2-SER-172; 1-SER-003. The Bee has accounts on online platforms like Rumble, X, Facebook, Instagram, and YouTube, where it republishes its articles, posts videos, and republishes third-party content. 2-SER-173; 1-SER-003. As of March 2025, it had 4.7 million followers on X, 2 million followers on Instagram, over 1.5 million followers on Facebook, over 1.5 million subscribers on YouTube, and over 475,000 followers on Rumble. 2-SER-173; 1-SER-003.

The Bee's satire is so good that fact-checking sites, like Snopes, have reviewed dozens of its posts for factual accuracy. 2-SER-178; 1-SER-003. For example, Snopes fact-checked an article titled "Ninth Circuit Court Overturns Death of Ruth Bader Ginsburg." 2-SER-178; 1-SER-003. It consulted 15 different sources before concluding that the article had "no basis in fact." 2-SER-179; 1-SER-003. Eventually, it changed course and confirmed that article was—in fact—satire. 2-SER-179; 1-SER-003.

Kohls also creates humorous online content commenting on and satirizing political figures. 2-SER-181; 1-SER-003. He created and

operates the "@MrReaganUSA" account on X where he has over 125,000 followers, the "MrReagan" account on Rumble where he has over 10,000 followers, and the "Mr Reagan" account on YouTube where he has about 386,000 subscribers. 2-SER-181; 1-SER-003.

During the 2024 campaign season, Kohls created a Harris parody video. 2-SER-181; 1-SER-003. The video features AI-generated cuts of a voice sounding like Vice President Harris narrating why she should be President: "Joe Biden finally exposed his senility at the debate"; she's "a deep state puppet"; and she "carefully hide[s] [her] total incompetence." 2-SER-181–82; 1-SER-003. On July 26, Kohls posted the video to Rumble, X, and YouTube with the word "parody" in the video's title; it quickly went viral. 2-SER-181; 1-SER-003. The same day, Elon Musk reposted the video, and it gained over 100 million views. 2-SER-196; 1-SER-004. Two days later, Governor Newsom posted a screenshot of a news story discussing Musk's repost. 2-SER-196; 1-SER-004. Newsom protested that the video "should be illegal" and promised to sign "a bill in a matter of weeks to make sure it is." 2-SER-196; 1-SER-004.

Rickert is a California attorney and fan of The Bee and Kohls. 2-SER-184; 1-SER-003. She reposted on X a Bee article satirizing Gov. Newsom. 2-SER-187–88; 1-SER-003. She wanted to repost the Harris parody video but didn't because of AB 2655. 2-SER-185–86; 1-SER-003. She also wanted to post the below AI-generated images of Donald

10

Trump running from police and being forcefully arrested, but she didn't because of California's law. 2-SER-186, 209–10, 237; 1-SER-003–04.

 

### III. AB 2655 requires Rumble and other large online platforms to remove and label political content, like that posted by The Bee, Rickert, and Kohls.

Heeding Gov. Newsom's censorship demand, the California legislature accelerated AB 2655's passage. 2-SER-332–33, 335. Both houses passed it, 2-SER-200; 1-SER-005, and on September 17—just weeks after he made his initial pledge to make the Harris parody video illegal—Gov. Newsom signed AB 2655 into law. 2-SER-326.

The law sought to force Rumble to review, label, and remove vast amounts of political speech. The law regulates "materially deceptive content" on "large online platform[s]." Cal. Elec. Code §§ 20512(h), 20512(i)(1). "'Materially deceptive content' means audio or visual media that is digitally created or modified … such that it would falsely appear

11

to a reasonable person to be an authentic record of the content depicted in the media," *id.* § 20512(i)(1), like Kohls's video and Rickert's images. A "large online platform" means "a public-facing internet website, web application, or digital application, including a social media platform[,] … video sharing platform, advertising network, or search engine that had at least 1,000,000 California users during the preceding 12 months." *Id.* § 20512(h). Rumble qualifies. 2-SER-189; 1-SER-004.

AB 2655 imposes three main burdens on large online platforms like Rumble. It also deputizes numerous politically motivated actors to enforce the law while creating a host of exemptions.

### A. The reporting requirement: platforms must create a way for Californians to report political speech they don't like.

First, the reporting requirement mandates that large online platforms "provide an easily accessible way for California residents to report" that content should be removed or labeled as "manipulated" and "not authentic." Cal. Elec. Code §§ 20515(a), 20514(c). Platforms must respond to the reporting person within 36 hours, "describing any action taken or not taken … with respect to the content." *Id.* § 20515(a).

### B. The removal requirement: platforms must remove reported political speech.

Second, the removal requirement forces covered platforms to "develop and implement procedures for the use of state-of-the-art

techniques to identify and remove materially deceptive content if" four criteria are met. *Id.* § 20513(a). The criteria are: (1) the content has been reported under the reporting requirement; (2) the content falls within one of three categories of "materially deceptive content"; (3) the content is posted within the applicable timeframe; and (4) the large online platform "knows or acts with reckless disregard for the fact that the content meets the" prior three requirements. *Id.* § 20513(a)(4).

The "materially deceptive content" categories are: (a) a "candidate" depicted as doing or saying something he didn't "that is reasonably likely to harm" his "reputation or electoral prospects"; (b) an "elections official" depicted as doing or saying something he didn't "that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests"; and (c) an "elected official" featured as doing or saying something he didn't that "influences an election … and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests." *Id.* § 20513(a)(2).

Large online platforms must remove the content within 72 hours of receiving a report. *Id.* § 20513(b). They must also "identify, using state-of-the-art techniques, and remove" "any" content "identical or substantially similar" to "materially deceptive content" previously removed. *Id.* § 20513(c). The removal requirement applies from "120 days before an election in California and through the day of the election." *Id.* § 20513(e)(1). But if the content "pertains to elections

13

officials" the timeframe extends from 120 days before an election to 60 days after. *Id.* § 20513(e)(2).

### C. The labeling requirement: platforms must put a disclaimer on political content.

Third, the labeling requirement demands platforms "develop and implement procedures for the use of state-of-the-art techniques to identify materially deceptive content" and label it if three criteria are met. *Id.* § 20514(a). The criteria are: (1) the content has been reported under the reporting requirement; (2) the content is either (a) "materially deceptive content" under the removal requirement but posted outside that requirement's timeframe, or (b) the content is "materially deceptive content" and appears in an "advertisement" or "election communication" that is not subject to the removal requirement; and (3) the large online platform "knows or acts with reckless disregard for the fact that the materially deceptive content meets the" prior two requirements. *Id.* § 20514(a). Within 72 hours of discovery or report, platforms must label the content: "This [image, audio, or video] has been manipulated and is not authentic." *Id.* § 20514(b)–(c).

The labeling requirement imposes further burdens. Platforms must create a means to "permit users to click or tap on [the label] for additional explanation about the materially deceptive content in an easy-to-understand format." *Id.* § 20514(d). But the statute doesn't delineate what "additional explanation" the platform must supply. The

14

labeling requirement applies "regardless of the language used in the content" and mandates that large online platforms label the content both in English and the language used. *Id.* § 20517. Its timeframe runs from "six months before an election in California and through the day of the election." *Id.* § 20514(e)(1). That deadline extends to 60 days after an election for certain content, like that pertaining to "elections officials" or "a voting machine, ballot, voting site, or other equipment related to an election." *Id.* § 20514(e)(2).

### D.     Politically motivated actors enforce AB 2655.

AB 2655 deputizes an array of enforcers. "A candidate for elective office, elected official, or elections official" who has filed a report with a large online platform "may seek injunctive or other equitable relief" to enforce any of the three requirements. *Id.* § 20515(b). Likewise, the Attorney General, any district attorney, or any city attorney "may seek injunctive or other equitable relief" to enforce the requirements. *Id.* § 20516. Such lawsuits "shall be entitled to precedence" under California's Code of Civil Procedure. *Id.* §§ 20515(b), 20516.

### E.     AB 2655 has a multitude of exemptions.

While AB 2655 imposes these onerous obligations on platforms, it exempts many other entities and certain content. It does not apply to online newspapers, magazines, or periodicals that publish or broadcasters that broadcast "materially deceptive content" if the entity includes a disclosure. *Id.* §§ 20519(a), 20519(b)(1). The statute also

15

doesn't require platforms to remove certain content posted by the candidate if the content is labeled as "manipulated." *Id.* § 20513(d). And it doesn't apply to platforms with less than 1 million California users—like Truth Social and Parler. 2-SER-228. It further doesn't require labeling content with "minor modifications that do not significantly change the perceived contents or meaning of the content." Cal. Elec. Code § 20512(i)(2).

