No. 25-6138

# United States Court of Appeals for the Ninth Circuit

THE BABYLON BEE, LLC; RUMBLE, INC.; KELLY CHANG RICKERT; X CORP.; CHRISTOPHER KOHLS; RUMBLE CANADA, INC.,

*Plaintiffs-Appellees*,

– v. –

ROB BONTA, in his official capacity as Attorney General of the State of California; SHIRLEY WEBER, in her official capacity as California Secretary of State,

*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA IN NO. 2:24-CV-02527-JAM-CKD THE HONORABLE JOHN A. MENDEZ, JUDGE PRESIDING

## ANSWERING BRIEF OF PLAINTIFF-APPELLEE X CORP.

JOEL KURTZBERG
   *Counsel of Record*
FLOYD ABRAMS
JASON ROZBRUCH
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
(212) 701-3120
jkurtzberg@cahill.com
fabrams@cahill.com
jrozbruch@cahill.com

WILLIAM R. WARNE
MEGHAN M. BAKER
DOWNEY BRAND, LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814
(916) 444-1000
bwarne@downeybrand.com
mbaker@downeybrand.com

*Attorneys for Plaintiff-Appellee X Corp.*

CP COUNSEL PRESS    (800) 4-APPEAL • (391185)

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

ISSUES PRESENTED...........................................................................................7

STATEMENT REGARDING ADDENDUM...........................................................7

STATEMENT OF THE CASE...............................................................................8

    I.     AB 2655 APPLIES TO X CORP.............................................................8

    II.    AB 2655'S STATUTORY SCHEME....................................................8

          A.     Removal Requirement ................................................................10

          B.     Labeling Requirement.................................................................12

          C.     Monitoring/Reporting Requirement ..........................................13

          D.     Enforcement Provisions .............................................................13

    III.   AB 2655'S LEGISLATIVE HISTORY ACKNOWLEDGES THAT THE STATUTE POSES SIGNIFICANT SECTION 230 PROBLEMS .......................................................................................14

    IV.   SECTION 230'S LEGISLATIVE HISTORY, PURPOSE, AND APPLICATION TO X CORP............................................................15

    V.    THE BURDENS IMPOSED BY AB 2655 ON COVERED PLATFORMS ......................................................................................17

    VI.   PROCEDURAL HISTORY ................................................................26

SUMMARY OF THE ARGUMENT ....................................................................33

    I.     SECTION 230(c)(1) IMMUNITY APPLIES TO AB 2655 ...............33

    II.    SECTION 230(c)(2)(B) IMMUNITY APPLIES TO AB 2655..........38

ARGUMENT .......................................................................................................39

I.     AB 2655 IS SUBJECT TO EXPRESS AND CONFLICT PREEMPTION ................................................................................39

II.     AB 2655 VIOLATES AND IS PREEMPTED BY SECTION 230(c)(1) ..........................................................................................40

     A.     AB 2655 Does Not Treat Covered Platforms As Mere Conduits With No Editorial Discretion ...................................41

     B.     Section 230(c)(1) Immunity Is Not Conditioned On A Proactive Monitoring Requirement And, In Any Event, AB 2655 Imposes Such A Requirement..................................48

     C.     There Is No Categorical Exemption From Section 230(c)(1) For Claims Brought Under A State Statute ..............52

III.     AB 2655 VIOLATES AND IS PREEMPTED BY SECTION 230(c)(2)(B)......................................................................................59

CONCLUSION ..............................................................................................62

ii

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*A.B.* v. *Salesforce, Inc.*,
123 F.4th 788 (5th Cir. 2024) ................................................................ *passim*

*Backpage.com, LLC* v. *Cooper*,
939 F. Supp. 2d 805 (M.D. Tenn. 2013) ...........................................................58

*Backpage.com, LLC* v. *McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) .........................................................58

*Barnes* v. *Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ................................................................ *passim*

*Batzel* v. *Smith*,
333 F.3d 1018 (9th Cir. 2003), *overruled on other grounds,*
*Gopher Media LLC* v. *Melone*, 154 F.4th 696 (9th Cir. 2025) ........................46n

*Calise* v. *Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) ................................................................ *passim*

*Carafano* v. *Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ...........................................................3, 14, 16n

*Comput. & Commc'n Indus. Ass'n* v. *Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024) ...........................................................57

*Doe 1* v. *Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) ....................................................................*passim*

*Doe* v. *Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .....................................................................*passim*

*Doe* v. *MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ...........................................................................46n

*English* v. *Gen. Elec. Co.*,
496 U.S. 72 (1990)..................................................................................39, 40

*Enigma Software Grp., USA, LLC* v. *Malwarebytes, Inc.*,
946 F.3d 1040 (9th Cir. 2019) .....................................................................61, 62

iii

*Est. of Bride* v. *Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) ....................................................................*passim*

*Fair Hous. Council of San Fernando Valley* v. *Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ........................................................2, 34, 41, 50

*Fields* v. *Twitter, Inc.*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016)............................................................40

*Force* v. *Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ............................................................................46n

*Green* v. *Am. Online*,
318 F.3d 465 (3d Cir. 2003) ..........................................................................29n

*HomeAway.com, Inc.* v. *City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ..........................................................................49

*M.P. by and through Pinckney* v. *Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025) ........................................................................29n

*NetChoice* v. *Carr*,
789 F. Supp. 3d 1200 (N.D. Ga. 2025)............................................................58

*PC Drivers Headquarters, LP* v. *Malwarebytes Inc.*,
371 F. Supp. 3d 652 (N.D. Cal. 2019)............................................................59

*Universal Commc'n Sys., Inc.* v. *Lycos, Inc.*,
478 F.3d 413 (1st Cir. 2007)............................................................29n, 46n, 52

*Zango, Inc.* v. *Kaspersky Lab, Inc.*,
568 F.3d 1169 (9th Cir. 2009) ........................................................................61

*Zeran* v. *Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ..................................................................16n, 46n

**Statutes**

47 U.S.C. §230 ..............................................................................*passim*

Cal. Elec. Code §320 ...........................................................................9n

Cal. Elec. Code §359.5 .........................................................................9n

Cal. Elec. Code §§20510–20520 .......................................................*passim*

**Other Authorities**

U.S. Cons. art. VI, cl. 2 .......................................................................39

# **INTRODUCTION**

The California law in this case, Assembly Bill ("AB") 2655,[1] requires covered online platforms to adopt a government-imposed system for regulating certain political content—digitally created or modified audio or visual media referred to as "deepfakes" and defined as "materially deceptive content" under the statute—posted by users of the platforms. The government controls this content-moderation scheme from beginning to end. It does so by imposing duties on covered platforms to (i) devise and implement a monitoring system that allows users to report the existence of such content and requires a response to such reports within 36 hours, §20515; (ii) assess whether the reported content meets the statutory definition for "materially deceptive content," §20512(i); and, if it does, (iii) remove or label the content, depending on whether it meets certain other statutory requirements. §§20513, 20514. If the platforms do not comply with these duties, they are subject to lawsuits permitting injunctive or other equitable relief to compel the removal or labeling of the content in question. §§20515(b), 20516.

The duties on which liability hinges under the statute are those that this Court—and every other court of appeals to have addressed the issue—has described as quintessential publishing conduct that triggers immunity under Section 230 of the

---

[1] Codified in law at Sections 20510–20520 of the California Election Code.

Communications Decency Act of 1996, 47 U.S.C. §230(c)(1). As this Court has repeatedly made clear, Section 230(c)(1) "shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009); *see also Doe* v. *Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) (Section 230(c)(1) immunity applies if claims are based on the defendants' "efforts, or lack thereof, to edit, monitor, or remove user generated content"); *Fair Hous. Council of San Fernando Valley* v. *Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."); *Doe 1* v. *Twitter, Inc.*, 148 F.4th 635, 643 (9th Cir. 2025) (applying immunity where "the only way for [the defendant] to avoid [liability] would be to remove third-party posts—a quintessential publishing activity"). Liability under the statute here is triggered by failing to remove or edit/label "materially deceptive content" or failing to provide an adequate "reporting" system designed to allow the public to help monitor the platform for forbidden content.

Appellants strain to avoid this ineluctable conclusion in three ways, none of which has merit.

*First*, Appellants argue that AB 2655 does not treat covered platforms as publishers—and thus does not trigger Section 230(c)(1) immunity—because, under

the statute, platforms have no editorial discretion about whether to remove or label content. *See, e.g.*, Appellants' Opening Br. ("Br.") 29 ("[U]nder AB 2655, platforms have *no editorial discretion* about whether to remove or label material within the statute's scope. If a political deepfake is reported to the platform and falls within the requirements of AB 2655, it *must* be removed or labeled, regardless of the platform's own thoughts or preferences about doing so.") (emphases in original). But even if that were true—and it is not, given that platforms will need to make judgment calls about **whether** reported content satisfies the statute and will be subject to liability if their judgment calls are deemed to be "wrong"—it is based on a fundamental misunderstanding of this Court's Section 230(c)(1) jurisprudence.

In fact, efforts to divest platforms of their editorial discretion over third-party generated content by imposing on them governmentally mandated content-moderation standards—such as AB 2655—are the hallmark of laws that trigger Section 230(c)(1) immunity, which itself was passed, in part, to encourage self-regulation of content on such platforms. *See, e.g.*, *Carafano* v. *Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). Appellants' argument gets this backwards: it is the divestment of editorial discretion under the statute that affirmatively demonstrates that Section 230(c)(1) immunity applies, because it shows that liability hinges on making publishing decisions that differ from those mandated by the statute. *Internet Brands,* 824 F.3d at 852 (Section 230(c)(1)

3

immunity is triggered if claims are triggered by defendants' "efforts, or lack thereof, to edit, monitor, or remove user generated content").

***Second,*** Appellants argue that Section 230(c)(1) immunity does not apply because AB 2655 does not require covered platforms to actively monitor third-party content. Br. 25–26. But, under all applicable case law, active monitoring is only one of several bases for Section 230(c)(1) immunity to apply. *See, e.g.*, *Internet Brands*, 824 F.3d at 852 (applying Section 230(c)(1) immunity to claims based on the defendants' "efforts, or lack thereof, to ***edit***, ***monitor***, ***or remove*** user generated content").[2] And Appellants are wrong that AB 2655 does not require active monitoring. It compels covered platforms to set up a system for users to report "materially deceptive content" that should be removed or labeled under the statute, §20515(a), which is a monitoring system for the content moderation that the State desires. If the platform were to fail to create the moderation system or if, in the eyes of the State, it was somehow insufficient, that platform would be subject to suit for injunctive relief. §20516. Appellants' argument also ignores Section 20513(c) of the statute, which plainly imposes an additional proactive monitoring requirement on the platforms.

---

[2] Unless otherwise indicated, emphases in quotes are added and internal citations and quotations are omitted.

***Third***, Appellants argue that Section 230(c)(1) immunity is inapplicable because AB 2655 does not impose a duty to engage in publishing decisions, but rather merely imposes a general duty "to follow the law." *See* Br. 29 ("[A]ny sanction a platform faces under AB 2655 does not stem from the kind of discretionary publishing decisions that are immunized under section 230(c)(1), but rather from its failure to comply with its statutory obligations.").

This argument cannot be reconciled with controlling case law; it ignores the fact that this Court has applied Section 230 immunity on numerous occasions to statutory causes of action, *see, e.g.*, *Doe 1*, 148 F.4th at 642–44 (applying Section 230(c)(1) immunity to claims for violations of federal child pornography statutes); *Calise* v. *Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024) (applying Section 230(c)(1) immunity to claim under California's Unfair Competition Law ("UCL") statute). Moreover, this Court has never defined the "duty" underlying the theory of liability as broadly as a general duty "to follow the law." Such an approach would be unworkable: immunity would be foreclosed in any case involving an alleged statutory violation.

Importantly, it also fails to apply the requisite "exacting analysis" of the cause of action this Court has applied in Section 230(c)(1) cases. That analysis looks past the "name of the cause of action" and examines "whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of

5

content provided by another." *Est. of Bride* v. *Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024). Appellants' facile suggestion that the only duty under AB 2655 is one "to follow the law" is inconsistent with the "exacting analysis" this Court requires. And when the requisite, exacting analysis is applied, there can be no doubt that AB 2655 triggers Section 230(c)(1) immunity because it imposes liability for decisions about whether to remove and/or edit/label content, which under controlling case law are quintessential functions of a publisher.

*Finally*, AB 2655 also directly contravenes Section 230(c)(2)(B). AB 2655 forces interactive computer service ("ICS") providers to create technical means that can be employed by users to report content for removal, and then subjects platforms to suits for injunctive and equitable relief if the State is not satisfied with the mechanism they create in response to such reports. Section 230(c)(2)(B) immunizes ICS providers from such liability.

