No. 25-6138

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**THE BABYLON BEE, LLC, ET AL.,**

*Plaintiffs-Appellees,*

– v. –

**ROB BONTA, ET AL.,**

*Defendants-Appellants.*

On Appeal from the United States District Court for the Eastern District of California, No. 2:24-cv-02527-JAM-CKD, Hon. John A. Mendez

**AMICI CURIAE BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND FIRST AMENDMENT COALITION IN SUPPORT OF PLAINTIFFS-APPELLEES SEEKING AFFIRMANCE**

Gabriel Rottman
  *Counsel of Record for Amici Curiae*
Lisa Zycherman*
Mara Gassmann*
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1050
Washington, D.C. 20005
(202) 795-9300

Ian Kalish, Esq.*
UNIVERSITY OF VIRGINIA LAW SCHOOL
  FIRST AMENDMENT CLINIC
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316

*Of counsel

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amici curiae certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST AND IDENTITY OF AMICI CURIAE .................................................. 1

SOURCE OF AUTHORITY TO FILE ..................................................................3

FED. R. APP. P. 29(a)(4)(E) STATEMENT .....................................................3

INTRODUCTION ..........................................................................................4

ARGUMENT ................................................................................................6

    I.     The news media depends on Section 230's robust protections for user-generated content..............................................................................6

    II.    By intruding on Section 230's protections for hosts of online content, AB 2655 endangers newsgathering and core journalistic functions.......10

    III.   AB 2655 threatens First Amendment protections for the exercise of editorial discretion..............................................................................15

CONCLUSION ............................................................................................20

CERTIFICATE OF SERVICE ..........................................................................22

Form 8. Certificate of Compliance for Briefs...............................................23

# TABLE OF AUTHORITIES

**Cases**

*Assocs. & Aldrich Co. v. Times Mirror Co.*,
  440 F.2d 133 (9th Cir. 1971) ..................................................................18

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ........................................................... 16, 19

*Calise v. Meta Platforms, Inc.*,
  103 F.4th 732 (9th Cir. 2024) ...............................................................19

*Courthouse News Serv. v. Planet*,
  947 F.3d 581 (9th Cir. 2020) ...................................................................4

*Doe 1 v. Twitter, Inc.*,
  148 F.4th 635 (9th Cir. 2025) ...............................................................17

*Fair Hous. Council of San Fernando Valley v. Roommates.com*,
  521 F.3d 1157 (9th Cir. 2008) ...............................................................16

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014) .................................................................18

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988) ...............................................................................14

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ..................................................... 15, 16, 17, 18

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ..............................................................................12

**Statutes**

47 U.S.C. § 230 (2022) .....................................................1, 4-7, 10, 15-20

Cal. Elec. Code § 20512 ................................................................ 14, 16

Cal. Elec. Code § 20514 ...............................................................................13

Cal. Elec. Code § 20515 ......................................................................... 13, 16

Cal. Elec. Code § 20519 ......................................................................... 14, 15, 17

Cal. Elec. Code § 20513 ......................................................................... 13, 19, 23

**Other Authorities**

Clare Y. Cho & Dana A. Scherer, Cong. Rsch. Serv., R47018,
*Stop the Presses? Newspapers in the Digital Age* (2023).....................................7

Eli Langer, *The Five-Year Anniversary of Twitter's Defining Moment*,
CNBC (Jan. 15, 2014) ...............................................................................9

*How to Use Social Media for Newsgathering*,
NBC News (Oct. 5, 2021) .........................................................................9

J. Scott Trubey, *AJC to Move to Fully Digital Publication, Phase Out Print Dec.
31*, Atlanta J.-Const. (Aug. 28, 2025) .................................................7

Jeff Kosseff, *The Twenty-Six Words that Created the Internet*
(Cornell Univ. Press 2019) ...................................................................16

Jeffrey Gottfried et al., *Journalists Sense Turmoil in Their Industry Amid
Continued Passion for Their Work*,
Pew Rsch. Ctr. (June 14, 2022) ...............................................................9

Joel Golby, *I Thought I Was Immune to Being Fooled Online. Then I Saw the Pope
in a Coat*, The Guardian (Mar. 27, 2023).........................................13

Lucas A. Powe Jr., *The Fourth Estate and the Constitution*
(Univ. of Cal. Press 1992) ...................................................................17

