No. 25-6138

## In the United States Court of Appeals for the Ninth Circuit

THE BABYLON BEE, LLC, et al.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court for the Eastern District of California, No. 2:24-cv-02527-JAM-CKD The Honorable John A. Mendez

BRIEF OF *AMICI CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION AND TECHFREEDOM IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Ari Cohn
FOUNDATION FOR INDIVIDUAL RIGHTS
   AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20005
(215) 717-3473
ari.cohn@fire.org
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus* **Foundation for Individual Rights and Expression** has no parent corporation, it issues no stock, and no publicly-held corporation owns a ten-percent or greater interest in it.

*Amicus* **TechFreedom** has no parent corporation, it issues no stock, and no publicly held corporation owns a ten-percent or greater interest in it.

/s/ Ari Cohn

ii

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

INTEREST OF *AMICI CURIAE* ......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT..........................4

ARGUMENT ...............................................................................10

    I.   AB 2655 is Preempted by Section 230.............................10

          A.    AB 2655 Directly Compels Publisher Activity.....................12

          B.    California Cannot Strip Editorial Discretion and then Deny It Ever Existed .....................................................15

          C.    Section 230 Abrogates State Authority................................16

    II.  AB 2655 is an Unconstitutional Content-Based Speech Regulation .........................................................18

          A.    Regulation of Allegedly False Political and Election-Related Speech Must Satisfy Strict Scrutiny .....................................19

          B.    AB 2655 Cannot Withstand Strict Scrutiny ........................22

               1.    AB 2655 is not actually necessary to serve a compelling government interest....................................22

               2.    AB 2655 is Not Narrowly Tailored..............................24

               3.    AB 2655 is Not the Least Restrictive Means........28

CONCLUSION ............................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ...................................................................19

*Ashcroft v. ACLU,*
535 U.S. 564 (2002) ...................................................................20

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ...................................................................28

*Backpage.com, LLC v. Cooper,*
939 F. Supp. 2d 805 (W.D. Tenn. 2013)....................................16, 17

*Backpage.com, LLC v. McKenna,*
881 F. Supp. 2d 1262 (W.D. Wash. 2012).......................................9, 11

*Barnes v. Yahoo!, Inc.,*
570 F.3d 1096 (9th Cir. 2009) ........................................................7, 12

*Batzel v. Smith,*
333 F.3d 1018 (9th Cir. 2003) ......................................................10, 14

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) ...................................................................5, 22

*Burson v. Freeman,*
504 U.S. 191 (1992) ...................................................................21, 29

*Carafano v, Metrosplash.com, Inc.,*
339 F.3d 1119 (9th Cir. 2003) .........................................................11

*Citizens United v. FEC,*
558 U.S. 310 (2010) ...................................................................19, 20

*Commonwealth v. Lucas,*
34 N.E.3d 1242 (Mass. 2015) ................................................26, 27, 29

*Doe v. Internet Brands, Inc.,*
824 F.3d 846 (9th Cir. 2016) .............................................................13

*Dyroff v. Ultimate Software Grp. Inc.*,
   934 F.3d 1093 (9th Cir. 2019) .............................................................15

*Est. of Bride v. Yolo Technologies, Inc.*,
   122 F.4th 1168 (9th Cir. 2024)....................................................6, 7, 18

*Eu v. San Francisco County Democratic Central Comm.*, 489 U.S.
   214 (1989).........................................................................................20

*Grimmett v. Freeman*,
   59 F.4th 689 (4th Cir. 2023)........................................................26, 29

*McIntyre v. Ohio Elections Com'n*,
   514 U.S. 334 (1995) ...........................................................................28

*Meyer v. Grant*,
   486 U.S. 414 (1988) .....................................................................19, 20

*Moody v. NetChoice, LLC,*
   *603 U.S. 707 (2024)* ...........................................................................15

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .............................................................................5

*People v. White*,
   506 N.E.2d 1284 (Ill. 1987) ...............................................................28

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ...........................................................................20

*State v. 119 Vote No! Comm.*,
   957 P.2d 691 (Wash. 1998)................................................................22

*Susan B. Anthony List v. Driehaus*,
   814 F.3d 466 (6th Cir. 2016) .......................................................26, 27

*U.S. v. Alvarez*,
   567 U.S. 709 (2012) ..........................................20, 21, 22, 26, 28, 29

*Voicenet Commc'ns, Inc. v. Corbett*,
   No. CIV.A. 04-1318, 2006 WL 2506318 (E.D. Pa. Aug. 30, 2006) .......17

*Whitney v. California*,
274 U.S. 357 (1927) ...................................................................... 29

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ................................................ 11, 14, 18

**Statutes**

47 U.S.C. § 230(e)(3) ...................................................................... 12

Cal. Elec. Code § 20512(i) ................................................................ 6

Cal. Elec. Code § 20513 ............................................................... 6, 27

Cal. Elec. Code § 20515 ............................................................... 6, 26