Finally, AB 2655 does not apply to "[m]aterially deceptive content that constitutes satire or parody." *Id.* § 20519(c). But it leaves the terms "satire" and "parody" undefined.

## IV. The California legislature recognizes AB 2655's statutory and constitutional problems but passes it anyway.

In its haste, the legislature recognized but ran roughshod over many objections that AB 2655 violates Section 230 and the Constitution. Legislative committees acknowledged that AB 2655 would: (1) face legal challenge under Section 230; (2) impose serious burdens on speech and be "vulnerable" to a constitutional challenge; and (3) place onerous burdens on covered platforms.

As originally proposed, AB 2655 disclaimed "alter[ing] or negat[ing] any rights, obligations, or immunities of an interactive service provider under Section 230." AB 2655, Cal. Leg. 2023–24 Sess. (Feb. 14, 2024). But legislators quickly deleted that language from the next version. AB 2655, Cal. Leg. 2023–24 Sess. (Mar. 21, 2024).

16

The Senate Judiciary Committee report conceded that AB 2655 would "likely … face" a Section 230 "challenge." ER-67. As it recognized, Section 230 provides "platforms immunity from any civil or criminal liability that could be incurred by user statements, while explicitly authorizing platforms to engage in their own content moderation without risking that immunity." ER-67. Thus, courts have "immunize[d] internet platforms from virtually all suits arising from third-party content." ER-67 (citing *inter alia Carfano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003)) (citation modified). The Assembly Committee on Judiciary recognized the risk that Section 230 "preempted" AB 2655 because the federal statute gives interactive computer services "the right to moderate content on their platforms and immunizes them from liability for content posted by the third party." 2-SER-225–26.

Legislative committees also realized that AB 2655 regulates political speech based on content and would thus have to satisfy strict scrutiny's demands. The Senate Judiciary Committee acknowledged that AB 2655 restricted "the right to speak about elections, as well as the right to receive information regarding them." ER-71. But the "United States Supreme Court has emphasized the extraordinary protection afforded to political speech." ER-69 (citing *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976)). That protection provides "wide latitude" to speech during "campaigns" because "[h]yperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies

17

and distributing bumper stickers and pot holders." ER-68 (quoting *Beilenson v. Superior Court*, 44 Cal. App. 4th 944, 954–55 (1996)). The Committee understood that "[l]aws that burden political speech" must survive "strict scrutiny." ER-68. So the Committee found it "safe to say" that the law would "likely face legal challenge and arguably be vulnerable thereto." ER-74.

The Assembly Committee on Judiciary admitted that AB 2655 had narrow tailoring problems. It did "not matter" that the law "restricts speech that is 'materially deceptive' or 'false'" because the "U.S. Supreme Court has been unequivocal that the First Amendment protects even 'false' speech." 2-SER-224. The proper "remedy"—in the Committee's words—"for false speech is more true speech, and false speech tends to call forth true speech." 2-SER-224 (citing *United States v. Alvarez*, 567 U.S. 709 (2012) (plurality)). "Tellingly," the legislative "findings and declarations" didn't even assert that the removal requirement was "narrowly tailored." 2-SER-225.

The Committee also noted concerns from "industry groups and the ACLU" that "platforms will err on the side of blocking content, thus burdening more speech than is necessary." 2-SER-225. Those groups observed that "no technology" exists "to determine if content is 'materially deceptive.'" 2-SER-225. "[W]ith no sure means" to tell what falls within the statutory definition, platforms have an incentive when "vetting millions of different posts"—according to the ACLU—"to

18

aggressively censor or prohibit speech out of caution, including speech by candidates." 2-SER-225, 229. Similarly, the Computer Communications Industry Association (CCIA) likened AB 2655 to the Digital Millenium Copyright Act (DMCA) takedown regime, under which platforms "err in taking down the content lest they face liability." 2-SER-211 (citation modified); 1-SER-008.

In the final Assembly Floor Analysis in August 2024, the California legislature continued to acknowledge AB 2655 may be unconstitutional. 1-SER-164. That analysis recognized the law "burdens core political speech" and would be subject to strict scrutiny. 1-SER-166.

The Assembly Committee on Elections admitted the near-impossible burdens placed on platforms. For example, under AB 2655's removal requirement, the Committee recognized the platform would have to determine (1) whether the person portrayed was a candidate; (2) "the date (or dates)" of the candidate's election; and (3) whether the candidate "had actually said or done the thing" claimed. ER-49. That would require the platform to find "arcane" information "[g]iven the number of elections (including standalone local and special elections) and candidates (including write-in candidates and candidates for local elections in smaller jurisdictions) in California at any given time." ER-49. In the words of one bill opponent, platforms would have "to know everything that every candidate in every city, county, state and federal election said and everywhere they went." ER-75. And the same for

19

"every other elected official in the state." ER-75. NetChoice, another bill opponent, observed that AB 2655 imposes the impossible duty of becoming "an appropriate arbiter of deciding what constitutes accurate election information." ER-74–75. In sum, AB 2655 demands that platforms become "judge, jury and executioner" for who gets to discuss important political issues. ER-75.

And biased political actors could weaponize the reporting requirement "to power a broad censorship regime." ER-75. Candidates can make reports about their opponents, "which may be inaccurate, politically motivated, or malicious." ER-75. Platforms must gather potentially "arcane" information quickly and respond to these reports. So they have an incentive to censor liberally to avoid liability. But removal of content not subject to AB 2655 "may well impact election results" based on politically motivated reports. ER-75.

## V. AB 2655 places near impossible burdens on Rumble and incentivizes it to over-censor.

The record evidence confirmed the legislative committees' concerns. Rumble hosts millions of hours of content, with users uploading an average of 12,000 new hours every day. 2-SER-203; 1-SER-006. Rumble enforces its content moderation policy through manual review. 2-SER-194; 1-SER-004. Its manual reviewers watch uploaded videos and review comments on those videos for policy violations. 2-SER-194; 1-SER-004.

To comply with AB 2655's requirements and deadlines, Rumble would have to hire more employees or contractors to review content and respond to reports. 2-SER-203; 1-SER-006. Rumble doesn't have and isn't aware of any technical tools to determine if content is "materially deceptive"; manual reviewers would have to decide. 2-SER-200, 203; 1-SER-005–06.

Those decisions require Rumble's content reviewers to gather a host of reliable contextual information, including what issues are involved in an election campaign, what positions a candidate has taken, who the candidate's opposition is, and what statements a candidate has made. 2-SER-200; 1-SER-005. The manual reviewers would also have to research and find reliable information about the candidates involved in even municipal races, the identities of local government officials conducting elections, and statements that any of those people have made. 2-SER-201; 1-SER-005.

AB 2655 applies to a vast universe of people, many of whom are local-level officials. For the 2026 election cycle, there will be at least 866 people qualifying as "candidate[s]," not including the "write-in" candidates noted by the legislative committee. 2-SER-200–01; 1-SER-005. AB 2655 doesn't define "elected official"—meaning it could encompass hundreds of thousands of elected officials across the country. 2-SER-201; 1-SER-005. California alone has 57 counties and 482 cities, each with clerks and other elected officials. 2-SER-201; 1-SER-005. AB

21

2655 also grants prosecution discretion to the people most likely to benefit from enforcement against their opponents and critics—candidates and elected officials. Cal. Elec. Code § 20515(b).

Rumble currently curates and hosts content covered by AB 2655. 2-SER-212; 1-SER-008. The Bee and Kohls post videos, like the Harris parody video, on Rumble. 2-SER-181, 212; 1-SER-003, 008. Rumble also hosts a wide variety of other political speech, with some of its most viewed videos coming from political commentators Dan Bongino, Dinesh D'Souza, Ben Shapiro, Russell Brand, and (formerly) Charlie Kirk. 2-SER-212; 1-SER-008. And it hosts and curates content created by politicians, including Donald Trump, Robert F. Kennedy Jr., and California politicians such as former Speaker of the House Kevin McCarthy. 2-SER-212; 1-SER-008.

Some of these creators—like The Bee and Kohls—post satire and parody on Rumble. AB 2655 ostensibly exempts otherwise covered satire and parody. But reasonable people disagree on what constitutes satire and parody. 2-SER-202; 1-SER-005. After all, Kohls clearly labeled his video "parody," but Governor Newsom said it "should be illegal." 2-SER-196; 1-SER-004. And numerous fact-checkers have analyzed The Bee's articles for veracity. 2-SER-178; 1-SER-003.