As the district court correctly concluded, through AB 2655, California has attempted to foist its "preferred content-moderation scheme" on covered platforms, "backed by a looming threat of costly, expedited litigation if the platforms do not sufficiently comply." ER-28. AB 2655's regime is "antithetical to the objectives set forth by Congress in enacting Section 230," which were to promote "self-regulation and self-moderation unfettered by the types of threats of liability that AB 2655 effects and encourages." *Id.* The district court correctly held that AB 2655

6

violates and is preempted by Section 230(c)(1) and Section 230(c)(2)(B). This Court should affirm.

## ISSUES PRESENTED

Did the district court correctly conclude that AB 2655—a law that requires covered platforms to implement a system for reporting, removing, and labeling third-party political content disapproved of by the State—directly contravenes, violates, and is preempted by Section 230(c)(1), which immunizes such platforms from liability based on such quintessential publishing activities?

Did the district court correctly conclude that AB 2655—a law that forces covered platforms to create a mechanism for users to report content to the provider for removal and provides for liability if the mechanism is not created to the State's satisfaction—directly contravenes, violates, and is preempted by Section 230(c)(2)(B), which immunizes actions by ICS providers that grant users the ability to restrict objectionable content through technical means?

## STATEMENT REGARDING ADDENDUM

Pursuant to Circuit Rule 28-2.7, all pertinent statutes are contained in a separate addendum.

7

## STATEMENT OF THE CASE

### I.    AB 2655 APPLIES TO X CORP.

AB 2655 covers "large online platform[s]," including "public-facing internet website[s]," "web application[s]," "digital application[s]," "video sharing platform[s]," "advertising network[s]," "search engine[s]," or "social media platform[s] as defined in Section 22675 of the Business and Professions Code" that "had at least 1,000,000 California users during the preceding 12 months" (collectively, "covered platforms").  §20512(h).  X Corp. owns and operates the X platform, which qualifies as a "social media platform" (as defined in Section 22675 of the Business and Professions Code) and as a "video sharing platform."  1-XSER-50–52; 2-XSER-158.  In addition, X is a "public-facing internet website" and "web application." *Id.*

### II.    AB 2655'S STATUTORY SCHEME

AB 2655 has four relevant components: (i) a **Removal Requirement**, whereby covered platforms must identify and remove certain "materially deceptive

8

content" about "candidate[s] for elective office,"[3] "elections official[s],"[4] and "elected official[s],"[5] §20513; (ii) a **Labeling Requirement**, whereby covered platforms must identify and label certain "materially deceptive content," §20514; (iii) a **Monitoring/Reporting Requirement**, whereby covered platforms must provide a mechanism to monitor the platforms for content for such removal or labeling by allowing users to report such content and requiring the platforms to respond to any such report within 36 hours, §20515(a); and (iv) **Enforcement Provisions**, whereby such persons and California government officials under certain conditions, including if they "disagree[]" with the "response" or "action taken" by

---

[3] While AB 2655 does not define "elective office," Section 20512(c) defines "[c]andidate" as any person running for President or Vice President of the United States, any person running for the office of Superintendent of Public Instruction, or any person running for a voter-nominated office as defined in Cal. Elec. Code §359.5, which means a "congressional or state elective office for which a candidate may choose to have his or her party preference or lack of party preference indicated upon the ballot" and includes a Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Insurance Commissioner, Member of the State Board of Equalization, United States Senator, Member of the United States House of Representatives, State Senator, and Member of the Assembly. As the district court correctly found, "the 2026 election cycle has at least **866** people qualifying as 'candidates' under Section 20512(c)." ER-29.

[4] Section 20512(g) defines "Elections official" as (i) the California Secretary of State or (ii) an elections official as defined by Cal. Elec. Code §320, which is a (a) "clerk or any person who is charged with the duty of conducting an election," or (b) "county clerk, city clerk, registrar of voters, or elections supervisor having jurisdiction over elections within any county, city, or district within the state."

[5] AB 2655 does not define "elected official" and, as the district court correctly found, there could be "**several hundreds of thousands** of 'elected officials' nationwide." ER-29.

the covered platform, may sue the platform to comply with the Removal and/or Labeling Requirements, §§20515(b), 20516.

AB 2655 defines "materially deceptive content" as "digitally created or modified" media that "would falsely appear to a reasonable person to be an authentic record." §20512(i)(1). However, "materially deceptive content" does not include "only minor modifications that do not significantly change the perceived contents or meaning of the content." §20512(i)(2). Under AB 2655, covered platforms must "identify, using state-of-the-art techniques, and remove, upon discovering or being alerted to the posting or reposting of, any identical or substantially similar materially deceptive content that the platform had previously removed" under the statute. §20513(c).

## A.    Removal Requirement

AB 2655's Removal Requirement mandates that covered platforms "develop and implement procedures" that use "state-of-the-art techniques to identify and remove materially deceptive content if all of the following conditions are met," **§20513(a)**:

- The "content is reported pursuant to [Section 20515(a)]," **§20513(a)(1)**;

- The "materially deceptive content is any of the following:"

- o "A candidate for elective office portrayed as doing or saying something that the candidate did not do or say and that is reasonably likely to harm the reputation or electoral prospects of a candidate[,]" **§20513(a)(2)(A)**;

- o "An elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests[,]" **§20513(a)(2)(B)**; or

- o "An elected official portrayed as doing or saying something that influences an election in California that the elected official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests[,]" **§20513(a)(2)(C)**;

- The content is posted during the 120 days leading up to an election and through the election day, and—for certain content—also through the 60th day following the election, **§§20513(a)(3), 20513(e)**; and

- The covered platform "knows or acts with reckless disregard for the fact that the content meets" Section 20513's requirements, **§20513(a)(4)**.

If a covered platform "determine[s]" that content meets Section 20513(a)'s requirements, the platform must remove the content immediately and no later than 72 hours following the report. **§20513(b)**. In addition, covered platforms must

11

"identify, using state-of-the-art techniques, and remove, upon discovering or being alerted to the posting or reposting of, any identical or substantially similar materially deceptive content that the platform had previously removed" under the statute. **§20513(c).**

## B.    Labeling Requirement

AB 2655's Labeling Requirement mandates that covered platforms develop and implement procedures using state-of-the-art techniques to identify materially deceptive content and for labeling such content if the following conditions are met, **§20514(a):**

- The content is reported pursuant to Section 20515(a), **§20514(a)(1)**;

- The materially deceptive content is (i) encompassed by Section 20513(a), but is posted outside Section 20513(e)'s applicable time periods or (ii) appears within an advertisement or election communication (*see* §§20512(a), 20512(e)) and is not subject to Section 20513, **§20514(a)(2)**; and

- The covered platform knows or acts with reckless disregard for the fact that the materially deceptive content meets Section 20514's requirements, **§20514(a)(3)**.

If a covered platform "determine[s]" that content meets 20514(a)'s requirements, the platform must label the content immediately and no later than 72 hours following a report. **§20514(b)**. The label must contain the language set forth in Section 20514(c) and must provide users with "additional explanation" about the

12

content. **§§20514(c)–(d)**. The Labeling Requirement applies during the period beginning six months before the election and through the election, and—for certain content—also through the 60th day following the election. **§20514(e)**.

## C. Monitoring/Reporting Requirement

AB 2655's Monitoring/Reporting Requirement requires covered platforms to implement a method for monitoring the platform for "materially deceptive content." It does so by mandating that covered platforms provide an "easily accessible way" for California residents to report content subject to the Removal and Labeling Requirements and requiring platforms to respond to any such report within 36 hours, describing "any action taken or not taken" by the platform. **§20515(a)**.

## D. Enforcement Provisions

AB 2655 authorizes candidates for elective office, elected officials, and elections officials to seek injunctive or other equitable relief against covered platforms—if those persons make a report pursuant to Section 20515(a) and (i) do "not receive[] a response" within 36 hours, (ii) "disagree" with the platform's response or action taken, or (iii) the platform does not act within 72 hours—to compel (a) removal of content under Section 20513, (b) labeling of content under Section 20514, or (c) compliance with the Monitoring/Reporting Requirement. **§20515(b)**.

13

AB 2655 also authorizes the California Attorney General, any California district attorney, and any California city attorney to seek injunctive or other equitable relief against covered platforms to compel (i) removal of content under Section 20513, (ii) labeling of content under Section 20514, or (iii) compliance with the Monitoring/Reporting Requirement. **§20516**. The statute does not authorize anyone to seek injunctive or other equitable relief against covered platforms to remedy improper takedown or labeling decisions. *See* **§§20515(b), 20516**. Enforcement actions will be "entitled to precedence" under Section 35 of the California Code of Civil Procedure. **§§20515(b), 20516**.

### III. AB 2655'S LEGISLATIVE HISTORY ACKNOWLEDGES THAT THE STATUTE POSES SIGNIFICANT SECTION 230 PROBLEMS

The legislative history of AB 2655 reflects that California's Senate Judiciary Committee anticipated that AB 2655 would "likely" face a preemption challenge under Section 230. 1-XSER-62; ER-67. The Senate Judiciary Committee conceded that AB 2655 "provides for the potential liability of platforms for failing to block and prevent certain content from being posted or shared by users," notwithstanding that Section 230 "immunize[s] internet platforms from virtually all suits arising from third-party content." *Id.* (citing, *e.g.*, *Carafano*, 339 F.3d at 1125).[6]

Nonetheless, the California legislature passed AB 2655.

---

[6] *See also* ER-21–22 (district court noting same in ruling that AB 2655 violated and was preempted by Section 230(c)(1), Section 230(c)(2)(B), and Section 230(e)).

14

## IV. SECTION 230'S LEGISLATIVE HISTORY, PURPOSE, AND APPLICATION TO X CORP.

Section 230 of the Communications Decency Act of 1996 ("CDA") promotes the "policy of the United States" to "preserve the vibrant and competitive free market" for the "Internet and other interactive computer services, unfettered" by "State regulation[.]" 47 U.S.C. §230(b)(2). Section 230 seeks to "promote the continued development of the Internet and other interactive computer services and other interactive media[.]" §230(b)(1). In enacting Section 230, Congress found that the "Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." §230(a)(4). "Congress expressly designed" Section 230 to "help the internet grow[.]" *Calise*, 103 F.4th at 739.

Section 230 provides, in relevant part, that:

- "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." **§230(c)(1)**[7];

- "No provider or user of an interactive computer service shall be held liable on account of … any action taken to enable or make available to information content

---

[7] An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." **§230(f)(3)**.

providers or others the technical means to restrict access to material described in

§230(c)(2)(A)." **§230(c)(2)(B)**;

- "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." **§230(e)(3)**; and

- "Nothing in [Section 230] shall be construed to impair the enforcement" of any "Federal criminal statute." **§230(e)(1)**.

X Corp. is an "interactive computer service" because it is the provider of the X platform, which is an "interactive computer service" under Section 230(f)(2). *See* 1-XSER-52; 2-XSER-159; §230(f)(2) ("The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.").

Finally, Congress enacted Section 230 to provide interactive computer services with the freedom to *self*-regulate content on their platforms unfettered by threats of liability.[8]

---

[8] *See, e.g., Carafano*, 339 F.3d at 1122 ("Congress enacted" Section 230 "to encourage **voluntary** monitoring for offensive or obscene material."); *Zeran* v. *Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) (Congress enacted Section 230 to "encourage service providers to **self-regulate** the dissemination of offensive material over their services").