Mark Glaser, *6 Ways Local News Makes a Crucial Impact Covering COVID-19*,
Medium (Apr. 20, 2020)...........................................................................12

iv

Neha Gupta, *How Short-Form Video Is Helping* The Economist *Gain Young Users*,
World Ass'n News Publishers (Aug. 17, 2023) ......................................................9

Nic Newman et al., *Reuters Institute Digital News Report 2025*
(Reuters Inst. for the Study of Journalism 2025) ....................................................9

Nicola Bruno, *Tweet First, Verify Later? How Real-Time Information is Changing Coverage of Worldwide Crisis Events*
(Reuters Inst. for the Study of Journalism 2011) ..................................................11

Pew Rsch. Ctr., *News Platform Fact Sheet*
(Sep. 25, 2025) .......................................................................................................8

R. Kelly Garrett et al., *Too Many People Think Satirical News Is Real*,
Ohio State. Univ. (Aug. 16, 2019) ........................................................................15

Sarah Scire & Sophie Culpepper, *Local News Orgs Missed Out on Political Ad Money in 2024, and Other Takeaways from a Survey of Local Media Companies*,
NiemanLab (Jan. 16, 2025) .....................................................................................9

*Social Media Guidelines for the Newsroom*,
N.Y. Times (June 21, 2024) ..................................................................................10

Stuart A. Thompson & Tiffany Hsu, *Trump Elevates Once-Fringe Meme Makers to the Mainstream*,
N.Y. Times, (Nov. 20, 2025) ................................................................................15

Susanna Kim, *All the Times People Were Fooled by The Onion*,
ABC News (June 1, 2015) ....................................................................................14

The Economist (@theeconomist),
TikTok (last visited Feb. 24, 2026) ........................................................................9

## INTEREST AND IDENTITY OF AMICI CURIAE

Amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee") and First Amendment Coalition ("FAC"). Amici have a strong interest in ensuring robust public discourse on the internet, particularly on news media websites and digital platforms where many readers, listeners, and viewers encounter journalism today. This robust digital information-sharing ecosystem is facilitated by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, bipartisan legislation passed by Congress and signed into law in 1996. Today, journalists, news organizations, and the public still depend on the free flow of information that Section 230 promotes.

The Reporters Committee is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. It often appears as amicus curiae in federal courts to underline the importance of editorial independence to the freedom of the press, including in the context of new and digital media, which often depend on Section 230's protections when hosting content authored by third parties. *See, e.g.*, Br. Amici Curiae of the Reps. Comm.

for Freedom of the Press, et al., *NetChoice, L.L.C. v. Paxton* (U.S. Dec. 5, 2023) (No. 22-55); Br. Amici Curiae of the Reps. Comm. for Freedom of the Press and the Media Law Res. Ctr, *Gonzalez v. Google* (U.S. Jan. 19, 2023) (No. 21-1333); Br. Amici Curiae of Ctr. for Democracy & Tech., Reps. Comm. for Freedom of the Press, et al., *Twitter v. Taamneh* (U.S. Dec. 5, 2022) (No. 21-1496).

FAC is a nonprofit public interest organization dedicated to defending free speech, free press, and open government rights in order to make government, at all levels, more accountable to the people. Its mission assumes that government transparency and an informed electorate are essential to a self-governing democracy. FAC advances this purpose by working to improve governmental compliance with state and federal open government laws. FAC's activities include free legal consultations on access to public records and First Amendment issues, educational programs, legislative oversight of California bills affecting access to government records and free speech, and public advocacy, including extensive litigation and appellate work. Among its work in this regard, FAC submitted written opposition to California Assembly Bill 2655, at issue in this appeal. FAC's members are news organizations, law firms, libraries, civic organizations, academics, freelance journalists, bloggers, activists, and ordinary citizens.

## SOURCE OF AUTHORITY TO FILE

Plaintiffs-Appellees consent to the filing of this brief. Defendants-Appellants do not oppose its filing. Amici move to file it pursuant to Federal Rule of Appellate Procedure 29(a)(2)-(3) and Circuit Rule 29-3.

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

No party's counsel authored any part of this brief. No person other than amici or their counsel contributed money intended to fund the brief's preparation or submission.