**Other Authorities**

Adrienne LaFrance, *In 1858, People Said the Telegraph Was 'Too Fast for the Truth'*, THE ATLANTIC (July 28, 2014), https://bit.ly/4uoBevP ................................................................... 4

Bingbing Zhang, *'Inoculation' helps people spot political deepfakes, study finds*, THE CONVERSATION (Feb. 4, 2026), https://bit.ly/41d120B .................................................................. 30

Brief of Internet Law Scholars as *Amici Curiae* in Support of Respondents at 8–12, *Gonzalez v. Google*, 598 U.S. 617 (2023) .......... 14

Bryan Anderson, *Hines' Challenge raises question: If a robot quotes accurately, is an ad deceitful?*, WRAL NEWS (May 11, 2022), https://bit.ly/4saMiv0 ............................................................ 25

Clara Murray, *How we were deepfaked by election deepfakes*, FINANCIAL TIMES (Dec. 27, 2024), https://bit.ly/4bop4u9 .................... 23

*How worried should you be about AI disrupting elections?*, THE ECONOMIST (Aug. 31, 2023), https://bit.ly/3NnwB4s ........................... 24

Jonny Thomson, *People destroyed the printing presses out of fear*, BIG THINK (Apr. 6, 2023), https://bit.ly/40xcuDZ ................................ 4

Leo Rostein, THE JOYS OF YIDDISH (1968)....................................................8

Ramsey Touchberry, *Senate GOP uses James Talarico's words against him with deepfake attack ad*, WASHINGTON EXAMINER (Mar. 11, 2026), https://bit.ly/4sbtJXJ.................................................25

Sayash Kapoor & Arvind Narayanan, Knight First Amendment Institute, *We Looked at 78 Election Deepfakes. Political Misinformation Is Not an AI Problem*, TOWARD A BETTER INTERNET (Dec. 13, 2024), https://bit.ly/4rvo0us ................................24

Scott Babwah Brennen & Matt Perault, *The new political ad machine: Policy Frameworks for political ads in an age of AI*, CENTER ON TECHNOLOGY POLICY at 12–13 (Nov. 8, 2023), https://bit.ly/4bpoblf .............................................................24

Sheera Frankel, *The Year of the A.I. Election That Wasn't*, NY TIMES (Aug. 21, 2024), https://bit.ly/4rzEmTc .....................................24

Walter Karp, *Where the Media Critics Went Wrong*, 39 AMERICAN HERITAGE (Mar. 1998), https://bit.ly/4boD2wl ......................................5

## INTEREST OF *AMICI CURIAE**

The **Foundation for Individual Rights and Expression** (FIRE) is a nonpartisan nonprofit that defends the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to speakers' views through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights. *E.g.*, *NewsGuard Techs., Inc. v. FTC*, No. 1-26-cv-353 (D.D.C. filed Feb. 6, 2026); *Rosado v. Bondi*, No. 1:26-cv-01532 (N.D. Ill., filed Feb. 11, 2026). FIRE's work includes litigating to protect expressive rights in the digital realm—ensuring courts apply First Amendment protections consistently, and that they are not subverted or weakened based on misunderstandings or fears about emerging technologies. *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *Volokh v. James*, (2d Cir. 2025), *certification accepted*, No.

---

* No party's counsel authored any part of this brief. No one, apart from amici and their counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

1

124, 2025 WL 2646981 (N.Y. Sept. 16, 2025); *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575 (W.D. Tex. 2025), *appeal docketed* No. 25-50096 (5th Cir. Feb. 11, 2025); *see also* Brief of FIRE *et al.*, as *Amicus Curiae* in Support of Petitioners, *TikTok Inc. v. Garland*, 604 U.S. 56 (2025); Brief of FIRE as *Amicus Curiae* in Support of Respondents, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

Particularly relevant here, FIRE opposes unconstitutional government efforts to restrict speech on social media. FIRE attorneys represented NetChoice in challenging California's Age-Appropriate Design Code Act, *NetChoice v. Bonta*, --- F.4th ----, 2026 WL 694471 (9th Cir. Mar. 12, 2026), for example, and individual social media users in challenging Utah's Minor Protection in Social Media Act, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024). FIRE also has grave concerns about attempts to weaken or undermine the immunity provided by Section 230 of the federal Communications Act, 47 U.S.C. § 230, which has allowed the Internet to fulfill its promise of democratizing and safeguarding online expression. *See, e.g.*, Aaron Terr, *Why repealing or weakening Section 230 is a very bad idea*, FIRE (Feb. 20, 2023), https://bit.ly/4nWT3hl. And FIRE has actively opposed laws that would

limit the use of artificial intelligence to create or disseminate speech regarding political figures. *See, e.g.*, John Coleman, *Gov. Hochul's crackdown on AI-generated 'political speech' won't pass the First Amendment test*, N.Y. POST (Feb. 21, 2026), https://bit.ly/4urWrVH.