As the ACLU warned, AB 2655's expansive requirements, quick deadlines, and politically motivated enforcement mechanism incentivize Rumble to over-censor. The vast amount of political content on Rumble,

22

its manual review process, the 36-hour deadline, and the law's vague terms force Rumble to remove and label reported content in all but the clearest cases falling outside the statute. 2-SER-202–03; 1-SER-005–06. AB 2655 doesn't impose any penalties for over-censoring. But Rumble could face endless lawsuits for failing to censor or label.

## VI. AB 2655 mandates a counterproductive solution for a speculative problem.

As Plaintiffs' expert Dr. Christopher Lucas concluded, the "widespread concern" about the possible effects of "deepfake[s]" is "speculative." 1-SER-053. Studies of digitally modified false content "find that the effects of deepfakes on outcomes of interest like belief accuracy, political attitudes, or trust, are small or statistically insignificant" as compared to false textual information. 1-SER-055. Even California's expert conceded that research about the "effects" of "political deepfakes" "on viewers is limited." 1-SER-111. Similarly, he admitted that the "effects of political deepfakes on voter trust and confidence in elections are understudied." 1-SER-112.

The evidence also established that censorship is counterproductive for two reasons. First, on the one hand, a ban would only be effective at restoring trust in public discourse if people believe "they will not encounter deepfakes at all." 1-SER-059. The mere existence of deepfakes can cause people to "dismiss sincere media as synthetic." 1-SER-059. On the other hand, a ban could create "a false sense of

23

security in the accuracy of political information in public discourse." 1-SER-059. But because digitally altered content can be "difficult to detect" and because people often have difficulty verifying whether "real-world political events" happened, a ban cannot be 100% effective at eliminating digitally altered content. 1-SER-059–60. So a ban cannot ensure that people will not encounter false content. 1-SER-059. That's all the more true because AB 2655 doesn't ban *all* false political content.

Second, Plaintiffs' expert Dr. John Ayers established that "censorship strategies … lack evidentiary support and risk amplifying misinformation's impact." 1-SER-020. Censorship prevents the public from having "a conversation about potentially misleading speech." 1-SER-020. People "cannot de-bunk and learn from de-bunking misinformation if the content is already censored." 1-SER-020. Censorship can also "backfire[ ]" by "creating a boomerang effect where suppressed content becomes more desirable, and those censored are further isolated from public discourse, limiting their exposure to contradictory evidence." 1-SER-017–18, 20. Ultimately, "censorship practices erode public trust in institutions" because they exert "authoritarian control over narratives" and "foster[ ] widespread skepticism and alienation." 1-SER-020.

Plaintiffs' experts (and California's expert) offered more effective, empirically verified, and democratic ways for California to address any perceived issues with false content. Dr. Lucas opined that "promoting

digital and media literacy and improving political knowledge can effectively combat misinformation through deepfakes." 1-SER-062. That "includes teaching the importance of source credibility, editorial standards, and the differences between reputable journalism and sensationalist content." 1-SER-062. California's expert agreed: "Not surprisingly, with strengthened media literacy skills and greater political sophistication, people can be more likely to identify political deepfakes and less likely to believe they are accurate." 1-SER-122.

Dr. Ayers concluded—in agreement with the Assembly Committee on Judiciary—that "counterspeech provides a powerful response to various types of online speech, including misinformation." 1-SER-019–20. Calling out false information online "chang[es] how users engage with a single post" and "how they engage in deliberation across a social media platform." 1-SER-017. Multiple modes of counterspeech have effectively addressed false speech. They include crowd-sourced notes, like Community Notes on the platform X, a note by the poster himself, and comments on content—like comments posted by Rumble users. 1-SER-019–20.

## VII. The district court permanently enjoins AB 2655.

The district court granted Plaintiffs' motion for summary judgment on the Section 230 claim and denied California's. ER-20. It held that AB 2655 "imposes the State's preferred content-moderation scheme on covered platforms backed by a looming threat of costly,

expedited litigation." ER-28. That "regime is antithetical" to Section 230 because Congress sought "to encourage self-regulation and self-moderation unfettered by the types of threats of liability that AB 2655" imposes. ER-28.

The court held that Section 230(c)(1) and 230(c)(2) preempt AB 2655. Applying the three-step framework from *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), it noted that the "first and third prongs … are pretty straightforward" because Rumble qualifies as an "interactive computer service" and hosts content generated by other people. ER-22–23.

Rumble also satisfied *Calise*'s second prong because "the alleged duty violated derives from an entity's conduct as a publisher." ER-22. AB 2655 treats Rumble as a "publisher or speaker of information provided by a third-party." ER-24. Applying this Court's precedent, the district court reasoned that "[p]ublishing activity includes 'reviewing, editing, and deciding whether to publish or withdraw from publication third-party content'" and "editorial decisions and functions ancillary to the decision to make content available[,] … such as 'reviewing material submitted for publication.'" ER-24 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009)).

AB 2655's removal, labeling, and reporting requirements all treat Rumble as a publisher. This Court "has recognized taking down content is 'quintessential publishing conduct.'" ER-24 (quoting *Calise*, 103 F.4th

26

at 744). "Adding labels to posts is similar to editing posts because it does transform how content may appear on the website." ER-25. And the reporting requirement "hinges on the removal and labeling requirements which both treat platforms as publishers." ER-26.

The district court held that the reporting requirement also violated Section 230(c)(2)(B) because it imposed liability for making available "the technical means to restrict access to" certain "material." ER-26. Providing a reporting mechanism itself allows the technical means to restrict access, and "platforms will face enforcement if the reporting mechanism they implement does not, in the view of the government, satisfy the reporting requirement." ER-26–27.

Finally, the district court held that Rumble met the remaining permanent-injunction factors. AB 2655 causes irreparable injury by "upend[ing]" Rumble's "existing content moderation scheme" and "subject[s]" it "to litigation risk for failing to comport with California's complicated method of election content moderation." ER-29. And "complying with AB 2655 would be nearly impossible because platforms cannot be expected to know what a candidate has or has not said because the number of individuals captured by California's law is unbounded"—including "at least 866" "candidates" in 2026 and "up to several hundreds of thousands of 'elected officials' nationwide." ER-29.

In sum, AB 2655 "incentivize[s]" platforms to "censor too much to avoid liability." ER-30. But that "over-censorship" would harm Rumble's

27

users and "the public's access to an uninhibited marketplace of ideas." ER-30.

The district court thus declared unlawful and permanently enjoined AB 2655's enforcement against "X Corp. and Rumble." ER-15–16. After California agreed "not to enforce AB 2655 against any 'provider' of 'an interactive computer service,'" The Bee, Rickert, and Kohls agreed that the district court need not reach their constitutional claims. ER-11. But that "agreement shall terminate" if this Court "vacates the judgment granted as to AB 2655" under Section 230. ER-11.

## STANDARD OF REVIEW

This Court reviews a "grant of summary judgment de novo." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1119 (9th Cir. 2020).

## SUMMARY OF THE ARGUMENT

The district court correctly ruled that Section 230 preempts AB 2655, faithfully applying this Court's precedent to hold that AB 2655 treats Rumble and other online platforms as publishers or speakers of others' content. California's law requires content removal and labeling, as well as creation of a reporting mechanism for such content. It doesn't create any duty independent of publishing activity. As this Court has held, "review[ing] material submitted for publication," editing it, and "decid[ing] whether to publish" or remove it are "*publishing conduct.*" *Barnes*, 570 F.3d at 1102–03. And Section 230 also independently preempts the reporting requirement because it imposes liability for giving users the means to block content. By imposing liability for failing to censor and label content, AB 2655 incentivizes platforms to over-censor. That destabilizes the marketplace of ideas and contravenes Section 230's stated aim of promoting an open forum for political discussion.

The First Amendment and California Constitution also invalidate AB 2655. As California conceded below, AB 2655 discriminates based on political content and targets platforms' content moderation, so it triggers strict scrutiny. It also triggers that demanding review because it discriminates based on viewpoint, compels speech through its labeling requirement, and mandates a prior restraint.

29

California can't meet its burden. Counterspeech, promoting media and political literacy, and existing causes of action all serve as less restrictive alternatives to censoring political commentary. AB 2655 doesn't advance any compelling government interest because it imposes paternalistic, selective limitations on speech that deprive the people of their right to speak about politics. California also didn't prove that the content it targets has ever deceived a single voter—let alone one in California. As the record evidence shows, concerns about digitally modified false content are speculative—at best.