16

## V. THE BURDENS IMPOSED BY AB 2655 ON COVERED PLATFORMS

The content-moderation scheme mandated by AB 2655 imposes substantial burdens on covered platforms. Thus, these platforms will need to make difficult judgment calls under tight timelines about whether content posted by third parties must be labeled or removed, with the constant threat of enforcement actions being filed against them if government officials or political candidates disagree with their interpretations. The burdens associated with deciding to remove or label content are further heightened by the voluminous amount of content on the X platform (roughly 170 billion posts per year) and the sheer quantity of election-related content received by covered platforms like that of X. 1-XSER-21, 65; 2-XSER-161–62.[9]

*First*, AB 2655 requires covered platforms to assess the speech of a vast array of candidates and officials. For instance, under the statute, platforms must determine whether content portrays candidates for elective office, elections officials, and elected officials "doing or saying something" that they "did not do or say." *See* §§20513(a)(2), 20514(a)(2)(A). Given the range of persons that are "candidate[s]

---

[9] For example, from November 5–6, 2024, there were 942 million posts on X globally, which was an all-time global daily record. *Id.* In addition, in the first six months of 2024, when elections were occurring in the EU and India, X Corp. received 224,129,805 user reports related to content on the platform. *Id.*

for elective office,"[10] "elections official[s]," and "elected official[s],"[11] the task associated with discovery of such material will be incredibly difficult, *see* 1-XSER-62–63;2-XSER-159–60, as the April 8, 2024, analysis of the Assembly Committee on Elections acknowledges:

> "[I]n order to determine whether it must block content that ***portrays a candidate for election as doing or saying something that the candidate did not do or say***,[12] the platform would need to know not only that the person portrayed in the content was a candidate for office, but also the date (or dates) of the election when the candidate will appear on the ballot. Similarly, it would need to determine whether the candidate had actually said or done the thing that the candidate is portrayed as doing. While some of that information will be widely available and well known in some cases (e.g., the identity of major party candidates for President of the United States in presidential general elections and the dates of federal elections), it will be more arcane in other situations. Given the number of elections (including standalone local and special elections) and candidates (including write-in candidates and

---

[10] As previewed above, and as the district court correctly found "the 2026 election cycle has at least 866 people qualifying as 'candidates' under Section 20512(c)." ER-29. Specifically, there will be at least two candidates for each the offices of governor, lieutenant governor, attorney general, secretary of state, treasurer, controller, insurance commissioner, and superintendent of public instruction (at least sixteen total); eight candidates for the Board of Equalization; 104 candidates for the federal House of Representatives; 40 candidates for state senate; 160 candidates for state assembly; 57 county clerks; and 482 city clerks. 1-XSER-62–63; 2-XSER-159–60.

[11] Because AB 2655 does not define "elected official," it is unclear how far the term reaches. However, as previewed above, and as the district court correctly found, the term could encompass "several hundreds of thousands of 'elected officials' nationwide." ER-29. But even if it only covered elected officials in California—and the law provides no indication that the term is so limited—it would cover at least 120 individuals, and has the potential to cover many more, given that California has 57 counties and 482 cities, each presumably with elected officials. *See* 1-XSER-9, 15, 63; 2-XSER-159.

[12] Emphasis in original.

candidates for local elections in smaller jurisdictions) in California at any given time, ***making the determinations at scale about which content must be blocked or labeled likely will be considerably more challenging than making those determinations on a case-by-case basis in a court of law***."

1-XSER-63–64; ER-49.  Similarly, Tracy Rosenberg of Oakland Privacy, which opposed AB 2655, explained that "***technology platform[s] can[not] be expected to know everything that every candidate running for office [has said]***."  1-XSER-64, 91.

***Second***, whether content triggers AB 2655's requirements and prohibitions depends on the interpretation of terms that will be subject to reasonable disagreement.  AB 2655's reach extends beyond prohibiting actually false speech to speech that merely "falsely appear[s] to a reasonable person to be an authentic record[.]"  §20512(i)(1).  AB 2655 also forbids speech that state officials view as "reasonably likely to harm the reputation or electoral prospects of a candidate" and that "is reasonably likely to falsely undermine confidence in the outcome of" an election.  §20513(a)(2).  It also purports to exempt "[m]aterially deceptive content that constitutes satire or parody," §20519(c), but does nothing to define "satire or parody."

These standards put platforms in the position of needing to make individualized assessments of whether speakers' statements are intended earnestly or satirically in deciding whether to remove content on the platform, at scale—a burdensome exercise that would risk censoring lawful, valuable speech, such as that

19

of Appellees Christopher Kohls, The Babylon Bee, Kelly Chang Rickert, and other content creators. AB 2655 thus requires X Corp. to train its manual content reviewers about (i) the relevant candidates and officials, (ii) how to make judgment calls about what constitutes satire or parody, (iii) what "would falsely appear to a reasonable person" to be authentic, and (iv) what is "reasonably likely" to harm reputation or electoral prospects or undermine confidence in an election. 1-XSER-64; 2-XSER-159–60.

Given these challenges, Appellants' description of AB 2655 as "remov[ing] a platform's discretion to make [editorial] choices altogether when it comes to the content the law regulates," Br. 2, is inaccurate and cannot be reconciled with the district court's finding that AB 2655 "subject[s] [covered platforms] to litigation risk for failing to comport with California's *complicated* method of election content moderation," ER-29.

***Third***, AB 2655 imposes an extremely compressed timeframe for making and acting on these determinations, thus requiring complicated judgment calls about these editorial decisions to be made under intense pressure. Covered platforms must respond to requests to remove content under the statute "within 36 hours of the report, describing any action taken or not taken [] with respect to the content," §20515(a), and remove or label any such content "no later than 72 hours after a report is made," §§20513(b), 20514(b). These compressed timeframes will be

20

difficult to meet in practice, *see* 1-XSER-65; 2-XSER-159–60, and enforcement actions may be filed against the covered platforms if the timeframes are not met, *see* §§20515(b), 20516.

Moreover, the Enforcement Provisions, once triggered, provide for causes of action seeking to require the covered platforms to remove or label "materially deceptive content" covered by the statute, but do not provide for any consequences for improperly removing or labeling content that should not have been removed or labeled. *See id.* Put another way, enforcement actions can be brought for censoring too little, but not for censoring too much. *See id.*

*Fourth*, all of the above shows that AB 2655 will require covered platforms to make difficult judgment calls about what third-party content can stay on their platform and what third-party content must be edited to satisfy the statute. It also shows that the statutory scheme will inevitably pressure covered platforms to over-censor flagged content, since there is no liability for removing or labeling something that should not be removed or labeled but potential liability for failing to remove or label content that should arguably be removed or labeled.

To take just a few examples that illustrate the burdens imposed by the statute:

On April 25, 2023, the official Republican National Committee YouTube channel posted a video titled "Beat Biden" that, using artificial intelligence, imagined various scenarios that would occur during a second presidential term under

21

Joe Biden, including that "international tensions [will] escalate," "financial systems [will] crumble," and "crime [will] worsen[]." 1-XSER-70–71, 108. As shown below, the video's description states that it is "[a]n AI-generated look into the country's possible future if Joe Biden is re-elected in 2024."



Does this video portray President Biden "doing or saying something that" he "did not do or say," and would it have been "reasonably likely" that the video would have "harm[ed] [his] reputation or electoral prospects"? Perhaps not, but this video was cited in AB 2655's legislative history as an example of how "generative AI can spread misinformation regarding elections with ease," *see* 1-XSER-71; ER-61, seemingly indicating that at least some of the drafters think it would be prohibited under the statute. Given that the video asks "what if the weakest president we've ever had were re-elected," would the video fall within Section 20519(c)'s exemption

22

for satire or parody? That is also unclear. What is clear is that the statute puts at risk blunt and/or harsh, but surely protected, speech that has been common to political campaigns throughout the history of our nation.

Adding to the confusion is that the video's caption clearly states that the video was "AI-generated," but this would not bring the video within Section 20513(d)'s exemption, because it was posted by someone other than President Biden. *See* §20513(d) (self-portrayal exemption).

Another example further illustrates the point. In March 2023, an X user named Eliot Higgins (@EliotHiggins) used artificial intelligence to create a photo depicting Donald Trump being forcefully arrested. 1-XSER-71, 110. The same questions arise. Do these photos portray Donald Trump "doing or saying something that" he "did not do or say," and would it be "reasonably likely" that the photos would "harm [his] reputation or electoral prospects"? Would these photos be exempted as satire or parody under Section 20519(c)? If colorable arguments can be made that this type of political commentary is encompassed by the statute, covered platforms will face the choice of removing and/or labeling such content (which would ensure no liability for them) or risking costly enforcement actions.



Another example: on August 29, 2024, the X user Kamala HQ (@KamalaHQ) posted a five-second video on X where Vice Presidential candidate JD Vance says, "Democrats want to attack Republicans as being anti-union and sometimes the shoe fits." 1-XSER-72, 112. The clip cuts out right before Vance says "but not me and not Donald Trump." 1-XSER-114. How would the statute treat this edited snippet, which arguably misleadingly changes the *meaning*, but not the literal words, of what JD Vance actually said? AB 2655 defines "materially deceptive content" as "audio or visual media that is digitally created *or modified* … such that it would falsely

24

appear to a reasonable person to be an authentic record of the content depicted in the media." §20512(i)(1).

Consider also the video posted by Appellee Kohls, who goes by the name Mr. Reagan on X, titled Kamala Harris Ad PARODY, that was reposted on X by Elon Musk. 1-XSER-43, 116, 120–21.[13] The video uses AI to create an "advertisement" by Vice President Harris with her saying things that she would never actually say. While some would reasonably consider the video to be satire or parody—including because, in the video, "Harris" states that she is a "diversity hire," who "may not know the first thing about running the country" and is a "deep state puppet"—public statements made by Governor Newsom indicate that he believes that the statute would require the video to be removed from any covered platform. *See* 1-XSER-58, 118, 121 (stating that Mr Reagan's Kamala Harris Ad PARODY video "should be illegal" and declaring, the same day that AB 2655 was passed, that he "just signed a bill to make this illegal in the state of California"). And, at oral argument, Appellants refused even to say whether this video constituted "materially deceptive content," saying only that it could be argued either way. *See* 1-XSER-4–6.[14]

---

[13] X Corp. can, at the Court's request, provide the Court with physical media of this video and the others cited in this Answering Brief.

[14] Although this discussion at oral argument concerned AB 2839, not AB 2655, the two statutes employ nearly identical definitions of "materially deceptive content."

25

The statute does not get rid of covered platforms' editorial discretion but instead places unreasonable demands on platforms to make complicated editorial decisions quickly. If covered platforms fail at all with that challenging exercise, the statute exposes them to potentially costly litigation and liability whenever those permitted to enforce the statute view those editorial decisions as being incorrect. In short, AB 2655 subjects covered platforms to onerous legal liability for their decisions about what content to keep on the platform, what content to label, and/or how to monitor "materially deceptive content" under the statute.

## VI.  PROCEDURAL HISTORY

On March 7, 2025, Appellants and Appellees filed cross-motions for summary judgment under Fed. R. Civ. P. 56 on Appellees' claims that AB 2655 (i) violates the First Amendment and the Free Press Clause of the U.S. Constitution, (ii) violates and is preempted by Section 230(c)(1), Section 230(c)(2)(B), and Section 230(e), and (iii) violates the First and Fourteenth Amendments of the U.S. Constitution on overbreadth and vagueness grounds.

On August 5, 2025, the district court ruled from the bench in favor of Appellees X Corp., Rumble, Inc., and Rumble Canada Inc.[15] (each of whom is a covered platform under AB 2655)—granting those Plaintiffs' motion for summary

---

[15] Rumble, Inc. and Rumble Canada Inc., collectively, are referred to herein as "Rumble."

judgment and denying Defendants' motion for summary judgment—solely on the grounds that AB 2655 directly conflicted with, violated, and was preempted by Section 230(c)(1), Section 230(c)(2)(B), and Section 230(e).[16] The district court did not rule on the Plaintiffs' claims under the First Amendment or the Fourteenth Amendment of the U.S. Constitution.

***Section 230(c)(1)***. The district court ruled that AB 2655's Removal, Labeling, and Monitoring/Reporting Requirements violate and are preempted by Section 230(c)(1) and Section 230(e). The court explained that Section 230(c)(1) "bars any liability where the alleged duty violated derives from an entity's conduct as a publisher, including 'reviewing, editing, and deciding whether to publish or withdraw from publication third-party content.'" ER-22 (quoting *Barnes*, 570 F.3d at 1102). The court noted that, under the Ninth Circuit's decision in *Calise*, 103 F.4th 732, Section 230(c)(1) preempts claims (i) against "a provider" of "an interactive computer service" (ii) that "seek[] to treat" that provider "as a publisher or speaker" (iii) of "information provided by another information content provider." ER-22–23.

The court explained that the first and third prongs were not in dispute and were "pretty straightforward." ER-23. The first prong was met because X and

---

[16] The district court read its reasoned decision into the record at oral argument. *See* ER-19–30.

Rumble are "properly understood as" "interactive computer services" under Section 230(f)(2). The third prong was met because liability against X and Rumble under AB 2655 concerned information on X and Rumble provided by other information content providers. *Id*.

The court held that the second element was met because AB 2655's Removal, Labeling, and Monitoring/Reporting Requirements "impermissibly treat the covered platforms as publishers of third-party content." ER-24. The court explained that "[p]ublishing activity includes 'reviewing, editing, and deciding whether to publish or withdraw from publication third-party content[,]'" "includes editorial decisions and functions ancillary to the decision to make content available[,]" and "has been found to 'involve reviewing and editing,' such as 'reviewing material submitted for publication, perhaps editing it for style or technical fluency.'" *Id*. (citing *Barnes*, 570 F.3d at 1102). Here, the "conduct … regulate[d]" by the Removal, Labeling, and Monitoring/Reporting Requirements "can be understood as traditional publishing activity that Section 230 immunizes." ER-24. The district court's decision regarding the second element turned on the following findings.