3

**INTRODUCTION**

If allowed to enter into force, California Assembly Bill ("AB") 2655 would impoverish public discourse by interfering with the ability of journalists to gather and publish information online. The law, including its labeling and removal requirements as well as its vague and malleable definition of which content qualifies as "materially deceptive," invites both overenforcement and overcompliance. Those provisions – coupled with a mandate that all covered entities create a reporting system to enable that labeling or removal – would burden the press and leave the public less informed on important issues. The free flow of information online is invaluable because it allows news about emerging situations to be gathered quickly, or even in real time, and allows reporting to be distributed expeditiously and widely. *See, e.g.*, *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (discussing timeliness as core to newsgathering and reporting). A law like AB 2655 that would stanch that flow is thus dangerous for the press and for the public that depends on the news media to keep it informed.

Amici write to offer three points in support of affirmance.

First, these concerns with the law are further heightened because of the way Defendants-Appellants' arguments, if adopted, would eliminate certain protections under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 (2022) ("Section 230"). These protections apply directly to news outlets hosting third-

party content online, such as public comment features on outlets' websites. Section 230 also enlarges the store of newsworthy information that journalists can access online. For example, it permits platforms to engage in content moderation without fear that exercising editorial discretion – including about, for instance, content that it decides not to remove – could lead to onerous litigation or state criminal liability.

Second, while AB 2655 purports to exempt entities engaged in "regular[] publish[ing]" as well as broadcasters, these carveouts are insufficient. That is, to be protected, publishers and broadcasters would first have to determine what qualifies as materially deceptive, digitally created or modified content that would be perceived as authentic by a "reasonable person" – a tall order where audiences vary widely in age, media literacy, and knowledge regarding the hallmarks of such content. They would then have to include a label identifying the material as such, which clearly interferes with their prerogatives as publishers, in violation of Section 230. AB 2655 also purports to exempt "satire or parody" without defining those terms. That exemption would provide inadequate protection for journalists reporting on digitally created or modified content, as satire and parody can be notoriously difficult to define and identify both in practice and in law.

Finally, several of California's arguments in defense of AB 2655 would, if credited, improperly operate not only to circumvent Section 230, but to corrode

core First Amendment protections for the press's editorial autonomy. First, the State argues that by leaving platforms with no choice but to remove covered content, its statute would not implicate editorial discretion at all. Not only is this argument incorrect, as platforms must still exercise editorial discretion in determining *whether* the law applies to a particular piece of content, it would also justify *any* intrusion on moderation that operates in absolutes. Second, the State appears to argue that the statute does not treat platforms as publishers, as would be required to trigger Section 230's protections. Rather, the State claims, the measure simply imposes a statutory duty to "follow the law." But by mandating the removal or labeling of content, AB 2655 necessarily intrudes on a publishing function and there is no exception in Section 230 for state statutes. Indeed, the concern that platforms could be subject to 50 different, often mutually inconsistent statutory schemes was a major factor behind Section 230's passage. Although the district court rested its decision on Section 230 preemption, these lurking First Amendment concerns illustrate the flaws in several of the State's arguments.

For all the reasons above, amici urge this Court to uphold the lower court's decision finding AB 2655 expressly preempted by Section 230.

## ARGUMENT

I. **The news media depends on Section 230's robust protections for user-generated content.**

The open internet, backstopped by Section 230's protections, has become

6

particularly important for news organizations as both an avenue for the dissemination of news online and as a tool used by journalists for newsgathering. "Newspapers have been offering their articles online since at least January 1994, when the *Palo Alto Weekly* published the first online newspaper." Clare Y. Cho & Dana A. Scherer, Cong. Rsch. Serv., R47018, *Stop the Presses? Newspapers in the Digital Age*, at 2 (2023). And today, while many media organizations still circulate paper editions, reporting has increasingly moved online – with some outlets exclusively publishing digitally. *See* J. Scott Trubey, *AJC to Move to Fully Digital Publication, Phase Out Print Dec. 31*, Atlanta J.-Const. (Aug. 28, 2025), https://tinyurl.com/3pmpdzdd. This shift mirrors changes to the public's consumption of news. *Id.* ("The AJC's digital audience far surpasses that of print and has for some time."); Pew Rsch. Ctr., *News Platform Fact Sheet* (Sep. 25, 2025), https://tinyurl.com/8yvhm2pu ("Digital devices [were] by far the most common way Americans [accessed] news" in 2025, with only 7% of Americans responding that they read "printed newspapers or magazines.").