**TechFreedom** is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It opposes ever-evolving government meddling in online speech. See, e.g., Br. of TechFreedom, *NetChoice, LLC v. Fitch*, No. 25A97 (U.S., July 24, 2025) (opposing Mississippi social media age-verification law); Br. of TechFreedom, *Bonta v. NetChoice, LLC*, No. 23-2969 (9th Cir., Feb. 14, 2024) (opposing California social media "design" code); Br. of TechFreedom, *Moody v. NetChoice, LLC*, No. 22-277 (U.S., Dec. 7, 2023) (opposing Florida and Texas social media speech codes); Br. of TechFreedom & Prof. Eric Goldman, *Volokh v. James*, No. 23-356 (2d Cir., Sept. 25, 2023) (opposing New York social media "transparency" law).

AB 2655, the California statute at issue in this case, sits at the intersection of these concerns in requiring large social media platforms to remove "deceptively" edited digital media (deepfakes) of political

figures. In doing so, AB 2655 violates the First Amendment's core function of protecting democratic self-governance by enabling free and unfettered discussion of political affairs. And in defending its law, California asserts the novel authority to do exactly what nearly 30 years of jurisprudence has understood Section 230 to prohibit: regulating at the state level the third-party content online services are permitted to host.

## INTRODUCTION AND SUMMARY OF ARGUMENT

New forms of communication have always elicited concerns about their impact on the political landscape. The invention of the printing press posed a threat to the power of secular and ecclesiastical authorities, prompting a campaign of repression. *See* Jonny Thomson, *People destroyed the printing presses out of fear*, BIG THINK (Apr. 6, 2023), https://bit.ly/40xcuDZ. The telegraph was described as enabling the spread of "superficial" information that was "too fast for the truth." Adrienne LaFrance, *In 1858, People Said the Telegraph Was 'Too Fast for the Truth'*, THE ATLANTIC (July 28, 2014), https://bit.ly/4uoBevP. Radio and television were feared to be tools of propaganda and manipulation that reduced politics to soundbites and diminished the quality of political discussion and debate. *See* Walter Karp, *Where the Media Critics Went*

4

*Wrong*, 39 AMERICAN HERITAGE (Mar. 1998), https://bit.ly/4boD2wl. Today, fear that artificial intelligence will influence and even subvert American democracy motivates legislative efforts to curtail its use.

The cyclical nature of these concerns reflects a fundamental truth: Wherever there are politics, there will be puffery, hyperbole, and charges of falsity. But because "erroneous statement is inevitable in free debate," we have chosen to protect such speech to give our expressive freedoms "the breathing space they need to survive." *New York Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964) (cleaned up). Yet California has let fear get the better of it. Rather than hewing to the bedrock principles of free expression, which have proven out through all prior rounds of technical advancement and "do not vary when a new and different medium for communication appears," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (cleaned up), the state now asserts breathtaking authority to regulate and censor political speech that it deems insufficiently true.

California enacted AB 2655, which regulates "deceptive" digital media, or "deepfakes," of political candidates and elected officials online. The law requires "platforms"—that is, any online service (including

5

search engines) with more than 1,000,000 California users—to create a mechanism for reporting "materially deceptive content," Cal. Elec. Code § 20515, defined as "audio or visual media … digitally created or modified … such that it would falsely appear to a reasonable person to be an authentic record of the content depicted …." Cal. Elec. Code § 20512(i).

If posted within 120 days before an election, platforms must not only field the reports but remove any reported and verified "materially deceptive content" that depicts, *inter alia*, a candidate for office doing or saying anything "reasonably likely to harm the[ir] reputations or electoral prospects," or an elected official "doing or saying something that influences an election in California … that is reasonably likely to falsely undermine confidence in the outcome …." Cal. Elec. Code § 20513.

The district court properly held federal law preempts AB 2655, which is also an unconstitutional content-based speech regulation. Specifically, Section 230 immunizes interactive computer services from liability that would treat them as the publisher or speaker of third-party content, 47 U.S.C. §230(c)(1), "preempting even the will of the people as expressed in their state legislatures" through enacted statutes. *Est. of Bride v. Yolo Technologies, Inc.*, 122 F.4th 1168, 1177 (9th Cir. 2024.

6

Section 230 prohibits exactly this kind of state-by-state regulation to protect the Internet's speech-enabling capabilities and to foreclose speech-chilling liability on service providers that would ultimately chill Americans' online speech.

In contending that AB 2655 does not impose publisher liability and is thus not preempted by Section 230, California offers various convoluted, confused, and ultimately self-defeating arguments. It distorts this Court's analytical framework, intended to ensure that only claims deriving from a publisher's functions are immunized, *Est. of Bride*, 112 F.4th at 1176, by asserting that requiring platforms to remove content does not involve "publication decisions." But that is *exactly* how Section 230(c)(1) operates. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (immunity accrues for "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online") (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com*, LLC, 521 F.3d 1157 (9th Cir. 2008)).