AB 2655 also violates the First and Fourteenth Amendment's protections against overbreadth and vagueness. It targets wide swaths of political speech—speech entitled to the utmost constitutional protection—far outside traditionally unprotected categories. It also incentivizes platforms like Rumble to over-censor speech to avoid liability. The statute's vague terms only increase the chill on speech. How can platforms accurately assess in only 36 hours whether content will likely harm a candidate's electoral prospects or reputation or undermine confidence in an election? They can only speculate. After all, those judgment calls will vary from voter to voter.

AB 2655 distorts the free marketplace of ideas in an area of utmost importance—our decisions on who should serve as our leaders. The district court properly enjoined it and declared it unlawful. This Court should affirm.

30

## ARGUMENT

### I.   Section 230 preempts AB 2655.

The district court correctly held that Section 230 preempts AB 2655. AB 2655 targets Rumble's publishing functions by requiring it to remove and label reported content that it would otherwise allow on its website. It therefore violates Section 230(c)(1). And the reporting requirement independently violates Section 230(c)(2) because it imposes liability for not providing an "easily accessible" reporting mechanism to California's satisfaction.

### A.   Section 230(c)(1) preempts the removal, labeling, and reporting requirements.

The district court properly applied this Court's Section 230(c)(1) precedent. That subsection "protects from liability (1) a provider or user of an interactive computer service (2) whom the plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Calise*, 103 F.4th at 740 (quoting *Barnes*, 570 F.3d at 1100–01). As California acknowledges, "solely the second prong" is "[a]t issue in this appeal." Op. Br. 20.

That second prong "look[s] to the legal 'duty,'" as shown by two subprongs. *Calise*, 103 F.4th at 742. "First, what is the 'right' from which the duty springs?" *Id.* If it comes from "something separate from the defendant's status" or conduct "as a publisher"—like "an

31

agreement"—"then § 230(c)(1) does not apply." *Id.* at 740, 742. Second, the Court asks what "this duty" requires? *Id.* at 742. If it requires the platform to "'monitor third-party content'—or else face liability—then that … is barred by § 230(c)(1)." *Id.* (quoting *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019)). AB 2655 flunks both subprongs.

### 1. AB 2655 targets platforms' publishing activity.

AB 2655 has no application outside of Rumble's conduct as a publisher. *See Barnes*, 570 F.3d at 1103 (Section 230 protects "conduct as a publisher"). As the district court recognized, "removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove." *Id.* A publisher also "perhaps edits" content "for style or technical fluency, and then decides whether to publish it." *Id.* at 1102.

AB 2655 imposes the duties of creating a reporting mechanism and removing or labeling content. It grants plaintiffs the right to sue for breaches of each of those duties. Cal. Elec. Code §§ 20515(b), 20516. But all those duties pivot around Rumble's decision whether to remove or label content. They impose liability on Rumble's "*publishing conduct*" and its decision "whether to exclude" or edit "material that third parties seek to post online." *Barnes*, 570 F.3d at 1103.

32

AB 2655 does not impose liability based on a theory independent of publishing functions. *See Calise*, 103 F.4th at 742. This Court's cases have rejected 230(c)(1)'s application to claims against an entity "as the counter-party to a contract, as a promisor who has breached." *Barnes*, 570 F.3d at 1107. Creating a contract or making a promise "generates a legal duty distinct from the conduct at hand." *Id.* So in *Calise*, the plaintiffs' "contract claims" were "not barred by § 230(c)(1)," but their "non-contract claims" were. 103 F.4th at 746. Similarly, Section 230(c)(1) did not bar a "negligent design claim" because the duty alleged there came from the platform's "distinct capacity as a product designer." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021).

Here, AB 2655 does not target conduct "distinct" from publishing, like an independent contract or the design of a product. It imposes liability for failing to remove or label content—quintessential publishing functions.

California offers two unavailing arguments under the first subprong. First, it says that because AB 2655 *might* regulate some large online platforms "that do *not* engage in content moderation" and that don't qualify as interactive computer services, AB 2655 doesn't treat Rumble as a publisher. Op. Br. 27. But California doesn't identify any such platforms. And undisputed record evidence shows that other covered platforms like Meta, YouTube, TikTok, Snapchat, and Google Search all moderate content posted by others. 2-SER-195–96; 1-SER-

33

004. That makes sense. A platform would be useless, and users wouldn't access it, if it didn't moderate content in any way. Indeed, platforms must moderate some content to comply with federal laws like the Digital Millennium Copyright Act and the Allow States and Victims to Fight Online Sex Trafficking Act, 47 U.S.C. § 230(e)(5).

Section 230(c)(1) focuses on the "theory of liability," not on a statute's hypothetical effect on hypothetical third parties. *See Barnes*, 570 F.3d at 1101. It requires a "claim-specific" analysis. *Calise*, 103 F.4th at 739. The district court enjoined AB 2655's application to Plaintiffs here—Rumble and X Corp—and they undeniably moderate content. ER-16. As discussed above, California's theory of liability targets Rumble's publishing conduct.

California's cited case shows the difference. Op. Br. 27 (citing *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 798 (5th Cir. 2024)). In *A.B.*, the Fifth Circuit applied the same test as this Court, "focus[ing] on the claims and theories of liability advanced by a plaintiff." *A.B.*, 123 F.4th at 798. But there, the relevant statute created a general "duty to the public not to knowingly benefit from participation in a sex-trafficking venture." *Id.* And the "duty" there "simply require[d] that Salesforce not sell its tools and operational support to a company it knew (or should have known) was engaged in sex trafficking." *Id.* at 797. By contrast, AB 2655's removal, labeling, and reporting requirements—by their very nature—impose liability because of publishing conduct.

California's second argument attempts a similarly illusory distinction. As California admits, Section 230(c)(1) under this Court's precedent protects Rumble's "*editorial choices … regarding whether to allow or remove certain content.*" Op. Br. 28. In California's words, "[m]aking such editorial choices is what it means to be a publisher." *Id.* That concedes a 230(c)(1) violation.

But California then tries to exculpate itself by claiming that Rumble has "*no editorial discretion*" under AB 2655 and therefore the statute couldn't be preempted. *Id.* at 29. That's exactly the problem. By removing Rumble's discretion whether to remove or label certain content, AB 2655 imposes liability for acting like a publisher. By conceding that content covered by AB 2655 "*must* be removed or labeled," *id.,* California has "impose[d] liability on the basis of" not "removing content," which "necessarily involves treating the liable party as a publisher of the content it failed to remove"—just like in *Barnes.* 570 F.3d at 1103.

After all, a platform having no choice and a platform exercising its "*own choices*" are just two sides of the same coin. *See* Op. Br. 37. By removing choice, AB 2655 interferes with platforms' own choice of what to publish. In sum, "section 230 protects from liability any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Barnes,* 570 F.3d at 1103 (citation modified). AB 2655 violates the first subprong.

### 2. Platforms must remove, label, and monitor third-party content.

Under *Calise*'s second subprong, AB 2655 requires platforms to remove, label, and "monitor third-party content." *Calise*, 103 F.4th at 742. It commandeers Rumble's publishing discretion by forcing it to "remove … user content," thus "affect[ing] how it publishes or monitors such content." *Id.* at 741 (quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016)).

California concedes that publishing includes "'*actively* vet[ting] and evaluat[ing]' third-party content." Op. Br. 26 (quoting *Calise*, 103 F.4th at 744). And that's exactly what AB 2655 requires. It demands that when Rumble receives a report, Rumble must make the difficult and subjective determination under a compressed timeline of whether content qualifies as "materially deceptive." If it qualifies, Rumble must remove or label it. But "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc). AB 2655 thus interferes with platforms' publishing discretion over third-party content.

California's contrary argument relies on a mistaken reading of AB 2655 and a hyperliteral reading of "monitor." California says that AB 2655 "does not require platforms to continuously watch for, proactively

36

review for, or affirmatively search for particular third-party content when it is posted." Op. Br. 26. Yet the law mandates that platforms "identify and remove materially deceptive content" when reported. Cal. Elec. Code § 20513(a). Once reported, the platform must assess the content and make the "complicated" determination of whether it qualifies as "materially deceptive." *See* ER-29. AB 2655 also requires platforms to "identify, using state-of-the-art techniques," (a term undefined by AB 2655) "and remove, upon discovering or being alerted to the posting or reposting of, any identical or substantially similar materially deceptive content." Cal. Elec. Code § 20513(c). AB 2655 requires monitoring third-party content under any definition.