*First*, the Removal Requirement "mandates that platforms remove materially deceptive content within 72 hours after it is reported," and the "Ninth Circuit has recognized taking down content is 'quintessential publishing conduct.'" *Id*. (citing *Calise*, 103 F.4th at 741). "Because 'removing content is something that publishers

28

do,' AB 2655's imposition of 'liability on the basis of such conduct necessarily involves treating the covered platform as a publisher of the content it failed to remove.'" ER-24–25 (citing *Calise*, 103 F.4th at 740).

*Second*, the Labeling Requirement treats covered platforms as publishers, given that "[a]dding labels to posts is similar to editing posts because it does transform how content may appear on the website." ER-25. The court noted that "similar decisions surrounding rules about postings, whether to limit advertising on a posting, and choices about what content can appear and in what form[,] are editorial choices that fall within the purview of traditional publisher functions." *Id*.[17]

*Third*, the Monitoring/Reporting Requirement "treats covered platforms as publishers of third-party material because only content that has not been removed pursuant to [Section] 20513 or labeled pursuant to [Section] 20514 is subject to reporting." *Id*. The Monitoring/Reporting Requirement thus "treats covered platforms as publishers because it hinges on the removal and labeling requirements which both treat platforms as publishers." ER-25–26.

---

[17] Numerous Courts of Appeal have concluded that a publisher's "traditional editorial functions" include "deciding whether to … ***alter*** content." *E.g.*, *M.P. by and through Pinckney* v. *Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025); *A.B.* v. *Salesforce, Inc.*, 123 F.4th 788, 795 (5th Cir. 2024); *Universal Commc'n Sys., Inc.* v. *Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007); *Green* v. *Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003).

29

***Section 230(c)(2)(B)***. The district court also held that the Monitoring/Reporting Requirement violated and was preempted by Section 230(c)(2)(B) and Section 230(e). The court explained that the Monitoring/Reporting Requirement forced covered platforms to "create software that filters or screens objectionable material such as political deepfakes and subjects them to liability for not doing so" to the State's satisfaction. ER-27; ER-26 (crediting Appellees' argument that a "platform's attempt to comply with the reporting requirement is an action to make available the technical means to restrict access to objectionable content").

This "directly contravenes" the immunity afforded by Section 230(c)(2)(B) because "platforms will face enforcement if the reporting mechanism they implement does not, in the view of the government, satisfy" the Monitoring/Reporting Requirement. ER-27. The court explained that "Section 230(c)(2)'s provisions were meant to remove disincentives for the development of software that filters out objectionable or inappropriate material," and the Monitoring/Reporting Requirement "infring[ed] on the immunity that platforms enjoy in filtering their own content." *Id*.

***Not Severable***. The district court held that the "entire statute is preempted" and that "no parts of this state are severable" or "can be salvaged from Section 230's broad preemption framework." ER-28. The court explained that AB 2655 "as a

30

whole imposes the State's preferred content-moderation scheme on covered platforms backed by a looming threat of costly, expedited litigation if the platforms do not sufficiently comply." *Id.* The court further explained that AB 2655's "regime is antithetical to the objectives set forth by Congress in enacting Section 230, which were to encourage self-regulation and self-moderation unfettered by the types of threats of liability that AB 2655 effects and encourages." *Id.*

***Permanent Injunction Factors.*** Finally, the district court held that a permanent injunction should issue because Appellees demonstrated a likelihood of success on the merits (for the reasons above), a showing of irreparable injury, that other remedies are inadequate, and that the balance of hardships and the public interest favored an injunction. ER-29.

*First*, the court found that Appellees would be "irreparably harmed absent injunctive relief because loss of their Section 230 immunity would upend their existing content moderation scheme" and "subject them to litigation risk for failing to comport with California's complicated method of election content moderation." *Id.* The court credited the assertion of Appellees that "complying with AB 2655 would be nearly impossible because platforms cannot be expected to know what a candidate has or has not said," given that the "number of individuals captured by California's law is unbounded." *Id.* (noting that the "2026 election cycle has at least 866 people qualifying as 'candidates' under Section 20512(c)" and that the "term

31

'elected official' is undefined by the statute, meaning it could cover up to several hundreds of thousands of 'elected officials' nationwide").

*Second*, the balance of hardships and the public interest "favor[ed] an injunction in this case because California cannot violate the Supremacy Clause, and 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" ER-30. The court credited Appellees' argument that, "under AB 2655, internet platforms would be incentivize[d] to overcompensate and censor too much to avoid liability," and found that this "over-censorship would eliminate content to any covered platform user's detriment and would harm the public's access to an uninhibited marketplace of ideas." *Id*.

On August 20, 2025, the district court entered judgment consistent with its ruling at the August 5, 2025, hearing. ER-14–16. The court permanently enjoined AB 2655's enforcement against X Corp. and Rumble, the covered platform Plaintiffs. ER-16. The court also indicated that, given its ruling on the Section 230 issue, it would not "at this time" reach the other arguments for AB 2655's invalidity, including the First and Fourteenth Amendment arguments. *Id*.

After entry of the judgment, the remaining content-creator Plaintiffs entered into a joint stipulation with Defendants, whereby Defendants agreed not to enforce AB 2655 against any "interactive computer service" subject to Section 230(c) immunity. ER-10–12. The content-creator Plaintiffs and Defendants stipulated that,

given their stipulated agreement, the court "need not address the Parties' Cross-Motions for Summary Judgment as to the constitutionality of AB 2655" under the First and Fourteenth Amendments. ER-11. On August 28, 2025, the court "so ordered" the stipulation and made clear that, given the stipulation, it was not addressing the First Amendment challenge "at this time." ER-5–9.[18]

**SUMMARY OF THE ARGUMENT**

**I.      SECTION 230(c)(1) IMMUNITY APPLIES TO AB 2655**

Section 230(c)(1) immunizes and preempts claims (i) against "interactive computer service" providers (ii) that "seek[] to treat" the provider "under a state law cause of action, as a publisher" (iii) of "information provided by another information content provider." *Calise*, 103 F.4th at 738. Appellants concede that the first and third elements are met and that this appeal "solely" concerns whether "AB 2655 treats the platforms it regulates 'as a publisher.'" Br. 20.

As to the second element, this Court has made clear that courts must apply an "exacting analysis," *Bride*, 112 F.4th at 1176, that examines "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher," *Barnes*, 570 F.3d at 1102, or "if the means to avoid liability

---

[18] AB 2655 also violates the First Amendment, which presents an alternate ground for affirmance. As the district court did not reach that issue with respect to X Corp.'s claims, X Corp. does not address it here. But to the extent that other Appellees urge this Court to affirm on First Amendment grounds, X Corp. joins that request.

33

requires the defendant to act as a publisher." *Doe 1*, 148 F.4th at 642. In making that determination, this Court has "indicated that publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102. Therefore, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.com, LLC*, 521 F.3d at 1170–71. As this Court has emphasized, such decisions constitute "quintessential publishing activity." *Doe 1*, 148 F.4th at 643.

AB 2655 easily satisfies this standard. As Appellants concede, the statute imposes duties on covered platforms to remove and/or edit (by labeling) certain content posted by third parties and flagged by the government-mandated reporting system. *See, e.g.*, Br. 18–19 ("AB 2655 *prohibits* platforms from making a choice about whether to host or label content within the scope of the statute) (emphasis in original); *id.* 29 ("[U]nder AB 2655, platforms have *no editorial discretion* about whether to remove or label material within the statute's scope. If a political deepfake is reported to the platform and falls within the requirements of AB 2655, it *must* be removed or labeled, regardless of the platform's own thoughts or preferences about doing so.") (emphases in original); *id*. 31–32 (describing AB 2655 as a "statute that imposes a statutory obligation on all platforms … to remove or alter specific content when reported to it"). But, of course, those obligations AB 2655 imposes on covered

34

platforms—including setting up a monitoring/reporting mechanism, reviewing flagged material, and then deciding whether to remove, edit, or label such material— are precisely the types of obligations that this Court has unequivocally and repeatedly held to constitute "quintessential publishing activity." *Doe 1*, 148 F.4th at 643.

Appellants neither come to grips nor even grapple with the consequences that flow under this Court's Section 230(c)(1) jurisprudence from their own descriptions of and concessions about the duties imposed by the statute. Instead, Appellants offer three arguments that AB 2655 does not treat the covered platforms as publishers. None has merit.

***First***, Appellants argue that AB 2655 does not treat the covered platforms as publishers because, under the law, they are mere conduits, with no editorial discretion, that must remove any content reported to the platform if the content meets the requirements of the statute. This argument is wrong on both the facts and the law.

On the facts, it ignores the practical reality that, even if the statute mandates removal or labeling of content that meets the statutory requirements, the platforms will need to make judgment calls—in the shadow of threats of costly litigation— about whether flagged content meets the statutory requirements. Those types of

judgment calls require the platforms to exercise editorial discretion about what third-party content they must remove or label.

On the law, Appellants' argument gets things backwards. Passing a law that eliminates editorial discretion by imposing liability on platforms unless they remove or label content that the State disfavors is precisely what it means to impose a duty based on "the defendant's status or conduct as a publisher," *Barnes*, 570 F.3d at 1102, because "the means to avoid liability requires the defendant to act as a publisher." *Doe 1*, 148 F.4th at 642. Under AB 2655, covered platforms must make decisions to remove or edit/label third-party content to avoid liability—many of which will involve difficult judgment calls. *See, e.g.*, 1-XSER-4–6 (Appellants refuse to say whether a Kamala Harris parody video is covered by AB 2655). Those decisions are quintessential publishing decisions.

***Second***, Appellants argue that AB 2655 does not treat the covered platforms as publishers because it does not require platforms to proactively monitor third-party content. This argument is based on a mischaracterization of this Court's Section 230(c)(1) case law. Under this Court's cases, active monitoring is only one of several types of publishing behavior that triggers Section 230(c)(1) immunity. *See, e.g.*, *Internet Brands*, 824 F.3d at 852 (applying Section 230(c)(1) immunity to claims based on the defendants' "efforts, or lack thereof, to ***edit***, ***monitor***, ***or remove*** user generated content"). While some of this Court's cases, *e.g.*, *Calise*, 103 F.4th

36

at 741, focus on monitoring in light of the facts of the case, even those cases make clear that Section 230(c)(1) applies whenever the duty at issue requires the ICS provider to "***remove any user content or otherwise affect how it publishes or monitors such content***." *Id*. (quoting *Internet Brands*, 824 F.3d at 851). Appellants' argument is based on out-of-context quotes from cases that focus on monitoring while ignoring that the "treatment like a publisher" inquiry is not limited to monitoring alone.

Appellants' arguments also ignore that AB 2655 actually requires active monitoring. By requiring platforms to implement a "report[ing]" system that allows users to flag "materially deceptive content," §20515(a), requiring covered platforms to respond to any such reports within 36 hours, *id.*, and authorizing enforcement actions if the platforms make calls that others disagree with, §§20515(b), 20516, the statute mandates that platforms employ a system of monitoring that they must participate in whether they want to or not.

***Third***, Appellants argue that AB 2655 does not treat the covered platforms as publishers because the obligations it imposes on covered platforms to remove, edit/label, or otherwise moderate particular content inherently derives, not from the platform's status of a publisher, but from the platforms' general "statutory duty" to abide by the law. *See* Br. 27, 29. This argument is also contrary to this Court's Section 230(c)(1) decisions, which have never permitted courts to define the duty

37

imposed by a cause of action in such general terms as to be essentially meaningless. *Every* statutory cause of action imposes a "statutory duty" to abide by the law. But that has not stopped this Court from concluding that some statutory duties trigger Section 230(c)(1) immunity. *See, e.g.*, *Doe 1*, 148 F.4th at 642–44 (applying Section 230(c)(1) immunity to claims for violations of federal child pornography statutes); *Calise*, 103 F.4th at 744 (applying Section 230(c)(1) immunity to claim under California's UCL statute).

Under this Court's precedent, courts must look past the name of the cause of action and examine, on the specific facts of the case, "whether the cause of action inherently requires the court to treat the defendant as the publisher or speaker of content provided by another." *Bride*, 112 F.4th at 1176. That obligation does not permit courts to define this duty as one "to follow the law" (Br. 29); rather, one must look at whether liability is imposed by treating the defendant as a publisher—e.g., by holding the defendant responsible for decisions to take down, keep up, or edit/label content and/or to require the defendant to monitor content posted by third parties. AB 2655 does just that.