Not only do press outlets maintain their own websites and online publications, but they have also turned to social media to distribute their stories. *See* Neha Gupta, *How Short-Form Video Is Helping* The Economist *Gain Young Users*, World Ass'n News Publishers (Aug. 17, 2023), https://perma.cc/W8G2-B7EG ("We take the best The Economist has to offer and turn it into digestible,

7

engaging, quirky, interesting formats that can tease the audience with what's

behind the paywall."); The Economist (@theeconomist), TikTok,

https://tinyurl.com/nh6xtjd6 (last visited Feb. 24, 2026). Social media platforms

have even surpassed both television and traditional print media (both physical and

online) as the public's leading medium to consume news. Nic Newman et al.,

*Reuters Institute Digital News Report 2025* 11 (Reuters Inst. for the Study of

Journalism 2025), https://perma.cc/XD2R-JY5C. In line with these readership and

viewership trends, many news outlets have diversified the nature of the content

they produce to access online consumers. *See* Gupta, *supra* ("Diversity of content

by way of carousels, daily charts and reels, data and stories has significantly

improved the [Economist's] reach on Instagram."); Sarah Scire & Sophie

Culpepper, *Local News Orgs Missed Out on Political Ad Money in 2024, and

Other Takeaways from a Survey of Local Media Companies*, NiemanLab (Jan. 16,

2025), https://tinyurl.com/mmx4hxx4 (87 local news organizations self-reporting

that "newsletters, video, and digital subscriptions were their top digital successes in

2024").

The free flow of information on the internet has also become integral to

newsgathering. The *New York Times* explains, for instance, that social media

"plays a vital role in our journalism" allowing "our reporters and editors [to]

harvest and curate information, cultivate sources, engage with readers and

experiment with new forms of storytelling and voice." *Social Media Guidelines for the Newsroom*, N.Y. Times (June 21, 2024), https://perma.cc/M2T9-J2DX. NBC News has a dedicated "group of reporters who specialize in using social media to find, verify and report on different stories" and who serve "as digital first responders, sourcing and verifying videos and photos showing the news as it unfolded in real time." *How to Use Social Media for Newsgathering*, NBC News (Oct. 5, 2021), https://perma.cc/PB3Z-4SS5. In a 2022 survey, 75, 79, and 49 percent of polled journalists reported that social media has, respectively, helped them find stories, cultivate sources, and verify information. Jeffrey Gottfried et al., *Journalists Sense Turmoil in Their Industry Amid Continued Passion for Their Work*, Pew Rsch. Ctr. (June 14, 2022), https://perma.cc/46R7-PY2D. As social media provides members of the public with an immediate voice, posts often inform press coverage on developing stories – including natural disasters or other emergency situations. *See* Eli Langer, *The Five-Year Anniversary of Twitter's Defining Moment*, CNBC (Jan. 15, 2014), https://perma.cc/E6EG-DXUT (describing how a Twitter user was the first to post images of the emergency landing of United Flight 1549 in New York City, which quickly became known as the 'Miracle on the Hudson'). As journalists may not be immediately present on the ground in emergencies, they necessarily rely on information initially posted online by witnesses. *See* Nicola Bruno, *Tweet First, Verify Later? How Real-Time*

9

*Information is Changing Coverage of Worldwide Crisis Events* 14 (Reuters Inst. for the Study of Journalism 2011), https://perma.cc/RS57-H2EB (during the 2010 earthquake in Haiti, normal "communication channels [were] out of order in the areas hit hardest by the earthquake" and "the major media outlets which were still without correspondents on the ground quickly resorted to Twitter as a reliable source for their news-gathering").

Section 230's protections allow this kind of public interest newsgathering to occur, while empowering platforms to moderate potentially harmful content without fear of state civil or criminal liability.

## II. By intruding on Section 230's protections for hosts of online content, AB 2655 endangers newsgathering and core journalistic functions.

AB 2655, if allowed to stand, would constrain the press, in turn leaving the public less informed on issues of political importance. By permitting liability for third-party content in contravention of Section 230's protections, even news organizations not directly affected by the law will be impacted.