7

And with what can only be described as "chutzpah,"[1] California asserts that because AB 2655 strips platforms of editorial discretion over the regulated content, there is no publisher liability for AB 2655 to impose, and thus none for Section 230 to preempt. That is, Section 230 operates on the premise that a publisher *decides* whether to host or exclude content, and since AB 2655 doesn't give platforms any choice—it forces them to exclude specified content—the law does not treat them as publishers. In effect, California argues it can override federal law by regulating away the very activity that law protects—a claim as "creative" as it is wrong.

And the State compares AB 2655 to offline regulation of child sexual abuse material (CSAM), arguing that Congress did not intend to curtail states' regulatory authority to regulate platforms' distribution of online content. That ignores not only that such preemption is a primary purpose of Section 230, but also that Section 230 preempts application of state CSAM regulations to platforms for hosting third-party content. *See*

---

[1] *See* Leo Rostein, THE JOYS OF YIDDISH 93 (1968) (Chutzpah is "that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan").

*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273–75 (W.D. Wash. 2012) (Section 230 preempted state criminal CSAM law aimed at online service providers).

While Section 230 immunity and First Amendment protection are distinct issues, California's evasion of the former relies on the incorrect assumption that its law passes muster under the latter. California defends AB 2655 as an extension of state authority to regulate the offline distribution of illegal material like CSAM. But this argument makes logical sense only if AB 2655 doesn't unconstitutionally regulate protected speech—and, to be clear, AB 2655 regulates constitutionally protected speech, and the First Amendment protects the editorial discretion that California freely admits to infringing. This serves only to demonstrate that covered platforms *are* engaged in publisher activity, *contra* the State's rhetorical sleight-of-hand. California thus finds itself in a "heads I lose, tails you win" position: To avoid Section 230, it effectively admits to violating the First Amendment.

AB 2655 is also plainly an unconstitutional content-based speech regulation. Justified only by the questionable government interest in protecting voters from false ideas—without any evidence of an existing

9

problem—it curtails even *true* speech about candidates in a broad period of time before elections. Fearing that citizens need the government to dictate to them what is true or false—without even giving them a chance to decide for themselves—California has used what must be a last resort as its first one.

## ARGUMENT

### I.    AB 2655 is Preempted by Section 230

AB 2655 is precisely the type of state regulation that Section 230 was enacted to foreclose, and California's argument to the contrary ignores Section 230's plain text, demonstrable purpose, and well-established jurisprudence. Much to the State's apparent disbelief, Section 230 was a deliberate congressional choice to treat the Internet differently by "overrid[ing] the traditional treatment of publishers, distributors, and speakers under statutory and common law." *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003). Its authors recognized that laws, regulations, and doctrines developed for a system where mass communications were reserved for the elite few are not easily transposed to a world where anyone can transmit their thoughts, instantaneously and for free, to a global audience. Subjecting online speech to the same,

10

jurisdictionally varied legal regimes as offline communication would stymie the development of these new, far-reaching, and accessible modes of communication. Section 230 thus exhibits a policy preference towards protecting the Internet's promise of democratized, vibrant, and unfettered discourse.

Congress intended this preference to subordinate not only traditional tort liability principles, but state regulatory authority as well. *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122–23 (9th Cir. 2003) (Congress incorporated into Section 230's text its understanding that the Internet would best flourish "with a minimum of government regulation"); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("Section 230 was enacted, in part, to maintain the robust nature of Internet communications, and, accordingly, to keep government interference in the medium to a minimum."); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1273–75 (W.D. Wash. 2012) (invalidating state criminal CSAM law aimed at online service providers under Section 230).

This treatment is operationalized by Section 230(c)(1), which provides: "No provider or user of an interactive computer service shall be

11

treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). This Court has explained that this provision immunizes platforms (among other parties) from any liability for third-party content that is derived from their exercise of traditional publisher functions—reviewing, editing, and deciding whether to publish or to withdraw content. *Barnes*, 570 F.3d at 1102. Section 230 specifically preempts liability under any state law—whether tort, regulatory, or criminal—that is inconsistent with this immunity. 47 U.S.C. § 230(e)(3).

California resists this, arguing that requiring platforms to remove content does not touch on their publishing functions. But each of its arguments fails, as they must, because the removal (or non-removal) of content is the essence of publishing by any definition of the word.

## A. AB 2655 Directly Compels Publisher Activity

California distorts this Court's Section 230 jurisprudence, arguing that the lower court erroneously imposed a "but-for" test for immunity when it held that requiring platforms to remove political deepfakes treats them as the publishers of that content. Not so.