This Court's precedent (including that quoted by California) also rejects California's reading of "monitor." Publishing conduct extends beyond "scour[ing]" a platform for offending content. *Contra* Op. Br. 26 (quoting *Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 647 (9th Cir. 2025)). As recognized by *Doe 1*, the duty to "monitor content" counts as publication just as the duty to "take any action associated with publication (e.g., removal) once [a platform] learns of objectionable content" qualifies as a publishing activity. 148 F.4th at 648. Indeed, the *Doe 1* Court held—as quoted by California—that "decisions about what third-party content is disseminated are quintessentially the province of a publisher." Op. Br. 24 (quoting 148 F.4th at 645).

37

California recognizes that 230(c)(1) bars theories that attempt to hold platforms responsible for their "decision to publish" content or their decision of "not moderating content in some way, whether through deletion, change, or suppression." Op. Br. 23 (quoting *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1180 (9th Cir. 2024)). And *Barnes* didn't discuss "proactively" monitoring content—under California's theory—at all. It held that "removing content is something publishers do." 570 F.3d at 1103.

The district court didn't create a "but-for" test. *Contra* Op. Br. 33. It faithfully applied this Court's three-step framework for assessing 230(c)(1) claims. It examined whether the "duty" imposed by AB 2655 "derive[d] from an entity's conduct as a publisher, including 'reviewing, editing, and deciding whether to publish or withdraw from publication third-party content.'" ER-22 (quoting *Barnes*, 570 F.3d at 1102). And it properly held that AB 2655 imposed liability based on the failure to remove or label content and the failure to provide a reporting mechanism, all of which "necessarily involve[d] treating the covered platforms as a publisher of the content it failed to remove." ER-25 (quoting *Calise*, 103 F.4th at 740).

Nothing in the district court's ruling supports California's sky-is-falling claim that 230(c)(1) preempts "*any law*" involving third-party content. *Contra* Op. Br. 32. In a straightforward application of this Court's precedent, the district court held that AB 2655 imposed liability

38

for core publishing functions. It had no occasion to—and did not—question this Court's holdings that 230(c)(1) does not preempt causes of action based on conduct distinct from publishing—like contracts or negligent product design. *See supra* Section I.A.1.

Likewise, the district court's holding doesn't threaten "a State's ability to prevent the spread of dangerous and harmful content online." *Contra* Op. Br. 34. This Court has allowed claims to proceed against online "child sex abuse materials" and "advertisements for illegal goods." *Contra id. See Doe 1*, 148 F.4th at 639–40 & n.1 (allowing some claims to proceed based on online "child sexual abuse material"); *Calise*, 103 F.4th at 737 (allowing some claims to proceed based on allegedly "fraudulent ads"). But Section 230 doesn't permit California to mandate that platforms police their users' First Amendment-protected political speech.

The district court got it right. Section 230 "requires" courts "to scrutinize particularly closely any claim that can be boiled down to the failure of an interactive computer service to edit or block user-generated content." *Roommates.Com*, 521 F.3d at 1172 n.32. The district court carefully applied this Court's precedent to rule that's exactly what AB 2655 does. Section 230(c)(1) therefore preempts it.

## B. Section 230(c)(2)(B) preempts the reporting requirement.

Section 230 also protects an "interactive computer service" from liability "on account of … any action taken to enable or make available to information content providers or others the technical means to restrict access to" "material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2); *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173 (9th Cir. 2009).

Complying with the reporting requirement grants the "technical means" to "restrict access to" "objectionable" material. AB 2655 requires Rumble and other large online platforms to "provide an easily accessible way for California residents to report to that platform content that should be removed pursuant to Section 20513 or labeled pursuant to Section 20514." Cal. Elec. Code § 20515(a). Those reports then trigger the platform's obligation to restrict access to material the user found objectionable.

California attempts to read AB 2655's liability provision out of its statute. *See* Op. Br. 39. But, as the district court ruled, AB 2655's plain text imposes liability for lack of "compliance with the reporting process." Cal. Elec. Code §§ 20515(b), 20516; ER-26–27. What's more, California's concession that "AB 2655 solely requires a platform to act once a user has reported content to that platform" (while partially incorrect because

AB 2655 imposes an affirmative identification requirement, *supra* Section I.A.2), contradicts its claim that "AB 2655 *removes* a user['s] … ability to determine whether to remove or label content." Op. Br. 26, 39.

California's other concession that the "reporting user may wish such content removed" invalidates its argument against 230(c)(2)'s application. *See id.* at 40. California seems to think that because other users may wish to see covered content, a single user's complaint doesn't trigger 230(c)(2). *Id.* But the statute only refers to the objection of a single "user." 47 U.S.C. § 230(c)(2)(A). And—as California recognizes— its law requires Rumble to provide a user with the means to report content for removal or labeling. In California's words, the reporting requirement mandates that platforms provide the means "to remove content that a *user* objects to." Op. Br. 39. Section 230(c)(2) thus preempts it.

### C. AB 2655 incentivizes platforms to aggressively censor political speech, undermining the marketplace of ideas Section 230 aims to protect.

Congress's stated policy in enacting Section 230 reinforces the district court's preemption holding. Congress found that the "Internet and interactive computer services offer a forum for a true diversity of political discourse." 47 U.S.C. § 230(a)(3). And that—even in 1996— Americans "rel[ied] on interactive media for a variety of political … services." *Id.* § 230(a)(5). Thus, the "policy of the United States" is "to

promote the continued development of the Internet and other interactive computer services." *Id.* § 230(b)(1).

The district court correctly ruled that California's "regime is antithetical" to Congress's design. ER-28. "[U]nder AB 2655, internet platforms would be incentivize[d] to overcompensate and censor too much to avoid liability." ER-30. That "over-censorship" would harm both users of the platform and "the public's access to an uninhibited marketplace of ideas"—undermining the diversity of political discourse Congress sought to protect. ER-30.

AB 2655 imposes no penalties for removing or labeling content not covered by its terms. But it imposes substantial costs—endless lawsuits and injunctions—for not complying. Politically biased actors can weaponize those expedited lawsuits to help their campaigns or reputations. When platforms receive a complaint, they must try to assess the truth of the content. But much covered content may involve—in the words of the legislative committee—"arcane" local races for which it may be difficult to identify the candidates, including "write-in" candidates—let alone everything the candidate has said. ER-49. And the statute also extends to cover potentially hundreds of thousands of elected officials nationwide. ER-29.

Platforms like Rumble must make those difficult determinations within 36 hours of receiving a report. Within that timeframe, platforms must respond to a report "describing any action taken or not taken …

42

with respect to the content." Cal. Elec. Code § 20515(a). So in 36 hours, the platform needs to decide what to do with the reported content, making the statute's other deadline irrelevant. And given the extensive amount of content online (millions of hours on Rumble and 170 billion posts per year on X), platforms can expect to be inundated with reports. 2-SER-203; 1-SER-006.

AB 2655 places an especially acute burden on Rumble. Rumble relies on manual reviewers for the vast amounts of its hosted content. That means for every report Rumble receives, a person must review a multitude of contextual information, like the candidates and issues involved in a race, which candidates have said what, and who the relevant elected officials are. That's nearly impossible to do accurately when "real-world political events often lack verifiable ground truth." 1-SER-060. Based on that imperfect information, the content reviewer must then make a two-step judgment call about whether that content (1) might "appear to a reasonable person to be an authentic record" and (2) would be "reasonably likely" to harm the candidate's reputation or electoral prospects or undermine confidence in an election. 2-SER-202.

The satire or parody exemption makes that determination even more difficult. Even if the content qualifies under the above analysis, Rumble's reviewer could still exempt "satire and parody." But the statute doesn't define that term. And people can disagree about what qualifies as satire and what is simply false content, as shown by the

43

numerous factchecks for The Bee's articles and Governor Newsom deeming Kohls's video "illegal." The exemption just adds one more contextual and subjective judgment call, incentivizing platforms to err on the side of caution and censorship.

AB 2655's "broad censorship regime" takes political discourse out of the hands of the People. ER-75. It requires platforms to become the state-mandated "judge, jury, and executioner" of online political speech. ER-75. That's the opposite of why Congress enacted Section 230. It's the opposite of Pavlovski's reason for founding Rumble. And it's the opposite of what California thinks AB 2655 does—protect democracy. *See* Op. Br. 10. In properly applying Section 230 preemption, the district court ruled consistent with Congress's stated policy and protected the free marketplace of political ideas from heavy-handed government interference. AB 2655—not the speech it targets— undermines democracy.