## II. SECTION 230(c)(2)(B) IMMUNITY APPLIES TO AB 2655

Section 230(c)(2)(B) immunizes ICS providers from liability for "any action taken" to "make available" to users the "technical means to restrict access to [objectionable] material." AB 2655's Monitoring/Reporting Requirement in

38

Section 20515(a) forces covered platforms to create "an easily accessible way" for users to report political "materially deceptive content" targeted by the statute—an "action" that falls squarely within Section 230(c)(2)(B)'s protection—and subjects platforms to enforcement under Section 20516 if the reporting mechanism is not satisfactory to the State. Section 20516 thus directly contravenes and is preempted by Section 230(c)(2)(B).

## ARGUMENT

### I. AB 2655 IS SUBJECT TO EXPRESS AND CONFLICT PREEMPTION

Under the Supremacy Clause of the U.S. Constitution (Art. VI, cl. 2), a state law is preempted by federal law based on "express" preemption when Congress has "define[d] explicitly the extent to which its enactments pre-empt state law." *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 78–79 & n.5 (1990). Because preemption "fundamentally is a question of congressional intent," when "Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *Id.* at 78–79. Here, Section 230(e)(3) is the CDA's express preemption clause, which states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. §230(e)(3).

Under the Supremacy Clause, state laws are also preempted if they "conflict" with federal law—that is, "where it is impossible for a private party to comply with

39

both state and federal requirements[,] or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*, 496 U.S. at 79. Here, any "liability imposed under" AB 2655 would be fundamentally "inconsistent" with Section 230(e)(3), because such "liability" includes being subjected to the kind of injunctive and other equitable relief authorized by AB 2655's Enforcement Provisions.

Applying Section 230's broad immunity here would thus comport with "congressional intent." *Eng.*, 496 U.S. at 79; *see Fields* v. *Twitter, Inc.*, 217 F. Supp. 3d 1116, 1129 (N.D. Cal. 2016) (explaining that "any policy that requires [ICS] providers to remove or filter particular content undermines" the CDA's goal of "encourag[ing] the unfettered and unregulated development of free speech"). Section 230's preemption of AB 2655 is thus warranted and appropriate as a constitutional and statutory matter.

## II.  AB 2655 VIOLATES AND IS PREEMPTED BY SECTION 230(c)(1)

AB 2655 treats covered platforms as publishers because, as noted above, it imposes duties on those platforms to set up a monitoring/reporting system for identifying "materially deceptive content" posted by third parties and requiring the removal and/or editing/labeling of such content under certain circumstances. Those duties—i.e., monitoring, removing, and editing third-party content—are the types of quintessential publishing activity that this Court has repeatedly held trigger Section

230(c)(1) immunity. *See Internet Brands*, 824 F.3d at 852 (immunity applies if claims are based on defendants' "efforts, or lack thereof, to edit, monitor, or remove user generated content"); *Barnes*, 570 F.3d at 1105; *Roommates.com, LLC*, 521 F.3d at 1170–71; *Doe 1*, 148 F.4th at 643.

Appellants' arguments to the contrary are unpersuasive.

## A. AB 2655 Does Not Treat Covered Platforms As Mere Conduits With No Editorial Discretion

Appellants argue that AB 2655 does not treat covered platforms as publishers because, under the law, they have "*no editorial discretion* about whether to remove or label" content reported to them. Br. 29 (emphasis in original). And, to be "treat[ed] [like] a publisher," Appellants argue that liability must be imposed "for making editorial choices." *Id.* at 28–29.

That argument is wrong for several reasons. AB 2655 imposes liability on covered platforms for failing to exercise their editorial discretion in ways that the State tries to dictate. That is precisely what it means to impose liability on a party for its decisions as a publisher. *See, e.g.*, *Barnes*, 570 F.3d at 1105. But, as a practical matter, the statute does not eliminate the platforms' editorial choices. The platforms must still monitor the content reported as violative of the statute and make numerous and difficult judgments about whether to remove or label that content. And those editorial judgments, which must be made under severe time pressure with

41

the threat of costly litigation hanging over every decision, will not always be straightforward.

Appellants' argument simply ignores the practical burdens of complying with AB 2655, which requires covered platforms to make editorial judgments about whether any reported content is actually proscribed by the statute (i.e., "meet[s] the requirements" for "removal" or "labeling"). *See* §§20513(b), 20514(b). That exercise requires the platform to determine, at minimum, whether the content: (i) meets Section 20512(i)'s definition of "[m]aterially deceptive content," which requires assessing whether the content "would falsely appear to a reasonable person to be an authentic record of the content depicted in the media"; (ii) depicts a "candidate for elective office portrayed as doing or saying something that the candidate did not do or say and that is reasonably likely to harm the reputation or electoral prospects of a candidate," §§20513(a)(2)(A), 20514(a)(2)(A); (iii) depicts an "elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests," §§20513(a)(2)(B), 20514(a)(2)(A); and (iv) depicts an "elected official portrayed as doing or saying something that influences an election in California that the elected official did not do or say and that is reasonably

42

likely to falsely undermine confidence in the outcome of one or more election contests," §§20513(a)(2)(C), 20514(a)(2)(A).

As the district court correctly concluded, this exercise will be incredibly "complicated" in practice. ER-29. For example, as the California legislature acknowledged, the act of determining whether content depicts a candidate doing or saying something they did not do or say would require the platform to "know not only that the person portrayed in the content was a candidate for office, but also the date (or dates) of the election when the candidate will appear on the ballot." 1-XSER-63–64; ER-49. The platform would also "need to determine whether the candidate had actually said or done the thing that the candidate is portrayed as doing." *Id.* The legislature correctly recognized how challenging this will be for the range of officials covered by the statute (*id.*; *accord* 1-XSER-64, 91)—indeed, as the district court correctly found, the statute encompasses up to "866" candidates and "several hundreds of thousands of 'elected officials' nationwide." ER-29.

Accordingly, it will be "***nearly impossible***" to comply with AB 2655 "because platforms cannot be expected to know what a candidate has or has not said because the number of individuals captured by California's law is unbounded." *Id.*; *accord* 1-XSER-73, 100 (explaining that AB 2655 "requires online platforms to make determinations about truth and falsity in an ***impossible way***" and will inevitably force

43

platforms to "resort to over removing information in order to avoid liability and the penalties in this bill").

Even worse, the difficult removal and labeling decisions imposed under AB 2655's untenable regime must be assessed and accomplished for countless pieces of content (*see* 1-XSER-21–26, 65; 2-XSER-161–62), on an extremely compressed timeline (i.e., in less than 72 hours), and under the threat of costly, expedited litigation if the covered platform does not remove or label the content to the satisfaction of the State. (Indeed, Section 20515(b) explicitly authorizes lawsuits against covered platforms by government officials that "***disagree***[]" with the platform's moderation decision.) On this record, the district court correctly concluded that the exercise of determining whether reported content is proscribed by the statute will be incredibly difficult (if not, as a practical matter, "impossible"). ER-29–30.

To suggest—as Appellants do—that, under the statute, "platforms have no editorial discretion," Br. 29, is entirely baseless. To comply with the statute, platforms will have no choice but to exercise substantial editorial discretion in determining whether any flagged content falls within the statute.

In any event, Appellants' argument is also based on a misreading of the law. The law limits the editorial discretion of covered platforms by imposing liability on those platforms if their editorial decisions are "wrong" in the eyes of those

44

empowered to enforce the statute. That is precisely what it means to impose a duty based on "the defendant's status or conduct as a publisher," *Barnes*, 570 F.3d at 1102, because "the means to avoid liability requires the defendant to act as a publisher." *Doe 1*, 148 F.4th at 642. Put another way, Appellants' argument that the law eliminates (or limits) the covered platforms' editorial discretion because it imposes liability if such decisions are not made to the State's liking is not a reason for rejecting Section 230(c)(1) immunity; it is proof that Section 230(c)(1) immunity applies.

In the end, Appellants' argument proves too much. If a law that dictates content-moderation decisions about "materially deceptive content" does not hold a platform liable for its editorial choices, then neither would a law dictating content-moderation decisions about "defamatory" or "excessively violent" content. Under Appellants' faulty reasoning, so long as a statute defines the targeted content and forces platforms to eliminate or label it against their will, then immunity would not apply because "editorial discretion" is always eliminated. Not only is that not the law, the opposite is true. Efforts, like AB 2655, to impose liability on platforms for making certain editorial decisions about content posted by third parties *trigger* immunity under Section 230(c)(1) because they impose a duty based on "the defendant's status as a publisher," and because "the means to avoid liability requires the defendant to act as a publisher." *Doe 1*, 148 F.4th at 642. As the district court

45

correctly held, such an argument cannot be reconciled with the plain language of the statute, which forces the platforms, under threat of liability, to perform "quintessential publishing conduct" (removal and labeling of content) pursuant to the State's "preferred," "complicated method of election content moderation" (ER-24, 28), thereby interfering with the very core self-regulatory decision-making that Section 230 was enacted to protect.

Appellants also argue that, under AB 2655, covered platforms are not treated as publishers and are, instead treated as "distributors." Br. 26–29. This argument fares no better. Appellants assert that AB 2655 merely treats covered platforms as distributors, because it only penalizes platforms that "***knowingly*** disseminat[e]" or "distribut[e]" content proscribed under the statute. *See id.* 30–31. But AB 2655 penalizes covered platforms even if they ***do not have such knowledge*** because, under Sections 20513(a)(4) and 20514(a)(3), platforms may be sued even if they "act[]" only with "***reckless disregard***" of the fact that the content is proscribed by the statute. Appellants' argument falls apart under a close reading of the statute.[19]

---

[19] Even if AB 2655 treated covered platforms only as distributors, rather than publishers, Section 230(c)(1) encompasses distributor liability, as the majority of Circuit Courts of Appeals have found. *See, e.g.*, *Lycos, Inc.*, 478 F.3d at 420; *Force* v. *Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019); *Zeran*, 129 F.3d at 331–33; *Doe* v. *MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008). While the Ninth Circuit has not ruled on this question—and, for the reasons above, it need not do so here—it has recognized that most courts have found that Section 230(c)(1) immunity encompasses distributor liability. *See, e.g.*, *Batzel* v. *Smith*, 333 F.3d 1018, 1027 n.10 (9th Cir. 2003) (noting, in dicta, that while it need not reach whether Section

Finally, in attempting to analogize the platforms to distributors and AB 2655 to laws imposing distributor liability, Appellants assert that, "[j]ust as the State can require a bookstore not knowingly sell child sex abuse materials or a newspaper not knowingly advertise illegal goods, it can require platforms to create a reporting mechanism and remove or label specified reported materials without running afoul of section 230(c)(1)." Br. 37–38; *see also id.* 19, 29–30. Appellants' bookstore analogy is inapt. For starters, bookstores are not covered by Section 230 immunity because that immunity applies only in the online context. And, in any event, a law prohibiting bookstores from selling obscene material to minors regulates the distribution of content that has already been adjudicated unlawful and does not, like AB 2655, require rapid, complex editorial judgments about the truth or meaning of protected political speech. Put differently, AB 2655's requirements are not analogous to a bookstore's obligation to decline to sell illegal contraband and would instead be akin to a law requiring bookstores to investigate continually the factual accuracy of books about political candidates, all while under the threat of suit by State officials whenever they might "disagree" with the bookstore's assessment.

---

230 "encompasses both publishers and distributors," most "court[s] to reach the issue ha[ve] decided that Congress intended to immunize both distributors and publishers"), *overruled on other grounds, Gopher Media LLC* v. *Melone*, 154 F.4th 696 (9th Cir. 2025).

In the end, AB 2655 compels the covered platforms to perform, and holds the platforms liable for, the quintessential publishing conduct of evaluating, reviewing, removing, and editing/labeling third-party political expression. AB 2655 thus treats the platforms as publishers under Section 230(c)(1).

**B. Section 230(c)(1) Immunity Is Not Conditioned On A Proactive Monitoring Requirement And, In Any Event, AB 2655 Imposes Such A Requirement**

Appellants next argue that AB 2655 does not treat covered platforms as publishers because it does not require platforms to proactively "monitor third-party content." Br. 24–26. This argument (i) ignores the fact that AB 2655 *does* require active monitoring and (ii) is incorrect as a matter of law because active monitoring is only one of several types of publishing behavior that triggers Section 230(c)(1) immunity.