AB 2655 addresses the use of materially deceptive, digitally created or modified content connected with California elections by imposing three regulations on "large online platforms." Cal. Elec. Code § 20513–20515. First, platforms must "develop and implement procedures for the use of state-of-the-art techniques to identify and remove [covered] materially deceptive content" reported by users. Cal. Elec. Code § 20513. Second, platforms must "develop and implement

10

procedures for the use of state-of-the-art techniques to identify materially deceptive content and for labeling such content" reported by users.  Cal. Elec. Code § 20514.  And third, platforms must "provide an easily accessible way for California residents to report to that platform [covered] content that should be removed . . . or labeled."  Cal. Elec. Code § 20515.  Put simply, AB 2655 requires platforms to go through the difficult process of identifying content that a "reasonable person" would consider to be authentic and then (1) remove that content, (2) label that content in cases where removal is not mandated, and (3) allow users to report content they believe is covered under the statute.

Large platforms covered by AB 2655 are not limited to social media companies but instead include any "public-facing internet website, web application, or digital application . . . that had at least 1,000,000 California users during the preceding 12 months."  Cal. Elec. Code § 20512.  This broad definition could potentially apply directly to members of the news media – including small or independent outlets – that publish widely read materials.  *See, e.g.*, Mark Glaser, *6 Ways Local News Makes a Crucial Impact Covering COVID-19*, Medium (Apr. 20, 2020), https://tinyurl.com/2s4k9rw6 (detailing how a small online publisher, *The Batavian*, garnered 1.3 million views and went viral after creating a Coronavirus Community Support Map highlighting "food distribution from schools, medical centers, food pantries, blood drives, business support services and

11

more"). Faced with these statutory requirements, the press may be chilled from publishing reports on, or enabling online comment sections about, content that could implicate AB 2655.

Though AB 2655 purports to exempt "regularly published online newspaper[s], magazine[s], or other periodical[s] of general circulation" as well as "broadcasting station[s]," Cal. Elec. Code § 20519(a)-(b), such language is inadequate. It applies only when an outlet includes "a clear disclosure that the materially deceptive content does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct." *Id.* Beyond the potential First Amendment concerns raised by this compelled disclosure provision, *see Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (permitting only the compelled disclosure of "factual and uncontroversial" information even in the context of commercial advertising), it suffers from the additional problem that reporters may not immediately be able to tell even with reasonable diligence whether a piece of content is materially deceptive. *See* Joel Golby, *I Thought I Was Immune to Being Fooled Online. Then I Saw the Pope in a Coat*, The Guardian (Mar. 27, 2023), https://perma.cc/MH4G-77X8. Verification of digitally modified content can also often take experts weeks and occasionally requires the examination of hash values or applying complex geometry and mathematical principles to assess light sources and corresponding shadowing. The statutory

12

carveout for broadcasting stations airing "bona fide newscast[s], news interview[s], news documentar[ies], commentary of general interest, or on-the-spot coverage of bona fide news events" is similarly flawed, as it requires the outlet to identify covered content and include "clear[] acknowledge[ment] through content or a disclosure" that the material is inauthentic.  Cal. Elec. Code § 20519.

These statutory carveouts would also fail to prevent the indirect harms AB 2655 could impose on the press.  Even when not themselves subject to the law, as described *supra*, the press relies on large social media platforms to both circulate and gather news.  News stories shared on the internet – either by the outlets themselves or interested readers – could face state-mandated removal if they reproduce purportedly covered material.  *See e.g.*, Stuart A. Thompson & Tiffany Hsu, *Trump Elevates Once-Fringe Meme Makers to the Mainstream*, N.Y. Times, (Nov. 20, 2025),  https://tinyurl.com/n5c67njm (reproducing politically motivated deepfakes in the context of reporting).  Indeed, as AB 2655 requires platforms to "provide an easily accessible way for [any] California resident[] to report materially deceptive content," individuals – including candidates or officials who may be the subject of unflattering news coverage involving digitally created or modified content – could report news stories shared over social media in an effort to suppress them.  Those reports would trigger a requirement for the platform to remove the post "within 36 hours of [the report's] submission."  Cal. Elec. Code §

13

20515(a). If the candidate or official disagrees with an outlet's decision that the material does not qualify under the law, the candidate can seek injunctive or other equitable relief in court.