12

This Court, to avoid immunizing activity that does not truly touch on a platform's editorial functions, has rejected efforts to claim Section 230 immunity that rest on the bare argument that the harm would not have occurred without third-party content. *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (Section 230 does not create unbounded immunity "for businesses that publish user content on the internet, though any claims might have a marginal chilling effect on internet publishing businesses"). But the state can find no traction in that body of law, as AB 2655 does not operate on the bare presence of third-party content—it requires platforms to engage in the specific publisher activity of reviewing and removing third-party content, under penalty of law.

Section 230 "was enacted to protect websites against the evil of liability for failure to remove offensive content," such that a law requiring platforms "to remove any user content" is precluded by Section 230. *Id.* at 851–52 (quoting *Roomates.com, LLC*, 521 F.3d at 1174). And there is nothing "but-for" about Section 230's preemption of AB 2655. California's law imposes the most direct form of publisher liability possible by

13

instructing platforms to engage in specific publisher activity and subjecting them to liability if they do not.

Finally, California offers a convoluted argument that AB 2655's mandate does not "spring from" a platform's status as a publisher because the statute "is indifferent as to whether a platform is a common-law publisher or distributor," AOB at 27. This argument fails because "Congress has indeed spoken directly to the issue by employing the legally significant term 'publisher,' … encompass[ing] distributors and original publishers alike." *Zeran*, 129 F.3d at 334. *See also Batzel*, 333 F.3d at 1026 (Section 230(c)(1) "overrides the traditional treatment of publishers, distributors, and speakers under statutory and common law"); Brief of Internet Law Scholars as *Amici Curiae* in Support of Respondents at 8–12, *Gonzalez v. Google*, 598 U.S. 617 (2023) ("Congress incorporated and preempted legal theories that would extend liability from content creators to secondary distributors."). AB 2655's indifference to which types of entities it regulates is immaterial. If the law requires online platforms to remove third-party content—and it indisputably does—it treats them as publishers and is preempted by Section 230.

14

### B. California Cannot Strip Editorial Discretion and then Deny It Ever Existed

California also cannot avoid Section 230 preemption by asserting that in stripping online publishers of all editorial discretion—*i.e.*, they *must* remove deepfakes—AB 2655 does not treat them as publishers because they do not get to decide whether to publish at all. Here, California undermines its own argument while running directly into the First Amendment.

A law does not cease to regulate editorial judgment because that same law abolishes the freedom to exercise it. Quite the opposite: it proves the law *does exactly that*. Just as states cannot recast platforms' editorial discretion as "censorship" to avoid triggering the First Amendment, *Moody*, 603 U.S. 707 (2024), California cannot first regulate away the publisher function, only then to retroactively deny its existence and deny Section 230 immunity. The State offers no coherent reason why liability for violating a state statute that requires content removal is materially different from liability for breaching a duty in state tort law by not removing harmful content. Section 230 preempts both. *See Dyroff v. Ultimate Software Grp. Inc.*, 934 F.3d 1093 (9th Cir. 2019) (Section 230 precluded tort claims alleging website's recommendations and

15

notifications led to user's drug purchase and subsequent overdose); *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (W.D. Tenn. 2013) (invalidating statute making it a crime for online services to knowingly host certain third-party ads depicting minors in commercial sex). Hiding the liability behind (or within) a statute does not change its basis. In short, AB 2655's removal of platforms' editorial discretion *is* liability based on traditional publisher functions that Section 230 preempts.

## C. Section 230 Abrogates State Authority

California runs headlong into itself by arguing that rather than treating platforms as publishers, AB 2655 is an exercise of state authority to regulate "knowing distribution of harmful or illicit materials" similar to a prohibition on physical bookstores knowingly selling CSAM. AOB at 29–31. This argument proves too little *and* too much.

As a threshold matter, comparing AB 2655's restriction on political deepfakes to CSAM fails in the conception. States can regulate CSAM in the first instance because it is unprotected by the First Amendment. But as discussed below, political deepfakes are generally entitled to First

16

Amendment protection—rendering the state's regulatory authority over them very different indeed. So the analogy fails on its own terms.

But beyond that, California ignores that Section 230 limits state regulation of even unprotected, illegal third-party content hosted by platforms. *See Cooper*, 939 F. Supp. 2d 805 (state law criminalizing sale of sex-oriented advertisements preempted by Section 230); *Voicenet Commc'ns, Inc. v. Corbett*, No. CIV.A. 04-1318, 2006 WL 2506318 (E.D. Pa. Aug. 30, 2006) (same). California cites its offline authority as evidence that Congress did not intend to supplant state authority to regulate "illegal" content, arguing: "Nothing … suggests that Congress intended to grant online platforms a special exemption from such general regulations, one that not even their brick-and-mortar common-law distributor counterparts enjoy." AOB at 30. But, putting aside, again, that that is irrelevant to constitutionally protected deepfakes, it is also *precisely* what Congress meant to do. Section 230 creates a uniform body of law for the Internet to avoid a patchwork of state laws that would hinder innovation and stifle the Internet's speech-enabling effects. It "represents the approach of Congress to a problem of national and international dimension" and reflects "Congress' desire to promote