## II. AB 2655 violates the First Amendment and California Constitution.

This Court should independently affirm because AB 2655 violates the First Amendment and the California Constitution's free speech guarantee. Rumble, The Bee, Rickert, and Kohls all brought constitutional challenges against AB 2655. California repeatedly references AB 2655's constitutional implications, arguing that it has "longstanding authority" to regulate "third-party content." Op. Br. 30;

44

*see id.* at 29, 31. But California cannot "deputize private actors into determining whether material is suitable" for political discussion. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024). And because the California Constitution provides at least as much speech protection as the federal Constitution, AB 2655 violates the state constitution for the same reasons it violates the First Amendment. *See Fashion Valley Mall, LLC v. NLRB*, 172 P.3d 742, 749 (Cal. 2007).

AB 2655 triggers and fails strict scrutiny for many of the same reasons the district court enjoined California's similar law, AB 2839 (a decision California didn't appeal), and a district court recently enjoined Hawaii's similar law. *See Kohls v. Bonta*, 797 F. Supp. 3d 1177 (E.D. Cal. 2025); *The Babylon Bee, LLC v. Lopez*, 2026 WL 555552, at *1 (D. Haw. Jan. 30, 2026). As California conceded below, strict scrutiny applies because AB 2655 discriminates based on political content and interferes with platforms' content moderation. It also discriminates based on viewpoint, compels speech, and imposes a prior restraint.

California cannot meet its strict-scrutiny burden. The record shows that AB 2655 is not the least restrictive means to further any compelling government interest. Many more effective and more democratic means—like counterspeech—exist to serve California's aims.

45

**A.     AB 2655 triggers at least strict scrutiny.**

**1.     AB 2655 interferes with Rumble's content moderation decisions.**

AB 2655 interferes with the content of Rumble's speech because "presenting a curated and edited compilation of third party speech is itself protected speech." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (citation modified). Rumble curates the content it hosts under its content moderation policy. 2-SER-193; 1-SER-004. That policy doesn't prohibit political speech, but bars pornography, "grossly offensive" content like racist or antisemitic material, and content that incites or promotes violence. 2-SER-193–94; 1-SER-004. Rumble also doesn't label content. 2-SER-194; 1-SER-004.

AB 2655 forces Rumble to remove or label political content it wouldn't otherwise. But Rumble "has a First Amendment right to use its platform to promote views it finds congenial and to refrain from promoting views it finds distasteful." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024). As California conceded below, "AB 2655 implicates the expressive activity of online platforms" like Rumble, but Rumble has the "expressive interest in the expressive selection, ordering, and labeling of third party posts." 1-SER-090 (citation modified). AB 2655 therefore triggers strict scrutiny. 1-SER-090.

46

### 2. AB 2655 discriminates based on political content.

California (and two legislative committees) rightfully conceded that "AB 2655 regulates on the basis of content and is subject to strict scrutiny." 1-SER-090; *see* ER-71; 2-SER-224. The law "regulates based on content because … '[it] applies to particular speech because of the topic'—a political candidate, elected official, elections official, ballot, or voting mechanism." *Kohls*, 797 F. Supp. 3d at 1183 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

Indeed, as the Senate Judiciary Committee recognized, AB 2655 targets core First Amendment conduct: "[p]olitical speech." *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (citation modified); *see* ER-69. But the First Amendment broadly protects speech about political candidates, ballot measures, and controversial political topics "to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (citation modified).

AB 2655 also regulates speech far outside historically unprotected categories. *Kohls*, 797 F. Supp. 3d at 1184. As a legislative committee again recognized, no "categorical" rule exists "that false statements receive no First Amendment protection." *Alvarez*, 567 U.S. at 719 (plurality); 2-SER-224. Indeed, false speech can be regulated only if it falls within historical exceptions to the First Amendment, for things like defamation or fraud. *Alvarez*, 567 U.S. at 717 (plurality). These

47

"traditional categories [of expression] long familiar to the bar" are "well-defined and narrowly limited." *United States v. Stevens*, 559 U.S. 460, 468–69 (2010). And they "typically require proof of specific or tangible harm" or "a material benefit to the speaker." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194–95 (9th Cir. 2018).

By contrast, AB 2655 "proscribes content that is merely 'reasonably likely' to cause harm, which is speculative and prophylactic rather than remedial or concrete." *Kohls*, 797 F. Supp. 3d at 1184. "[T]he statute also goes beyond reputational harms to include amorphous harms to the 'electoral prospects' of a candidate." *Id.* And AB 2655 "does not require reliance or actual injury." *Id.*

California seems to think that "the election context gives the government broader authority to restrict speech." *Commonwealth v. Lucas*, 34 N.E.3d 1242, 1253–54 (Mass. 2015) (calling this argument "remarkable"). In fact, "[t]he opposite is true." *Id.*; *accord 281 Care Comm. v. Arneson*, 766 F.3d 774, 782–83 (8th Cir. 2014) (applying higher standard of scrutiny to election misinformation regulation than to regulation of other falsehoods). The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339 (citation modified).

### 3. AB 2655 discriminates based on viewpoint.

AB 2655 exacerbates its constitutional violation by discriminating based on viewpoint. Viewpoint discrimination is "uniquely harmful to a

48

free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). Thus, if a law is "viewpoint-based, it is unconstitutional." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *accord Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) ("prohibited"); *see Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1124 (9th Cir. 2023) (VanDyke, J., concurring) (collecting cases suggesting viewpoint discrimination is "per se invalid"). But, at the very least, it triggers strict scrutiny. *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020).

AB 2655 allows political content that is "positive about a person" and bolsters his reputation—like memes of President Trump praying or playing professional football—but prohibits "derogatory" political content likely to harm a candidate's prospects for election—like memes of Vice President Harris in a red communist uniform. *Iancu*, 588 U.S. at 393 (citation modified); *see* 2-SER-186, 213; 1-SER-003, 08. Similarly, AB 2655 countenances digitally altered content that promotes confidence in elections but prohibits content likely to "undermine confidence" in those elections. Cal. Elec. Code § 20513(a)(2). "These distinctions are the 'essence of viewpoint discrimination.'" *Kohls*, 797 F. Supp. 3d at 1183 (quoting *Iancu*, 588 U.S. at 393).

### 4. AB 2655 compels speech.

California's law doesn't just restrict speech—it compels it. The government compels speech when it requires someone to say something that affects the speaker's message. *303 Creative LLC v. Elenis*, 600 U.S.

49

570, 586 (2023). And a speaker's right to choose her own message applies "equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). So, for example, this Court has said that requiring online platforms to publish information about their content-moderation practices compels speech. *X Corp. v. Bonta*, 116 F.4th 888, 894, 901 (9th Cir. 2024). Laws that compel speech necessarily discriminate based on content and are thus "subject to strict scrutiny." *Id.* at 903.

The labeling requirement doubly compels speech. Covered platforms, like Rumble, must "label" content with the words: "This ___ has been manipulated and is not authentic." Cal. Elec. Code § 20514(c). To compound the violation (and vagueness), covered platforms must also "permit users to click or tap on" that label "for additional explanation about the materially deceptive content in an easy-to-understand format." *Id.* § 20514(d). The statute doesn't provide any requirements for what "additional explanation" Rumble must offer, compelling Rumble to justify the labeling of political content it doesn't want to label.

The reporting requirement, too, doubly compels speech. It mandates that covered platforms "provide" on their platforms "an easily accessible way for California residents" to report content. *Id.* § 20515(a). And it requires the platform to "respond to the person who made the report … describing any action taken or not taken." *Id.*

### 5. AB 2655 facilitates prior restraints.

By requiring platforms to remove content under threat of injunction, AB 2655 mandates a prior restraint on political content—the "most serious and the least tolerable infringement on First Amendment rights." *Garcia v. Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (en banc). The statute's required "takedown order[s]" are "classic" prior restraints. *Id.* A "historical and heavy presumption" against the constitutionality of prior restraints exists, meaning they must meet at least strict scrutiny. *Id.*; *In re Dan Farr Prods.*, 874 F.3d 590, 593 n.2 (9th Cir. 2017) (per curiam).

### B. AB 2655 fails strict scrutiny.

AB 2655's selective application to certain content and viewpoints makes it "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992). And that presumption is heightened here because California explicitly seeks to police political discourse. *Citizens United*, 558 U.S. at 340 (suggesting "political speech simply cannot be banned or restricted as a categorical matter"). At minimum, AB 2655 must advance a compelling state interest through the least-restrictive means possible. *Reed*, 576 U.S. at 173. California "bears the burden of proving the [law] meets this standard." *Pierce v. Jacobsen*, 44 F.4th 853, 862 (9th Cir. 2022).