*First*, Appellants' argument plainly ignores that AB 2655 actually requires active monitoring in several ways. For example, the statute requires platforms to implement a monitoring/reporting system that allows users to flag "materially deceptive content" posted by third parties, requires covered platforms to respond to any such reports within 36 hours, *see* §20515(a), and authorizes enforcement actions if the platforms make calls that others disagree with, *see* §§20515(b), 20516. Through that system, the statute compels platforms to employ a system of monitoring that imposes substantial burdens on the platforms; for example, it

48

requires expedited responses and corrective actions taken in connection with any third-party content flagged by anyone.

Section 20513(c) of the statute imposes another active monitoring requirement. That section states that covered platforms "***shall identify***" and "remove" content that is "identical or substantially similar" to materially deceptive content previously removed under the statute, even if that content is not the subject of a new report. The word "identify" imposes an independent, affirmative monitoring obligation on the platforms. And that burden is substantial, given the inherent subjectivity in trying to determine whether certain content is "substantially similar" (a term that the statute does not define) to other content.

***Second***, Appellants' argument is contrary to law. This Court has repeatedly held that active monitoring is one type of publishing behavior that can trigger Section 230(c)(1) immunity, but it is far from the only one. Thus, in *Internet Brands*, this Court held that Section 230(c)(1) immunity applies to claims based on the defendants' "efforts, or lack thereof, to ***edit***, ***monitor***, ***or remove*** user generated content." 824 F.3d at 852. And, in *Barnes*, the Court held that Section 230(c)(1) "shields from liability all publication decisions, ***whether to edit, to remove, or to post***, with respect to content generated entirely by third parties." 570 F.3d at 1105. In *HomeAway.com, Inc.* v. *City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019), the Court made clear that the relevant test for determining whether a cause of action

49

satisfies the treatment "as a publisher" requirement is whether "the underlying duty 'could have been satisfied without changes to content posted by the website's users.'" *See also Roommates.com, LLC*, 521 F.3d at 1170–71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."); *Doe 1*, 148 F.4th at 643 (applying immunity where "the only way for [the defendant] to avoid [liability] would be to remove third-party posts—a quintessential publishing activity").

Appellants rely heavily on this Court's decision in *Calise*, but do so by quoting only snippets of *Calise* that focus on monitoring. *Calise*, however, does not support the proposition that active monitoring is the only way to trigger Section 230(c)(1) protection. In fact, the decision actually holds that Section 230(c)(1) applies if the duty at issue requires the ICS provider to "***remove any user content or otherwise affect[s] how it publishes or monitors such content***." *Calise*, 103 F.4th at 741 (quoting *Internet Brands*, 824 F.3d at 851). *Calise* also reaffirms that "tak[ing] down third-party content" is "quintessential publisher conduct" and that Section 230(c)(1) immunizes ICS providers from liability for "fail[ing] to remove" content. *Id.* at 740–41, 744. That is exactly what AB 2655's Enforcement Provisions do here because they provide "injunctive or other equitable relief against any large online platform ***to compel the removal of specific content*** as required by Section 20513." §20516;

50

*see also* §20515(b) (providing that, if a platform does not remove content proscribed by the statute within 72 hours after it is reported, then the platform may be sued).

Appellants also cite other decisions of this Court that do not support their position. For instance, in *Doe 1*, the Ninth Circuit stated that a "'publisher' is someone who 'reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it[,]'" and, *interpreting Calise*, explained that a "claim that 'obliges the defendant to 'monitor third-party content'' to avoid liability *also* treats the defendant as a publisher." 148 F.4th at 640 (quoting *Calise*, 103 F.4th at 742); *see id.* at 648 (finding that Section 230(c)(1) did not bar negligence per se claim because the relevant "duty *neither* requires Twitter to monitor content *nor* take any action associated with publication (e.g., removal) once it learns of the objectionable content"). Similarly, in *Bride*, this Court elucidated *Calise*'s "duty analysis," which asks whether the ICS provider must "*moderate* content"—not whether it must proactively monitor third-party content— "to fulfill its duty[.]" 112 F.4th at 1177. And, in *Internet Brands*, this Court held that Section 230(c)(1) did not bar the plaintiff's duty to warn claim because it did "not require Internet Brands to remove any user content *or otherwise* affect how it publishes *or* monitors such content." 824 F.3d at 851.

Nor has any other Circuit Court of Appeals created a rule that Section 230(c)(1) is conditioned on an active monitoring requirement. Instead, those courts,

51

like this Court, have examined whether a cause of action implicates an ICS provider's "traditional editorial functions," which include "deciding whether to publish, withdraw, postpone or alter content." *See, e.g.*, *Lycos, Inc.*, 478 F.3d at 422. To be sure, causes of action that impose an obligation on ICS providers to monitor third-party content to avoid liability ***also*** implicate the role of a publisher, but Section 230(c)(1) immunity cannot be ***conditioned*** on such an obligation, as Appellants suggest.

In sum, Section 230(c)(1) immunity is not conditioned on a proactive monitoring mandate but, rather, applies whenever liability is premised on a platform's role in evaluating, publishing, withdrawing, or modifying third-party content. AB 2655 implicates the covered platforms' core publication functions, even if it purports to do so only after a report is made.

## C. There Is No Categorical Exemption From Section 230(c)(1) For Claims Brought Under A State Statute

Appellants' third argument is that any obligation imposed on covered platforms under AB 2655 to remove, label, or otherwise moderate particular content inherently derives, not from the platform's status of a publisher, but from the platform's "statutory duty" to "follow" AB 2655. Br. 27, 29, 34. Appellants' argument strains credulity and, if accepted, would mean that Section 230(c)(1) could ***never*** immunize liability deriving from a state statute, no matter how directly the statutory claim or statute itself targets publishing conduct. Under such a rule, a state

52

government could enact a law forcing ICS providers to remove any type of content disfavored by the State, because any liability for failing to do so would derive from the platform's "statutory duty," rather than its duty as a publisher. That, however, is not the law.

Appellants' argument suffers from several fatal flaws:

*First,* Appellants' "statutory duty" argument is contrary to this Court's Section 230(c)(1) decisions, which require courts to define the duty imposed by a cause of action by employing an "exacting analysis" that puts substance over form. Thus, courts are required to look past the name of the cause of action and examine, on the specific facts of the case, "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Bride*, 112 F.4th at 1176. That analysis does not permit courts to define this duty as one "to follow the law"—which would be meaningless. After all, every statutory cause of action imposes a "statutory duty" to abide by the law. Rather, this Court's precedents compel courts to examine whether the liability imposed by statute treats the defendant as a publisher—e.g., by holding the defendant responsible for decisions to take down, keep up, or edit/label content and/or to require the defendant to monitor content posted by third parties.

It is therefore not surprising that this Court has held, on more than one occasion, that statutory causes of action trigger Section 230(c)(1) immunity. *See, e.g.*, *Doe 1*, 148 F.4th at 642–44; *Calise*, 103 F.4th at 744.

In *Calise*, this Court held that Section 230(c)(1) barred the plaintiffs' claim under California's UCL statute. *Id.* That the claim was brought under a state statute did not end the inquiry, as Appellants' interpretation would dictate. Instead, this Court explained that Section 230(c)(1) applied because the "predicate duty" under the plaintiffs' UCL claim was to "not engage in unfair competition by advertising illegal conduct[,]" and that "[s]uch a duty not only touche[d] on quintessential publishing conduct," but was "indeed the very conduct that §230(c)(1) addresses." *Id.* Accepting Appellants' argument would mean that Section 230(c)(1) could not have barred the plaintiffs' UCL claim because the claim only would have implicated Meta's "statutory duty" to follow the UCL. *See* Br. 27, 34.

Now consider the liability imposed under AB 2655. Under Section 20515(b), election candidates and officials may sue a covered platform if, after making a report, (i) the candidate or official "disagrees" with the platform's "response" or "action taken" (i.e., the platform's decision about whether and how to remove or label the content) or (ii) the platform "fail[s]" to "take action within 72 hours" (i.e., fails to remove or label the content within 72 hours). §20515(b); *see* §20516 (authorizing causes of action against platforms to "compel the removal of specific content as

54

required by Section 20513" and the "labeling of specific content as required by Section 20514"). To avoid liability under AB 2655, the platform, rushed as it is by the highly compressed statutory timelines, **must** make the "publication decision[]" of "remov[ing]" or "edit[ing]" the reported third-party content. *Barnes*, 570 F.3d at 1105; *accord id.* at 1102 ("[P]ublication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content."). It is difficult to conceptualize a fact pattern more squarely within the heartland of Section 230(c)(1).

**Second**, Appellants' argument relies on *Salesforce, Inc.*, 123 F.4th 788, but *Salesforce* did not hold that claims premised on statutory obligations are categorically outside of the reach of Section 230(c)(1). To the contrary, *Salesforce* applies the same functional, duty-based inquiry applied by this Court in *Calise*, which examines "what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor[, alter, or remove] third-party content." *Salesforce, Inc.*, 123 F.4th at 795 (alterations in original); *cf.* Br. 27 (conceding that AB 2655 "might require a platform to review, remove, or label certain reported content").

In *Salesforce*, the Fifth Circuit held that Section 230(c)(1) immunity did not apply to the plaintiffs' claims that Salesforce "breached a statutory duty to not knowingly benefit from participation in a sex-trafficking venture" because "[t]o state

55

the obvious: this duty does not derive from Salesforce's status or conduct as a publisher or speaker and would not require Salesforce to exercise publication or editorial functions to avoid liability." 123 F.4th at 797 (citing *Bride*, 112 F.4th at 1176–77). Because that duty only required that "Salesforce not sell its tools and operational support to a company it knew (or should have known) was engaged in sex trafficking[,]" the plaintiffs' claims were not "quintessentially related to a publisher's role[,]" which precluded Section 230(c)(1) immunity. *Id.*

As such, the relevant question was not whether the plaintiffs brought their claims under a statute—which, under Appellants' position, would categorically bar application of Section 230(c)(1)—but rather, as a practical matter, what conduct the plaintiffs' claims "actually require[d]" of the platform. *See id.* at 795. The Fifth Circuit even implicitly rejected Appellants' argument, explaining that if courts did not analyze a plaintiff's "specific factual allegations and the implications of those allegations," plaintiffs could "avoid section 230's grant of immunity by artfully pleading their allegations in terms of negligence or any other duty not traditionally associated with publication." *Id.*; *see also id.* at 798 (explaining that Section 230(c)(1) would bar any claim brought under a sex-trafficking statute that "seek[s] liability 'for decisions relating to the monitoring, screening, and deletion of content'"). That is exactly what Appellants have attempted here, by framing liability

56

under AB 2655 "in terms of" a statutory duty rather than one "traditionally associated with publication." *See id.* at 795.

***Third***, Appellants' argument cannot be reconciled with the decisions of various courts that have found state statutes to violate and be preempted by Section 230(c)(1). For instance, in *Computer & Communications Industry Association* v. *Paxton*, 747 F. Supp. 3d 1011, 1042 (W.D. Tex. 2024), the Texas Attorney General advanced, and the court rejected, ***the very argument made by Appellants here***. The Texas statute at issue required social media platforms to "filter[] out" particular content from the accounts of minors, such as content "'promoting' 'substance abuse.'" The Texas Attorney General argued that the law could not be preempted by Section 230(c)(1) because "liability attaches based on whether a website complies with the law, not based on its content." *Id.* at 1043.

The court rejected that argument and explained that, if accepted, this "reasoning would altogether nullify Section 230 by having the same effect as directly imposing liability on the website for hosting third-party content." *Id.* ("Liability under [the statute] *stems from* the content [the platform] hosts, even if liability directly attaches based on compliance with the law.") (emphasis in original). The court explained that accepting such a view would allow a state government to "pass[] a law stating, 'Social media websites must remove defamatory content.'" *Id.* at 1042–43.

Similarly, in *NetChoice* v. *Carr*, 789 F. Supp. 3d 1200, 1231 (N.D. Ga. 2025), the court held that Section 230(c)(1) preempted a Georgia statute requiring that social media platforms "prohibit '[t]he display of any advertising'" based on account holder's personal information in the accounts of minors. Adopting the reasoning of the Fifth Circuit in *Salesforce*—which, as discussed, Appellants erroneously assert supports their position—the court explained that this statutory requirement "would ultimately [result in] liability 'for decisions relating to the monitoring, screening, and deletion of content from [a platform's] network,'" which are "actions quintessentially related to a publisher's role." *Id.* (quoting *Salesforce, Inc.*, 123 F.4th at 798). So, too, in *Backpage.com, LLC* v. *Cooper*, 939 F. Supp. 2d 805, 821–28 (M.D. Tenn. 2013) and *Backpage.com, LLC* v. *McKenna*, 881 F. Supp. 2d 1262, 1271–75 (W.D. Wash. 2012), in which those courts held that Section 230(c)(1) preempted Tennessee and Washington statutes that prohibited certain advertising on Backpage.com.