The statute could also prompt platforms to remove potentially newsworthy posts in the first instance, denying reporters the opportunity to examine such content entirely. This risk is particularly significant because several of the statute's key terms are difficult to define or apply in practice. The statute targets materially deceptive content – but identifying such content necessarily requires platforms to make difficult, if not impossible, determinations about how content will be understood by hypothetical audiences. *See* Cal. Elec. Code § 20512 (defining materially deceptive content to include digitally created content that would "falsely appear to a reasonable person to be an authentic record of the content depicted in the media"). While inherently challenging, this calculus is even less certain because today's digital audiences span not only age and education, but also media literacy. *See* R. Kelly Garrett et al., *Too Many People Think Satirical News Is Real*, Ohio State. Univ. (Aug. 16, 2019), https://tinyurl.com/rh8rr8c5 (discussing research showing audience members have often misinterpreted Stephen Colbert's political commentary as sincere); Susanna Kim, *All the Times People Were Fooled by The Onion*, ABC News (June 1, 2015), https://tinyurl.com/4twfkcpz (recalling how former FIFA vice president Jack Warner cited to an *Onion* article following

14

his indictment for corruption). Relatedly, while the statute exempts instances of "satire or parody" from its provisions, Cal. Elec. Code § 20519, satirical or parodical speech is often heavily contextual and subjective. There is no single watermark for satire or parody, and even courts have struggled to identify the boundaries of these concepts in other contexts. *See, e.g.*, *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 57 (1988).

In short, AB 2655 would force hosts of online content to remove or label content based on guesswork as to whether the "reasonable" audience member would perceive something as authentic. This requirement is untenable and could lead to over-moderation to avoid liability.

## III. AB 2655 threatens First Amendment protections for the exercise of editorial discretion.

California makes several related arguments to evade application of Section 230 that, if credited by the courts, could effectively gut core constitutional protections for online speech. Particularly troubling is that acceptance of these arguments would condone dangerous future intrusions by lawmakers at all levels of government and across the country on the editorial autonomy of the press. *Cf. Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 260 (1974) (White, J., concurring) ("[A]ny . . . system that would supplant private control of the press with the heavy hand of government intrusion . . . would make the government the censor of what the people may read and know.").

15

First, the State argues that because AB 2655 includes a blanket mandate that platforms remove or label materially deceptive content, a platform would not be exercising its editorial judgment in removing that or "substantially similar" content. *See* Def.'s Op. Br. 29, ECF. No. 19-1 (citing Cal. Elec. Code § 20513(c)). The government's fundamental argument is that, as the platforms are left with no choice as to how to deal with covered content, any sanctions derived from AB 2655 must result from activities other than publishing or speaking. But AB 2655 clearly impinges on traditional editorial functions: reviewing reported content (editorial review), determining whether it meets the statutory criteria (editorial judgment), deciding how to label it (editorial presentation), and, perhaps most importantly, making removal decisions (editorial control). "[R]emoving content is something publishers do," and this Court has consistently reiterated that "to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102, 1103 (9th Cir. 2009); *see also Fair Hous. Council of San Fernando Valley v. Roommates.com,* 521 F.3d 1157, 1170–71 (9th Cir. 2008); Jeff Kosseff, *The Twenty-Six Words that Created the Internet* 191 (Cornell Univ. Press 2019) ("If the central claim in a lawsuit against a website arises from user content, then it is difficult to rationalize how Section 230 would not apply."). In contrast to statutes that impose limited requirements on platforms to notify authorities when

they become aware of illegal content posted to their sites, AB 2655 clearly connects liability to *publishing* activity. *See Doe 1 v. Twitter*, *Inc.,* 148 F.4th 635 (9th Cir. 2025) (construing a notification requirement as not "require[ing] Twitter to...take any action associated with publication," because the statute did not mandate "removal . . . of the objectionable content").

California's argument that removal of materially deceptive content would implicate "no editorial discretion," Def.'s Op. Br. at 29, is also simply wrong: A platform's determination of what posts would be considered deceptive constitutes editorial choice. As argued *supra*, the statutory definitions of materially deceptive content – and the scope of the satire or parody exemption – can be subject to widely divergent interpretations depending on who is doing the interpreting. Publishers, including the news media, often exercise editorial judgment in assessing the legal risks of publishing content, but without protections for that editorial process, news reporting would become much more difficult.