17

unfettered speech on the Internet." *Zeran*, 129 F.3d at 334; *see also Est. of Bride*, 112 F.4th at 1176–77. Section 230 preempts "even the will of the people as expressed in their state legislatures." *Id.*

The State cites Section 230(e)'s exceptions in an effort to show Congress did not intend to limit state power to regulate platforms' distribution of harmful materials online. AOB at 30–31. But Section 230 indicates the opposite by excluding from the broad immunity conferred only *federal* criminal law. California's oblique reference to Section 230(e)(5)—added 20 years after Section 230 was initially enacted to create an exception to preemption for state criminal charges for conduct that would violate certain federal sex-trafficking statues—demonstrates the self-defeating nature of the State's argument. Congress added Section 230(e)(5) *because* it understood that Section 230 otherwise preempts state prosecutions, just as it preempts AB 2655.

## II. AB 2655 is an Unconstitutional Content-Based Speech Regulation

AB 2655 illustrates why government efforts at "enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism" under the

18

First Amendment. *Anderson v. Celebrezze*, 460 U.S. 780, 798 (1983). California, fearing without evidence its citizens might be incapable of discerning truth from falsity, has decided the ordinary course dictated by constitutional principles is too slow. It now thus claims for itself the sweeping power to ban speech about political affairs that it deems insufficiently truthful for 120 days before any election. The First Amendment does not permit such shortcuts.

Speech regarding candidates for office is of the highest constitutional concern. *See, e.g., Citizens United v. FEC*, 558 U.S. 310, 339–40 (2010); *Meyer v. Grant*, 486 U.S. 414, 425 (1988). Only upon an exceedingly strong showing that a law is necessary and appropriately tailored can the government invade the electorate's right to speak and decide what political information is true or false for itself. *281 Care Comm. v. Arneson*, 766 F.3d 774, 784 (8th Cir. 2014). California falls far short of making any such showing here for AB 2655.

### A. Regulation of Allegedly False Political and Election-Related Speech Must Satisfy Strict Scrutiny

False speech is not categorically excluded from First Amendment protection, even if it is a component of some categories of unprotected

19

speech like fraud or defamation. As the Supreme Court explained in *U.S. v. Alvarez*, 567 U.S. 709, 718 (2012) (plurality), "false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation." The government thus cannot restrict or punish speech based solely on falsity, *id*. at 719, and in fact "has no power to restrict expression because of its message, its ideas, or its content" whatsoever. *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up). Such content-based speech regulations are presumptively unconstitutional and subject to strict scrutiny, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), which AB 2655 cannot withstand.

Free and unfettered discourse regarding political affairs and campaigns for public office is a fundamental prerequisite to our prized democratic self-governance. *Citizens United*, 558 U.S. at 339. Accordingly, First Amendment protection is "at its zenith" for core political speech, *Meyer*, 486 U.S. at 425, and has its "fullest and most urgent application to speech uttered during a campaign for public office." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989).

20

Speech restrictions are therefore perhaps most suspect when they regulate the content of political speech and attempt to determine for the polity what political information is true or false. The right, and civic duty, to evaluate such speech rests with the electorate, *Alvarez*, 567 U.S at 728 (plurality), and regulation of "what is said or distributed during an election … goes beyond an attempt to control the process to enhance the fairness overall so as to carefully protect the right to vote." *Arneson*, 766 F.3d at 787.

Because of the dangers of allowing the government to operate as a political Ministry of Truth, laws regulating the content of election-related speech must satisfy strict scrutiny. *See Arneson*, 766 F.3d at 784. The government therefore bears an exceptionally heavy burden: it must prove that its restriction is necessary to serve a compelling government interest, is narrowly tailored to serve that interest, and is the least restrictive means of achieving its stated goal. *Burson v. Freeman*, 504 U.S. 191, 198 (1992). California cannot do so here with respect to AB 2655.

## B. AB 2655 Cannot Withstand Strict Scrutiny

### 1. AB 2655 is not actually necessary to serve a compelling government interest

It is questionable whether there is a legitimate, let alone compelling, government interest in protecting the public from false speech, including "deepfakes," during political campaigns. Such an interest "is patronizing and paternalistic. It assumes the people … are too ignorant or disinterested to investigate, learn, and to determine for themselves the truth or falsity in political debate." *State v. 119 Vote No! Comm.*, 957 P.2d 691, 698–99 (Wash. 1998) (cleaned up). "Society has the right and civic duty to engage in open, dynamic, national discourse," *Alvarez*, 567 U.S. at 728 (plurality), and "it is the citizenry that can discern for themselves what the truth is, not [government]." *Arneson*, 766 F.3d at 793.