California cannot meet its burden. Strict scrutiny "succeeds in" its mission to ensure that the government cannot police people's speech "if

and only if, as a practical matter, it is fatal in fact absent truly extra-ordinary circumstances." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 485 (2025). Thus, "only once" has the Supreme Court upheld a law burdening First Amendment rights under strict scrutiny. *Id.* at 484. And that was in the inapposite national security context. *Id.*

The record here shows that California has many less restrictive—and more effective—alternatives, like counterspeech, educational campaigns, and other causes of action. Those alternatives show that AB 2655 is vastly overinclusive. It also suffers from underinclusivity by exempting smaller online platforms from removing the *same* content, newspapers, magazines, and broadcasters, speech by candidates, and other content about elections. Finally, selective, paternalistic limitations on speech don't advance any compelling government interest. California hasn't shown that the content it targets has caused any of its feared consequences. Rather, the record evidence shows that concerns about digitally altered content are "speculative."

### 1. California can't meet its narrow tailoring burden.

#### a. California has many less restrictive alternatives.

"Because restricting speech should be the government's tool of last resort, the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive" and unconstitutional. *IMDb.com*, 962 F.3d at 1125. California has many alternative ways to advance any

52

compelling interest, and California has not shown that it considered these alternatives and found them ineffective. *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

First, "the ordinary course in a free society" is to remedy false speech with "speech that is true." *Alvarez*, 567 U.S. at 727 (plurality). "Especially as to political speech, counterspeech is the tried and true buffer and elixir." *281 Care Comm.*, 766 F.3d at 793. Courts in digitally modified political speech cases have found counterspeech "to be a viable, less restrictive alternative." *The Babylon Bee*, 2026 WL 555552, at *13; *see Kohls*, 797 F. Supp. 3d at 1186–87. For example, California could start a "Government-created database" that tracks deepfakes and "verif[ies] and expos[es] false claims." *Alvarez*, 567 U.S. at 729 (plurality).

California could also encourage counterspeech in the free market. Record evidence shows that more speech works much better than censorship. Multiple modes of effective counterspeech exist, including comments on posts (as Rumble users can), crowd-sourced community notes, user-posted disclaimers (like Kohls did), and AI-supported counterspeech flags. 1-SER-019–20. These methods provide a "powerful response to various types of online speech, including misinformation." 1-SER-020. "Peer-to-peer comments enable direct challenges to misinformation, including political deepfakes, fostering dialogue and leveraging social media's strength in community engagement." 1-SER-

53

015. But "censorship" prevents the public from having "a conversation about potentially misleading speech" and learning from it. 1-SER-020. And most content cited by California as potentially problematic either already had counterspeech or likely didn't fall under AB 2655. 1-SER-035.

Second, California could launch "educational campaigns" on how to spot deceptive content and increase media literacy. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (citing "educational campaigns" as alternative to First Amendment restriction); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 775 (2018) (same). That would likely be more effective (and definitely more constitutional) than censoring speech. "Research … shows that promoting digital and media literacy and improving political knowledge can effectively combat misinformation through deepfakes." 1-SER-062; *see* ER-96 (California citing news article quoting "experts" opining that "the best way to combat visual misinformation is better public awareness and education").

Increasing media and political literacy avoids AB 2655's counterproductive censorship. Education prevents the "false sense of security" from expecting not to encounter any digitally altered content. 1-SER-059. A false sense of security here would be especially dangerous because California has no way—and does not purport—to ban all digitally altered content. 1-SER-059.

54

California's expert agrees that "with strengthened media literacy skills … people can be more likely to identify political deepfakes and less likely to believe that they are accurate." 1-SER-122. His only objection is that this "would require a large investment of resources." 1-SER-122. But the "First Amendment does not permit the State to sacrifice speech for efficiency." *NIFLA*, 585 U.S. at 775.

AB 2655 appears to rely on the flawed premise that digitally modified content poses a problem different in kind from other forms of false information. But the record doesn't support that claim. As Dr. Lucas explained, digitally created or altered content is not uniquely harmful compared to other forms of misinformation. 1-SER-057. The few studies on deepfakes show only that the "persuasive and credibility advantages … are modest, at best." 1-SER-058. Lucas's study sits at the forefront of that research. In fact, California's expert cited it. 1-SER-112. So California's expert appears to agree with Lucas: "the consensus … is that deepfakes are not considerably more credible nor more affectively appealing than traditional forms of misinformation." 1-SER-056–57. In sum, "deepfakes are part of a broader ecosystem of potential misinformation, not a uniquely destructive force." 1-SER-063.

Third, as the district court noted in the case against a similar California law, "existing statutory causes of action, including privacy torts, copyright infringement, or defamation already provide recourse to public figures." *Kohls*, 797 F. Supp. 3d at 1186 (citation modified).

California also has a host of other provisions targeting false election-related information that causes a legally cognizable harm. *E.g.*, Cal. Elec. Code §§ 18502(a), 18573, 20500. "Because the State has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech, it fails to show that the law is the least restrictive means to protect [any] compelling interest." *IMDb.com*, 962 F.3d at 1126 (citation modified).

California must show that alternative methods "would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. California hasn't shown that it has considered, much less tested, these other options. It can't meet its least-restrictive-means burden.

### b. AB 2655 is fatally over and underinclusive.

"[A] statute is not narrowly tailored if it is either underinclusive or overinclusive." *IMDb.com*, 962 F.3d at 1125. The less restrictive alternatives discussed show AB 2655's overinclusivity. Its exemptions also make it "wildly underinclusive." *NIFLA*, 585 U.S. at 774.

AB 2655 doesn't apply to smaller online platforms, despite a legislative committee acknowledging that those platforms—like Truth Social and Parler—may "produce most of the concern" about false content. 2-SER-228. The law also doesn't require online newspapers, magazines, and periodicals to remove "materially deceptive content" with no explanation of how that content doesn't undermine California's

stated aim. Cal. Elec. Code § 20519. And platforms don't have to remove otherwise covered content by candidates. *Id.* § 20513(d)(1). But politicians promoting "self-aggrandizing falsehoods" are just as, or perhaps even more likely, to undermine elections as citizens posting similar content. *Grimmett v. Freeman*, 59 F.4th 689, 696 n.9 (4th Cir. 2023). After all, candidates will often have much larger online followings—like President Trump's 100 million to Rickert's 1,600— meaning multitudes more people will see content posted by them. 2-SER-185; 1-SER-003.

Finally, AB 2655 applies only to certain digitally modified speech about certain election-related topics, not all false election speech. In the last election, countless election-related "deepfakes," like ones portraying "Swifties for Trump," were allowed so long as they did not depict a candidate or official. 2-SER-274. So are many other false posts that "undermine the perception of electoral integrity"—like allegations about Russian disinformation—so long as they do not specifically reference a candidate, ballot measure, or other proscribed topic. *Grimmett*, 59 F.4th at 696 n.9. California "(wisely) declined to restrict" that speech. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 801 (2011). But it has "no persuasive reason why," *id.* at 802, it exempted that speech but targeted "deepfakes," which are "no more persuasive or better at deceiving people than traditional media," 1-SER-057.

### 2. AB 2655 doesn't advance any compelling government interest.

California must also "show that the statute furthers a compelling governmental interest." *IMDb.com*, 962 F.3d at 1125 (citation modified). But AB 2655 imposes selective limitations on speech that don't target any proven harm. Instead of protecting democracy—as the California legislature claimed—AB 2655 undermines it. AB 2655 is also both underinclusive and overinclusive, showing that it does not advance any compelling interest. *Brown*, 564 U.S. at 802, 805.

"[S]elective limitations upon speech" don't further any compelling interest. *R.A.V.*, 505 U.S. at 392. As discussed, AB 2655 targets speech portraying only certain subjects and expressing only certain viewpoints and gives special treatment to certain speakers. It also grants enforcement discretion to politically motivated actors. This selectivity reveals that California "seek[s] to handicap the expression of particular ideas." *Id.* at 394. That is anathema to the First Amendment even when the state's interests "are compelling" and even when a law "can be said to promote them." *Id.* at 395.

Courts reject California's "'highly paternalistic approach' [of] limiting what people may hear." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (citation modified). California's "claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some

skepticism." *Id.* at 228 (citation modified). Instead of safeguarding the right to vote, AB 2655 "goes beyond" to "[d]irectly regulat[e] what is said or distributed during an election." *281 Care Comm.*, 766 F.3d at 787. But free and open debate doesn't pose a risk to democracy. It sustains democracy.

California has failed to show that digitally created or modified content causes any harm justifying burdens on First Amendment rights. *See Brown*, 564 U.S. at 800. Neither California nor its expert cited a *single* instance of actual voter deception anywhere—let alone in California. The expert abounded in speculation. He recognized that problems from "political deepfakes" "*may* be profound," they "*might* affect a viewer," "*can* introduce uncertainty," etc. 1-SER-110–11 (emphasis added). He acknowledged that the research is nascent and that "the effects of political deepfakes on voter trust and confidence in elections are understudied." 1-SER-112. California has failed to do anything more than "simply posit the existence of the disease sought to be cured." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 307 (2022) (citation modified).