*Finally*, Appellants' reliance on the federal TAKE IT DOWN Act, and on California statutes that require the removal of child sex abuse materials and unlicensed hemp product advertising, does not salvage AB 2655. The validity or scope of the federal TAKE IT DOWN Act reflects the judgment of the U.S. Congress rather than, as here, a state law subject to federal preemption, and, as a federal criminal statute, the TAKE IT DOWN Act would not be preempted by Section 230

58

in any event. *See* §§230(e)(1), (3). Moreover, the California statutes cited by Appellants are not at issue on this appeal and do not, like AB 2655, impose a "complicated" system of political content-moderation. *E.g.*, §§20513, 20514; ER-39. These statutes do not demonstrate the validity of AB 2655; indeed, AB 2655 is a statutory scheme that compels platforms to remove and alter third-party political speech, holds covered platforms liable if they perform that quintessential publishing conduct different than how the State wants them to, and is fundamentally inconsistent with the protections afforded to ICS providers under Section 230(c)(1).

## III.  AB 2655 VIOLATES AND IS PREEMPTED BY SECTION 230(c)(2)(B)

Section 20516 of AB 2655's Enforcement Provisions also violates, and is thus preempted by, Section 230(c)(2)(B). The immunity provided by Section 230(c)(2)(B) is "broad"—it covers "any action" "taken to enable or make available to information content providers or others the technical means to restrict access to [objectionable] material." *See PC Drivers Headquarters, LP* v. *Malwarebytes Inc.*, 371 F. Supp. 3d 652, 660 (N.D. Cal. 2019) (quoting §230(c)(2)(B)). As the district court correctly held, Section 20516 "directly contravenes" Section 230(c)(2)(B) because it provides causes of action for "injunctive or other equitable relief against" covered platforms that attempt to comply with the Monitoring/Reporting Requirement (by creating a mechanism for users to report the "materially deceptive content" targeted by the statute), but not to the satisfaction of the State. *See* §20516;

ER-27 ("[P]latforms will face enforcement if the reporting mechanism they implement does not, in the view of the government, satisfy" the Monitoring/Reporting Requirement.).  Put differently, a covered platform's attempt to comply with the Monitoring/Reporting Requirement *is* precisely an action to "make available" the "technical means to restrict access to" objectionable content, and such actions are immunized under Section 230(c)(2)(B).  *See* ER-26.

Appellants' arguments to the contrary are wholly unpersuasive.  ***First***, Appellants argue that AB 2655 does not implicate Section 230(c)(2)(B) because AB 2655 has "nothing to do with providing users the technical means to block or restrict access to certain material," given that the statute "*removes* a user or provider's ability to determine whether to remove or label content within its scope."  Br. 39 (emphasis in original).  But the monitoring/reporting mechanism *is* a technical means for blocking or restricting "materially deceptive content" covered by AB 2655.  As Appellants argue, it requires covered platforms to remove or label any reported content under the statute, and thus provides the means for users to block or restrict access to such content through the reporting mechanism.  *Id.* at 29.  And, if the platforms do not provide this reporting mechanism to users in a way that is satisfactory to the State, the government "may seek injunctive or other equitable relief" against the platform to "compel" "compliance" with the

60

Monitoring/Reporting Requirement. §20516. That violates the immunity afforded to ICS providers under Section 230(c)(2)(B).

***Second***, Appellants cite two Ninth Circuit cases—*Zango, Inc.* v. *Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009), and *Enigma Software Group, USA, LLC* v. *Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019)—but neither supports Appellants' position. In *Zango, Inc.*, Kaspersky (an internet security company) was sued by Zango (a provider of software programs that displayed catalogs of advertisements) because Kaspersky provided users with an anti-malware program that blocked Zango's programs and advertisements. 568 F.3d at 1170. Zango argued that Section 230(c)(2)(B) could not immunize Kaspersky because Kaspersky was not an ICS provider, given that it did not provide users with access to content. *See id.* at 1173–75. The Court rejected Zango's argument, found that Kaspersky was an ICS provider because it provided "access software," and held that Section 230(c)(2)(B) immunized Kaspersky from Zango's tort claims. *Id.* at 1175–77. Here, there is no dispute that X Corp. (like other covered platforms) provides users with access to content and is an ICS provider. Br. 20. Accordingly, *Zango* supports Appellees, rather than Appellants.

*Malwarebytes, Inc.* does not support Appellants either. There, this Court held that Section 230(c)(2) did not immunize "blocking a competitor's program for anticompetitive reasons" because the "phrase 'otherwise objectionable'" in Section

61

230(c)(2)(A) did not include material that was "objectionable for anticompetitive reasons." 946 F.3d at 1045, 1052. This specific limitation on Section 230(c)(2) immunity—for anti-competitive conduct—has nothing to do with Appellees' claim.

Given that covered platforms will face enforcement under Section 20516 if the reporting mechanism they implement does not, in the view of the State, satisfy the Monitoring/Reporting Requirement, Section 20516 directly contravenes and is preempted by Section 230(c)(2)(B).

## CONCLUSION

This Court should affirm the district court's decision granting summary judgment to Appellees on the basis that AB 2655 violates and is preempted by Section 230(c)(1), Section 230(c)(2)(B), and Section 230(e).

DATED: March 11, 2026       /s/ Joel Kurtzberg

CAHILL GORDON & REINDEL LLP
Joel Kurtzberg
Floyd Abrams
Jason Rozbruch
32 Old Slip
New York, NY 10005
Telephone: 212-701-3120
Facsimile: 212-269-5420

DOWNEY BRAND LLP
William R. Warne
Meghan M. Baker
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: 916-444-1000
Facsimile: 916-444-2100

*Attorneys for Appellee X Corp.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form17instructions.pdf](http://www.ca9.uscourts.gov/forms/form17instructions.pdf)

**9th Cir. Case Number(s)** | 25-6138

The undersigned attorney or self-represented party states the following:

☉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/Joel Kurtzberg        **Date** | Mar 11, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**  *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6138

I am the attorney or self-represented party.

**This brief contains** 13,993 **words,** including 74 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Joel Kurtzberg **Date** March 11, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I caused this document to be electronically filed on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system. All registered case participants will be served via the Appellate Electronic Filing system.

DATED: March 11, 2026

/s/ Joel Kurtzberg

CAHILL GORDON & REINDEL LLP
Joel Kurtzberg
Floyd Abrams
Jason Rozbruch
32 Old Slip
New York, NY 10005
Telephone: 212-701-3120
Facsimile: 212-269-5420

DOWNEY BRAND LLP
William R. Warne
Meghan M. Baker
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Telephone: 916-444-1000
Facsimile: 916-444-2100

*Attorneys for Appellee X Corp.*

# ADDENDUM

## TABLE OF CONTENTS

| Statutes | Pages |
|---|---|
| 47 U.S.C. § 230 ................................................................................ A-1 | |
| Cal. Elec. Code § 320 ...................................................................... A-5 | |
| Cal. Elec. Code § 359.5 ................................................................... A-6 | |
| Cal. Elec. Code § 20510 .................................................................. A-8 | |
| Cal. Elec. Code § 20511 .................................................................. A-9 | |
| Cal. Elec. Code § 20512 ................................................................ A-10 | |
| Cal. Elec. Code § 20513 ................................................................ A-12 | |
| Cal. Elec. Code § 20514 ................................................................ A-14 | |
| Cal. Elec. Code § 20515 ................................................................ A-16 | |
| Cal. Elec. Code § 20516 ................................................................ A-17 | |
| Cal. Elec. Code § 20517 ................................................................ A-18 | |
| Cal. Elec. Code § 20518 ................................................................ A-19 | |
| Cal. Elec. Code § 20519 ................................................................ A-20 | |
| Cal. Elec. Code § 20520 ................................................................ A-22 | |

§ 230. Protection for private blocking and screening of offensive material, 47 USCA § 230

United States Code Annotated
  Title 47. Telecommunications (Refs & Annos)
    Chapter 5. Wire or Radio Communication (Refs & Annos)
      Subchapter II. Common Carriers (Refs & Annos)
        Part I. Common Carrier Regulation

47 U.S.C.A. § 230

§ 230. Protection for private blocking and screening of offensive material

Effective: April 11, 2018
Currentness

**(a) Findings**

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

A-1

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of--

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

A-2

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit--

**(A)** any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

A-3

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

    **(A)** filter, screen, allow, or disallow content;

    **(B)** pick, choose, analyze, or digest content; or

    **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

## CREDIT(S)

(June 19, 1934, c. 652, Title II, § 230, as added Pub.L. 104-104, Title V, § 509, Feb. 8, 1996, 110 Stat. 137; amended Pub.L. 105-277, Div. C, Title XIV, § 1404(a), Oct. 21, 1998, 112 Stat. 2681-739; Pub.L. 115-164, § 4(a), Apr. 11, 2018, 132 Stat. 1254.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 13925

Ex. Ord. No. 13925, May 28, 2020, 85 F.R. 34079, which related to moderation of content posted on social media platforms, was revoked by Ex. Ord. No. 14029, § 1, May 14, 2021, 86 F.R. 27025.

Notes of Decisions (307)

Footnotes

1      So in original. Probably should be "subparagraph (A)".

47 U.S.C.A. § 230, 47 USCA § 230
Current through P.L. 119-73, except P.L. 119-60. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-4

§ 320. Elections official, CA ELEC § 320

---

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 0.5. Preliminary Provisions (Refs & Annos)
      Chapter 4. Definitions

West's Ann.Cal.Elec.Code § 320

§ 320. Elections official

Effective: January 1, 2008
Currentness

"Elections official" means any of the following:

(a) A clerk or any person who is charged with the duty of conducting an election.

(b) A county clerk, city clerk, registrar of voters, or elections supervisor having jurisdiction over elections within any county, city, or district within the state.

**Credits**
(Stats.1994, c. 920 (S.B.1547), § 2. Amended by Stats.2007, c. 125 (A.B.1732), § 1.)

Notes of Decisions (1)

West's Ann. Cal. Elec. Code § 320, CA ELEC § 320
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**                                     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-5

West's Annotated California Codes
 Elections Code (Refs & Annos)
  Division 0.5. Preliminary Provisions (Refs & Annos)
   Chapter 4. Definitions

West's Ann.Cal.Elec.Code § 359.5

§ 359.5. Voter-nominated office

Effective: February 10, 2012
Currentness

(a) "Voter-nominated office" means a congressional or state elective office for which a candidate may choose to have his or her party preference or lack of party preference indicated upon the ballot. A political party or party central committee shall not nominate a candidate at a state-conducted primary election for a voter-nominated office. The primary conducted for a voter-nominated office does not serve to determine the nominees of a political party but serves to winnow the candidates for the general election to the candidates receiving the highest or second highest number of votes cast at the primary election. The following offices are voter-nominated offices:

(1) Governor.

(2) Lieutenant Governor.

(3) Secretary of State.

(4) Controller.

(5) Treasurer.

(6) Attorney General.

(7) Insurance Commissioner.

(8) Member of the State Board of Equalization.

(9) United States Senator.

(10) Member of the United States House of Representatives.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 1

A-6

(11) State Senator.

(12) Member of the Assembly.

(b) This section does not prohibit a political party or party central committee from endorsing, supporting, or opposing a candidate for an office listed in subdivision (a).

**Credits**
(Added by Stats.2009, c. 1 (S.B.6), § 7, operative Jan. 1, 2011. Amended by Stats.2012, c. 3 (A.B.1413), § 4, eff. Feb. 10, 2012.)

Notes of Decisions (6)

West's Ann. Cal. Elec. Code § 359.5, CA ELEC § 359.5
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-7

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20510

§ 20510. Short title

Effective: January 1, 2025
Currentness

This chapter shall be known and may be cited as the Defending Democracy from Deepfake Deception Act of 2024.

**Credits**

(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20510, CA ELEC § 20510
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-8

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20511

§ 20511. Legislative findings and declarations

Effective: January 1, 2025
Currentness

The Legislature finds and declares all of the following:

(a) California is entering its first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI will pollute our information ecosystems like never before. Voters will not know what images, audio, or video they can trust.

(b) In a few clicks, using current technology, bad actors now have the power to create a false image of a candidate accepting a bribe or a fake video of an elections official "caught on tape" saying that voting machines are not secure, or to generate the Governor's voice telling millions of Californians their voting site has changed.

(c) In the lead-up to the 2024 presidential elections, candidates and parties are already creating and distributing deepfake images and audio and video content. These fake images or files can spread to millions of Californians in seconds and skew election results or undermine trust in the ballot counting process.