Further, these assessments of legal exposure, and associated publication decisions, implicate the strong First Amendment protections for editorial choices by private speakers. *See* Lucas A. Powe Jr., *The Fourth Estate and the Constitution* 277 (Univ. of Cal. Press 1992) ("Because editorial autonomy is indivisible, it must be absolute."). In *Miami Herald v. Tornillo*, the Supreme Court assessed the nature of editorial decision-making in the context of the First

17

Amendment, concluding that the "choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials – whether fair or unfair – constitute the exercise of editorial control and judgment," 418 U.S. at 258, and protections for that activity must be "virtually insurmountable," *Id.* at 259 (White, J., concurring); *see also Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 135 (9th Cir. 1971) ("Appellant has not convinced us that the courts . . . should dictate the contents of a newspaper."); *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 424–25 (9th Cir. 2014) ("[W]here . . . an action directly targets the way a content provider chooses to deliver, present, or publish news content on matters of public interest, that action is based on conduct in furtherance of free speech rights."). California's conception of editorial choice is directly at odds with these constitutional boundaries, and crediting the State's argument here could open the door to future statutes that intrude on editorial decision-making.

Second, the State argues that AB 2655 would not interfere with editorial discretion because the law merely creates a *statutory* "duty to create a reporting process . . . and to respond to users' reports" by removing or labeling content. *See* Def.'s Op. Br. 2. But Section 230 preempts inconsistent state law, regardless of whether the source is state tort or state statutory law. 47 U.S.C. § 230(e)(3) ("No

18

cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."). And liability cannot not flow from protected publishing activity. For example, while a platform can be liable for breaching a contract independently requiring it to remove certain advertisements, this is because the contract "created a legal duty distinct from . . . its status as a publisher." *Calise v. Meta Platforms, Inc*., 103 F.4th 732, 744 (9th Cir. 2024) (applying Section 230 to preclude other claims that would generally require Meta "to actively vet and evaluate third party ads"). And a statute mandating that platforms label or remove content is manifestly connected to publishing. *Barnes*, 570 F.3d at 1102, 1103 ("[T]o impose liability on the basis of [content removal] necessarily involves treating the liable party as a publisher of the content it failed to remove."). Indeed, allowing states to characterize a law as simply imposing a statutory duty would render Section 230 toothless.

California's analogy to regulation of bookstores is unpersuasive. Such distributors can only be liable to the extent they knowingly distribute illegal materials, while AB 2655 imposes sanctions for failing to act on user reports, including, possibly, when the publisher independently determines that the material does not qualify as materially deceptive. Further, the requirement for platforms to remove other "substantially similar" material effectively mandates that hosts broadly review third-party content to flag those similarities. Cal. Elec. Code §

19

20513(c). In other words, despite the State's contention otherwise, the substantially-similar takedown mandate imposes a duty analogous to requiring bookstore owners to read every volume to guarantee that nothing is obscene, which has long been rejected as the basis of distributor liability. The report-and-remove requirement also again creates an incentive for platforms to err on the side of deleting third party content, rather than adopting new and innovative ways to moderate it – a concern motivating Section 230's enactment in the first place. 47 U.S.C. § 230(b)(4) (listing a statutory purpose "to remove disincentives for the development and utilization of blocking and filtering technologies").

In sum, California's litigation positions before this Court clearly illustrate how AB 2655, if permitted to enter into force, would cut to the heart of protections for an independent press in the United States and give the state a means to regulate content online in a way that could suppress news and commentary. Both Section 230 and the First Amendment prohibit that result.

## CONCLUSION

For the foregoing reasons, amici respectfully urge this Court to affirm the order of the District Court.

Dated: March 18, 2026                              Respectfully submitted,

                                                    */s/ Gabriel Rottman*
                                                    Gabriel Rottman

20

*Counsel of Record*
Lisa Zycherman*
Mara Gassmann*
THE REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1050
Washington, D.C. 20005
(202) 795-9300

Ian Kalish*
UNIVERSITY OF VIRGINIA LAW
    SCHOOL FIRST AMENDMENT CLINIC
580 Massie Road
Charlottesville, VA 22903
(202) 795-9316

*Of counsel*

21

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2026, I caused the foregoing Brief of Amici Curiae the Reporters Committee for Freedom of the Press and First Amendment Coalition to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send notices of such filing to all counsel of record.

/s/*Gabriel Rottman*
Gabriel Rottman
*Counsel of Record for Amici Curiae*

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** No. 25-6138

I am the attorney for *amici curiae* the Reporters Committee for Freedom of the Press and First Amendment Coalition.

**This brief contains 3,906 words,** excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

      [ ] it is a joint brief submitted by separately represented parties;
      [ ] a party or parties are filing a single brief in response to multiple briefs; or
      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/Gabriel Rottman*         **Date:** March 18, 2026