But even if there is a compelling interest, the remedy must be "actually necessary" to achieve it. *Alvarez*, 567 U.S. at 725 (plurality). Government must identify an actual problem in need of solving," and demonstrate a "direct causal link" between the harm to be prevented and the regulation. *Brown*, 564 U.S. at 799. And it must present empirical

22

evidence of an existing, rather than speculative, risk that false statements will cause cognizable harm:

> We have never accepted mere conjecture as adequate to carry a First Amendment burden . . . . Such conjecture about the effects and dangers of false statements equates to implausibility . . . because, when the statute infringes core political speech, we tend not to take chances.

*Arneson*, 766 F.3d at 790–91 (government did not satisfy its burden when it relied on "common sense" to justify its conclusion that political advertising designed to induce voting behavior based on false facts can influence votes and change election results).

Yet California offers only conjecture, arguing "bad actors now *have the power to* create a false image," "such media … *can* skew election results," and, ostensibly "[v]oters *will not know* what … they can trust." AOB at 10. The State does not claim, or attempt to prove, there is a real risk these things *will* happen, or that the ultimate harm it fears will manifest, nor does it allege past political deepfakes have ever caused such harms.

California's speculation is unsurprising, as no evidence suggests deepfakes have had a meaningful impact on domestic elections at all. *See*

23

Clara Murray, *How we were deepfaked by election deepfakes*, FINANCIAL TIMES (Dec. 27, 2024), https://bit.ly/4bop4u9; Sayash Kapoor & Arvind Narayanan, Knight First Amendment Institute, *We Looked at 78 Election Deepfakes. Political Misinformation Is Not an AI Problem*, TOWARD A BETTER INTERNET (Dec. 13, 2024), https://bit.ly/4rvo0us; Sheera Frankel, *The Year of the A.I. Election That Wasn't*, NY TIMES (Aug. 21, 2024), https://bit.ly/4rzEmTc. And there is little material evidence that deceptive digital media influences voters. *How worried should you be about AI disrupting elections?*, THE ECONOMIST (Aug. 31, 2023), https://bit.ly/3NnwB4s. In fact, a review of current research also finds that the persuasive impact of misinformation and political ads in general appears to be relatively minor. Scott Babwah Brennen & Matt Perault, *The new political ad machine: Policy Frameworks for political ads in an age of AI*, CENTER ON TECHNOLOGY POLICY at 12–13 (Nov. 8, 2023), https://bit.ly/4bpoblf. California's defense of AB 2655 under strict scrutiny founders out of the gate.

### 2. AB 2655 is Not Narrowly Tailored

California's law exhibits textbook tailoring failures common in laws regulating electoral speech, reaching far more speech than is justified by

the state's ostensible concerns. A law is not narrowly tailored if it "sweep[s] too broadly" and restricts more speech than necessary to achieve the government's interest. *Arneson*, 766 F.3d at 787. AB 2655 is overinclusive in nearly every way: It regulates a vast amount of speech, including true messages, speech that contains non-material falsehoods, and communications unrelated to politics altogether. And it does so for a far broader time than the interest California asserts would justify.

First, AB 2655 requires platforms to remove substantially *true* messages based on non-material, technical falsehoods. Deepfakes can be used to highlight a candidate's prior written statements. *See, e.g.*, Ramsey Touchberry, *Senate GOP uses James Talarico's words against him with deepfake attack ad*, WASHINGTON EXAMINER (Mar. 11, 2026), https://bit.ly/4sbtJXJ; Bryan Anderson, *Hines' Challenge raises question: If a robot quotes accurately, is an ad deceitful?*, WRAL NEWS (May 11, 2022), https://bit.ly/4saMiv0. But even where accurately reflecting a candidate's own words, AB 2655 censors such videos merely because the candidate wrote them, while the "deepfake" depicts the candidate speaking them. This prohibition of true messages alone renders AB 2655 unconstitutional. *See Grimmett v. Freeman*, 59 F.4th 689, 694 (4th Cir.

2023) (state cannot punish true statements made with reckless disregard).

Compounding the problem, AB 2655 extends to potentially reputation-harming content about a candidate even if unrelated to politics entirely (*e.g.*, a post from a neighbor about a property line dispute). "Penalizing non-material statements, particularly those made outside the political arena, is not narrowly tailored." *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 475 (6th Cir. 2016).

Second, laws regulating false speech are not narrowly tailored when they restrict speech posing minimal risk of harm. *See Alvarez*, 567 U.S. at 736 (Breyer, J., concurring) (Stolen Valor Act applied "in family, social, or other private contexts, where lies will often cause little harm"); *Commonwealth v. Lucas*, 34 N.E.3d 1242, 1255 (Mass. 2015) ("[i]t reaches not only those statements that are widely disseminated … but also those exchanged between two friends").

AB 2655 requires platforms to remove even speech that might pose only the smallest risk of reputational harm, like a private message or a post in a small online community. But AB 2655 does not require the

potential *harm* to be material—materiality pertains only the nature of the editing—so platforms must remove it. *Compare*, Cal. Elec. Code § 20515 (using materiality in the context of whether media has been edited to appear to be an "authentic record") *with*, Cal. Elec. Code § 20513 ("reasonably likely to harm" reputation or electoral prospects as the harm-related trigger). And even if it did, platforms—worried that initially low-risk content might later go viral—will still be incentivized to remove any content that could later trigger AB 2655.