This type of "speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980). As Dr. Lucas explained, concerns about deepfakes as a novel and dangerous technology are "speculative." 1-SER-053. The literature "is relatively new," and claims "that political

59

deepfakes will be more effective than existing forms of misinformation … remain[ ] an open empirical question." 1-SER-056. At most, California offers flawed evidence of correlation, not causation, and that is categorically insufficient to carry the State's burden here. *Brown*, 564 U.S. at 800; *Alvarez*, 567 U.S. at 725 (requiring "direct causal link").

## III.  AB 2655 is overbroad and vague.

The First Amendment overbreadth doctrine prohibits laws that have a substantial number of unconstitutional applications "relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008).

A law can also be overbroad if it's vague. Yet the test for vagueness is distinct: a law is void-for-vagueness when it (1) fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly;" or (2) fails to "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *accord Edge v. City of Everett*, 929 F.3d 657, 664–665 (9th Cir. 2019). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

AB 2655 fails the constitutional tests for overbreadth and vagueness.

### A. AB 2655 overwhelmingly targets protected speech.

AB 2655's expansive requirements far exceed the traditional, narrow categories of unprotected speech. *Supra* Section II.A.2. It regulates countless "YouTube videos, Facebook posts, and X tweets [that] are the newspaper advertisements and political cartoons of today." *Kohls v. Bonta*, 752 F. Supp. 3d 1187, 1195 (E.D. Cal. 2024). It requires removal or labeling of Rickert's digitally created images of President Trump being arrested. 2-SER-209–10; 1-SER-007. And it applies to the Harris parody video because a viewer (like Gov. Newsom) "could have concluded … that it was real" and not actually parody. 2-SER-317.

AB 2655 is also overbroad because it incentivizes aggressive over-censorship. ER-30. As discussed, AB 2655 threatens endless lawsuits and injunctions for platforms' failing to censor content under expansive and vague definitions. *Supra* Section I.C. But it doesn't create any liability for failing to censor. That will force platforms to further distort the marketplace of ideas.

### B. AB 2655 uses unconstitutionally vague terms.

A law is unconstitutionally vague "if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. The doctrine requires fair notice about what the law proscribes and guardrails to ensure that "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253. "[V]agueness concerns are more

acute when a law implicates First Amendment rights" because of the risks of chilled speech and discriminatory enforcement. *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022). In this context, there is an "enhanced standard" requiring "an even greater degree of specificity and clarity of laws." *Edge*, 929 F.3d at 664–65. "These concerns are magnified even further when a law regulates political speech." *Butcher*, 38 F.4th at 1169.

AB 2655 fails to define adequately four key terms:

First, it leaves undefined a platform's obligation to develop "state-of-the-art techniques" to affirmatively identify and remove certain "content." Cal. Elec. Code § 20513(a). Undisputed evidence shows that Rumble doesn't have and isn't aware of any technical tools that can identify "materially deceptive content." 2-SER-200, 203; 1-SER-005–06. But California still subjects platforms to liability for not complying.

Second, vagueness lies in the definition of "materially deceptive content." Covered content need not actually fool anyone, but simply "falsely appear to a reasonable person to be an authentic record of the content depicted in the media." Cal. Elec. Code § 20512(i)(1). That means large online platforms and content creators "must necessarily guess at" what types of political satire and parody appear authentic enough to violate the law. *Fox Television*, 567 U.S. at 253; *see also Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 513 (9th Cir. 1988) (treaty

62

affording favorable treatment to materials deemed "representative," "authentic," and "accurate" was "unquestionably vague").

Third, whether something is "reasonably likely to harm" or help the "electoral prospects of a candidate" or "confidence" in an election remains in the eye of the beholder and each individual voter. These terms focus "on the recipient encountering the manipulated content." *Kohls*, 797 F. Supp. 3d at 1190. Platforms can only speculate whether content qualifies. AB 2655 thus provides "no principle for determining when" speech will "pass from the safe harbor … to the forbidden." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1049 (1991).

Fourth, the "minor modifications" exception adds vagueness. Cal. Elec. Code § 20512(i)(2); *cf. Sackett v. EPA*, 598 U.S. 651, 681 (2023) ("the boundary between a 'significant' and an insignificant nexus is far from clear"). That's especially true for California's law, which relies on the "perceived" meaning of any allegedly "minor" modifications. Cal. Elec. Code § 20512(i)(2).

The law's vagueness also violates the content and viewpoint neutrality requirements because it gives enforcement authorities "unbridled discretion." *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012). Simply, "an indeterminate prohibition carries with it the opportunity for abuse." *Minn. Voters All.*, 585 U.S. at 21 (citation modified). Enforcement officials "must be guided by objective, workable standards." *Id.* AB 2655 gives anything but.

63

Return to "materially deceptive." Run-of-the-mill campaign ads attacking "a candidate's voting record," for example, often contain exaggerations. *Lucas*, 34 N.E.3d at 1256 ("distinguishing between truth and falsity may prove exceedingly difficult" in this context). If courts must undertake an "in-depth analysis of legislative history" to determine the truth or falsity of digitally altered content, that gives politically motivated enforcement authorities much discretion to determine which posts violate the law. *Id.*

Or take Rickert's memes of President Trump fleeing police. 2-SER-209–10; 1-SER-007. It's ambiguous whether they would be "reasonably likely to harm" his candidacy because some will view this content favorably while others will not. Or it may depend on whether someone somewhere thinks it's "materially deceptive" and could harm President Trump's reputation. "[T]his myriad of factors lends itself to discriminatory enforcement," where activists and government officials alike "resort to enforcing the [law] only against those messages the officer or the public dislikes." *Berger v. City of Seattle*, 569 F.3d 1029, 1047–48 (9th Cir. 2009) (citation modified). "The potential permutations associated with election strategy make any predication about what 'likely ... harm[s] electoral prospects' nebulous and intangible at best." *Kohls*, 797 F. Supp. 3d at 1190.

AB 2655's vague terms granting enforcement discretion to politically motivated actors will chill untold amounts of speech. These

64

vague terms further incentivize platforms like Rumble to err on the side of caution and block and label much more content than required. That would deprive everyone of critically important political speech. AB 2655's vagueness—not the speech the law targets—undermines our democracy.

## CONCLUSION

To promote the free marketplace of political speech envisioned by Section 230 and the First and Fourteenth Amendments, this Court should affirm.

Respectfully submitted this 11th day of March, 2026

*s/Adam E. Schulman*
 Adam E. Schulman
 Theodore H. Frank
 HAMILTON LINCOLN LAW INSTITUTE
 1629 K Street NW, Suite 300
 Washington, DC 20006
 (610) 457-0856
 adam.schulman@hlli.org
 ted.frank@hlli.org

*Counsel for Appellee Christopher Kohls*

 *s/Mathew W. Hoffmann*
 James A. Campbell
 Johannes Widmalm-Delphonse
 Mathew W. Hoffmann
 ALLIANCE DEFENDING FREEDOM
 44180 Riverside Pkwy
 Lansdowne, VA 20176
 (571) 707-4655
 jcampbell@ADFlegal.org
 jwidmalmdelphonse@ADFlegal.org
 mhoffmann@ADFlegal.org

 John J. Bursch
 ALLIANCE DEFENDING FREEDOM
 440 First Street NW, Suite 600
 Washington, DC 20001
 (202) 393-8690
 jbursch@ADFlegal.org

Jonathan A. Scruggs
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org

*Counsel for Appellees Rumble Inc.,*
*Rumble Canada Inc., The Babylon*
*Bee, LLC, and Kelly Chang Rickert*

66

## STATEMENT OF RELATED CASES

Under Circuit Rule 28-2.6, Appellees Rumble Inc., Rumble Canada, Inc., The Babylon Bee, LLC, Kelly Chang Rickert, and Christopher Kohls state that they are unaware of any related cases pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. I certify that all participants in the case are registered ACMS users, and that service will be accomplished by the ACMS system.

*s/Mathew W. Hoffmann*
Mathew W. Hoffmann
*Counsel for Appellees Rumble Inc., Rumble Canada Inc., The Babylon Bee, LLC, and Kelly Chang Rickert*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6138

I am the attorney or self-represented party.

**This brief contains** 13,671 **words, including** [ ] **words**

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Mathew W. Hoffmann  **Date** 03/11/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*