(d) The labeling information required by this bill is narrowly tailored to provide consumers with factual information about the inauthenticity of particular images, audio, video, or text content in order to prevent consumer deception.

(e) In order to ensure California elections are free and fair, California must, for a limited time before and after elections, prevent the use of deepfakes and disinformation meant to prevent voters from voting and to deceive voters based on fraudulent content. Accordingly, the provisions of this chapter are narrowly tailored to support California's compelling interest in protecting its free and fair elections.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20511, CA ELEC § 20511
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

A-9

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20512

§ 20512. Definitions

Effective: January 1, 2025
Currentness

For purposes of this chapter, the following terms have the following meanings:

(a) "Advertisement" means any general or public communication that a large online platform knows is authorized or paid for with the purpose of supporting or opposing a candidate for elective office.

(b) "Broadcasting station" means a radio or television broadcasting station, including any of the following:

(1) Cable operator, programmer, or producer.

(2) Streaming service operator, programmer, or producer.

(3) Direct-to-home satellite television operator, programmer, or producer.

(c) "Candidate" means any person running for a voter-nominated office as defined in Section 359.5, any person running for the office of President or Vice President of the United States, and any person running for the office of Superintendent of Public Instruction.

(d) "Deepfake" means audio or visual media that is digitally created or modified such that it would falsely appear to a reasonable person to be an authentic record of the actual speech or conduct of the individual depicted in the media.

(e) "Election communication" means a general or public communication that is not an "advertisement" and that concerns any of the following:

(1) A candidate for elective office.

(2) Voting or refraining from voting in an election in California.

A-10

(3) The canvass of the vote for an election in California, as defined in subdivision (f).

(4) Voting machines, ballots, voting sites, or other property or equipment related to an election in California.

(5) Proceedings or processes of the electoral college in California.

(f) "Election in California" means any election where a candidate, as defined in this section, is on the ballot, and any election where a statewide initiative or statewide referendum measure is on the ballot.

(g) "Elections official" means either of the following persons acting in their official capacity:

(1) An elections official as defined in Section 320.

(2) The Secretary of State.

(h) "Large online platform" means a public-facing internet website, web application, or digital application, including a social media platform as defined in Section 22675 of the Business and Professions Code, video sharing platform, advertising network, or search engine that had at least 1,000,000 California users during the preceding 12 months.

(i)(1) "Materially deceptive content" means audio or visual media that is digitally created or modified, and that includes, but is not limited to, deepfakes and the output of chatbots, such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media.

(2) "Materially deceptive content" does not include any audio or visual media that contains only minor modifications that do not significantly change the perceived contents or meaning of the content. Minor changes include changes to the brightness or contrast of images, removal of background noise in audio, and other minor changes that do not impact the content of the image or audio or visual media.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20512, CA ELEC § 20512
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-11

West's Annotated California Codes
Elections Code (Refs & Annos)
Division 20. Election Campaigns (Refs & Annos)
Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20513

## § 20513. Large online platforms; development and implementation of procedures to identify and remove materially deceptive content; conditions; removal; disclosure exception; time

Effective: January 1, 2026
Currentness

(a) Any large online platform shall develop and implement procedures for the use of state-of-the-art techniques to identify and remove materially deceptive content if all of the following conditions are met:

(1) The content is reported pursuant to subdivision (a) of Section 20515.

(2) The materially deceptive content is any of the following:

(A) A candidate for elective office portrayed as doing or saying something that the candidate did not do or say and that is reasonably likely to harm the reputation or electoral prospects of a candidate.

(B) An elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

(C) An elected official portrayed as doing or saying something that influences an election in California that the elected official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

(3) The content is posted during the applicable time period or periods set forth in subdivision (e).

(4) The large online platform knows or acts with reckless disregard for the fact that the content meets the requirements of this section.

(b) If a post is determined to meet the requirements for removal pursuant to subdivision (a), any large online platform shall remove the post upon that determination, but no later than 72 hours after a report is made pursuant to subdivision (a) of Section 20515 in order to be in compliance with this chapter.

A-12

(c) Any large online platform shall identify, using state-of-the-art techniques, and remove, upon discovering or being alerted to the posting or reposting of, any identical or substantially similar materially deceptive content that the platform had previously removed pursuant to this chapter, provided that this removal occurs during the applicable time period or periods set forth in subdivision (e).

(d)(1) Notwithstanding subparagraph (A) of paragraph (2) of subdivision (a), this section does not apply to a candidate for elective office who, during the time period set forth in subdivision (e), portrays themself as doing or saying something that the candidate did not do or say, if the digital content includes a disclosure stating the following: "This _____ has been manipulated." The blank in this disclosure shall be filled in with whichever of the following terms most accurately describes the media:

(A) Image.

(B) Audio.

(C) Video.

(2)(A) For visual media, the text of the disclosure shall appear in a size that is easily readable by the average viewer and no smaller than the largest font size of other text appearing in the visual media. If the visual media does not include any other text, the disclosure shall appear in a size that is easily readable by the average viewer. For visual media that is video, the disclosure shall appear for the duration of the video.

(B) If the media consists of audio only, the disclosure shall be read in a clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each.

(e)(1) Except as provided in paragraph (2), any large online platform shall remove the content to the extent required by subdivisions (a) to (c), inclusive, and any candidate for elective office shall include the disclosure required by subdivision (d), during a period beginning 120 days before an election in California and through the day of the election.

(2) If the content described in subdivision (a) depicts or pertains to elections officials, any large online platform shall remove the content to the extent required by subdivisions (a) to (c), inclusive, during a period beginning 120 days before an election in California and ending on the 60th day after the election.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025. Amended by Stats.2025, c. 67 (A.B.1170), § 71, eff. Jan. 1, 2026.)

West's Ann. Cal. Elec. Code § 20513, CA ELEC § 20513
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 2

A-13

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20514

### § 20514. Large online platforms; development and implementation of procedures to identify and label materially deceptive content; conditions; label requirements; time

Effective: January 1, 2025
Currentness

(a) Any large online platform shall develop and implement procedures for the use of state-of-the-art techniques to identify materially deceptive content and for labeling such content as provided in subdivision (c) if all of the following conditions are met:

(1) The content is reported pursuant to subdivision (a) of Section 20515.

(2) The materially deceptive content is either of the following:

(A) Included within subdivision (a) of Section 20513, but is posted outside the applicable time period described in subdivision (e) of Section 20513.

(B) Appears within an advertisement or election communication and is not subject to Section 20513.

(3) The large online platform knows or acts with reckless disregard for the fact that the materially deceptive content meets the requirements of this section.

(b) If a post is determined to meet the requirements for labeling pursuant to subdivision (a), any large online platform shall label the post upon that determination, but no later than 72 hours after a report is made pursuant to subdivision (a) of Section 20515 in order to be in compliance with this chapter.

(c) The label required by subdivision (a) shall state: "This _____ has been manipulated and is not authentic." The blank in this disclosure shall be filled in with whichever of the following terms most accurately describes the media:

(1) Image.

(2) Audio.

A-14

(3) Video.

(d) The label required by subdivision (a) shall permit users to click or tap on it for additional explanation about the materially deceptive content in an easy-to-understand format.

(e) The labeling requirement set forth in subdivision (a) applies during any of the following time periods, to the extent applicable:

(1) The period beginning six months before an election in California and through the day of the election.

(2) The period beginning six months before an election in California and ending on the 60th day after the election, if the content depicts or pertains to elections officials, the electoral college process, a voting machine, ballot, voting site, or other equipment related to an election, or the canvass of the vote.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20514, CA ELEC § 20514
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**　　　　　　　　　　　　　　　© 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW　© 2026 Thomson Reuters. No claim to original U.S. Government Works.　2

A-15

West's Annotated California Codes
    Elections Code (Refs & Annos)
        Division 20. Election Campaigns (Refs & Annos)
            Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20515

§ 20515. Report to large online platform content to be removed or labeled; response; candidates for elective office, elected official, or elections official; injunctive relief to compel removal or labeling of specific content or reporting compliance

Effective: January 1, 2025
Currentness

(a) A large online platform shall provide an easily accessible way for California residents to report to that platform content that should be removed pursuant to Section 20513 or labeled pursuant to Section 20514. The large online platform shall respond to the person who made the report within 36 hours of the report, describing any action taken or not taken by the large online platform with respect to the content.

(b) A candidate for elective office, elected official, or elections official who has made a report to a large online platform under subdivision (a) and who either has not received a response within 36 hours or disagrees with the response, action taken, or failure by the large online platform to take action within 72 hours, may seek injunctive or other equitable relief against the large online platform to compel the removal of specific content as required by Section 20513, labeling of specific content as required by Section 20514, or compliance with the reporting process required by subdivision (a). The plaintiff shall bear the burden of establishing the violation through clear and convincing evidence. An action under this subdivision shall be entitled to precedence in accordance with Section 35 of the Code of Civil Procedure.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20515, CA ELEC § 20515
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

End of Document
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-16

§ 20516. Attorney General or district or city attorney; injunctive..., CA ELEC § 20516

---

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20516

## § 20516. Attorney General or district or city attorney; injunctive relief to compel removal or labeling of specific content or reporting compliance

Effective: January 1, 2025
Currentness

The Attorney General or any district attorney or city attorney may seek injunctive or other equitable relief against any large online platform to compel the removal of specific content as required by Section 20513, labeling of specific content as required by Section 20514, or compliance with the reporting process required by subdivision (a) of Section 20515. The plaintiff shall bear the burden of establishing the violation through clear and convincing evidence. An action under this section shall be entitled to precedence in accordance with Section 35 of the Code of Civil Procedure.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20516, CA ELEC § 20516
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

End of Document      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-17

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20517

§ 20517. Language of materially deceptive content

Effective: January 1, 2025
Currentness

This chapter applies to materially deceptive content, regardless of the language used in the content. If the language used is not English, the disclosure required by subdivision (d) of Section 20513 and the label required by Section 20514 must appear in the language used as well as in English.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20517, CA ELEC § 20517
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

A-18

---

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20518

## § 20518. Authority of online platforms to block, remove, or label materially deceptive content

Effective: January 1, 2025
Currentness

(a) This chapter does not preclude a large online platform from blocking, removing, or labeling any materially deceptive content outside of the time periods specified in Sections 20513 and 20514.

(b) This chapter does not preclude any online platform not subject to this chapter from blocking, removing, or labeling any materially deceptive content.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20518, CA ELEC § 20518
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-19

§ 20519. Application of chapter, CA ELEC § 20519

West's Annotated California Codes
  Elections Code (Refs & Annos)
    Division 20. Election Campaigns (Refs & Annos)
      Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20519

§ 20519. Application of chapter

Effective: January 1, 2025
Currentness

This chapter does not apply to any of the following:

(a) A regularly published online newspaper, magazine, or other periodical of general circulation that routinely carries news and commentary of general interest, and that publishes any materially deceptive content that an online platform is required to block or label based on this chapter, if the publication contains a clear disclosure that the materially deceptive content does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct.

(b)(1) A broadcasting station that broadcasts any materially deceptive content prohibited by this chapter as part of a bona fide newscast, news interview, news documentary, commentary of general interest, or on-the-spot coverage of bona fide news events, if the broadcast clearly acknowledges through content or a disclosure, in a manner that can be easily heard or read by the average listener or viewer, that the materially deceptive content does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct.

(2) A broadcasting station when it is paid to broadcast materially deceptive content and either of the following circumstances exist:

(A) The broadcasting station can show that it has prohibition and disclaimer requirements that are consistent with the requirements in this chapter and that it has provided those prohibition and disclaimer requirements to each person or entity that purchased the advertisement.

(B) Federal law requires the broadcasting station to air advertisements from legally qualified candidates or prohibits the broadcasting station from censoring or altering the message.

(c) Materially deceptive content that constitutes satire or parody.

**Credits**
(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20519, CA ELEC § 20519

A-20

Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

**End of Document**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-21

West's Annotated California Codes
   Elections Code (Refs & Annos)
      Division 20. Election Campaigns (Refs & Annos)
         Chapter 7. Defending Democracy from Deepfake Deception Act of 2024 (Refs & Annos)

West's Ann.Cal.Elec.Code § 20520

## § 20520. Severability

Effective: January 1, 2025
Currentness

The provisions of this chapter are severable. If any provision of this chapter or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

**Credits**

(Added by Stats.2024, c. 261 (A.B.2655), § 3, eff. Jan. 1, 2025.)

West's Ann. Cal. Elec. Code § 20520, CA ELEC § 20520
Current with urgency legislation through Ch. 6 of 2026 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

A-22