Finally, AB 2655 is over-inclusive in its temporal breadth—censoring speech in the 120 days preceding an election. Laws regulating election-related speech are not narrowly tailored when they restrict speech beyond a very limited time before an election. In *Driehaus*, the Supreme Court invalidated a prohibition on disseminating false information about candidates in campaign materials for the duration of the campaign. 814 F.3d at 474; *see also Lucas*, 34 N.E.3d at 1254–55 (invalidating a false-election-speech law covering the length of a candidacy and applied in the case at bar to speech occurring within a month of an election). That's because, the further in time from an election, the more effective counterspeech is—and the less justifiable

27

regulation becomes. *See McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 352 (1995) (invalidating under First Amendment a state ban on distributing anonymous campaign literature that applied "not only to leaflets distributed on the eve of an election, when the opportunity for reply is limited, but also to those distributed months in advance"). Here, regulating speech up to four months before an election is not tailored to any "concern that the public could be misinformed and an election swayed on the strength of an eleventh-hour anonymous smear campaign to which the candidate could not meaningfully respond." *People v. White*, 506 N.E.2d 1284, 1288 (Ill. 1987). AB 2655 is accordingly unconstitutional.

### 3. AB 2655 is Not the Least Restrictive Means

California also cannot prove AB 2655 is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). When a law regulates the truth and falsity of political speech, that analysis will nearly always begin and end with counterspeech. "The remedy for speech that is false is speech that is true. That is the ordinary course in a free society." *Alvarez*, 567 U.S. at 727 (plurality). Justice Brandeis best described the First Amendment's command nearly a

28

century ago: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

The government's burden to disprove the efficacy of counterspeech is high where it seeks to regulate core political speech. "[S]tatutes broadly suppressing false statements about candidates or ballot questions cannot withstand strict scrutiny for the simple reason that '[o]ur constitutional election system already contains the solution to the problem …. That solution is counterspeech." *Lucas*, 34 N.E.3d at 1253; Indeed, "there is no greater arena wherein counterspeech is at its most effective" than in the political context. *Arneson*, 766 F.3d at 793; *see also Alvarez*, 567 U.S. at 738 (Breyer, J., concurring) ("I would also note, like the plurality, that in [the political arena] more accurate information will normally counteract the lie."); *Grimmett*, 59 F.4th at 695 ("Public officials and public figures . . . have a more realistic opportunity to counteract false statements."). *Contrast Burson v. Freeman*, 504 U.S. 191 (1992)

29

(upholding limitations on electioneering within 100 feet of the entrance to a polling place on election day).

There are precious few circumstances where the "tried and true buffer and elixir" of counterspeech will be inadequate, *Arneson*, 766 F.3d at 793; and California does not credibly assert one here. While the Internet allows false information to spread farther and faster, the same must be equally so for corrective responses. And counterspeech is <u>already</u> working: Fears and growing awareness of political deepfakes have resulted in their rapid detection, discussion, and refutation. *See, e.g.*, Bingbing Zhang, *'Inoculation' helps people spot political deepfakes, study finds*, THE CONVERSATION (Feb. 4, 2026), https://bit.ly/41d120B.

Beyond relying on counterspeech, if California wishes to act, it can create civic and digital literacy educational programs or consider initiatives that respond to misinformation. But what it may not do is short-circuit public discussion on the most important speech to our form of government, on the unfounded and unproven assumption that citizens will make the wrong decisions. Curtailing free and unfettered discussion about politics is no way to protect our democracy.

30

## CONCLUSION

California cannot avoid the application of either Section 230 or the First Amendment—and its efforts to do so confirm that each dooms AB 2655. It treats platforms as publishers of third-party content by prohibiting them from hosting it—in direct conflict with the statutory text and purpose of Section 230. And it censors a broad swath of core political speech based on speculative fears that voters will be powerless in the face of false information—a chilling affront to First Amendment rights. This Court should affirm.

Dated: March 18, 2026   Respectfully Submitted,

         By: /s/ Ari Cohn

           Ari Cohn
           FOUNDATION FOR INDIVIDUAL
            RIGHTS AND EXPRESSION
           700 Pennsylvania Avenue SE
           Suite 340
           Washington, DC 20003
           (215) 717-3473
           ari.cohn@fire.org

## CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed R. App. P. 29(a)(5) because it contains 5,775 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ Ari Cohn
Ari Cohn
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ari.cohn@fire.org

32

## CERTIFICATE OF SERVICE

On March 18, 2026, a copy of this brief was filed and served on all

registered counsel through the Court's CM/ECF system.

/s/ Ari Cohn
Ari Cohn
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
(215) 717-3473
ari.cohn@fire.org